**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

US VC PARTNERS GP LLC;
US VC PARTNERS MANAGEMENT, LLC;
ISRAELI VC PARTNERS LTD.;
ISRAELI VC PARTNERS MANAGEMENT,
LLC;
CN ODYSSEY GP LLC;
CN MAPANYTHING GP LLC;
SPARROW CAPITAL HOLDINGS LLC;
AUDUBON LOAN FUNDING GP LLC;
CN PARTNERS LLC; and
ANDREW INTRATER,

<em>Plaintiffs</em>,

v.

UNITED STATES DEPARTMENT OF THE
TREASURY, OFFICE OF FOREIGN ASSETS
CONTROL;
THE HONORABLE STEVEN MNUCHIN, in
his official capacity as the Secretary of the
United States Department of the Treasury; and
ANDREA GACKI, in her official capacity as
the Director of the United States Department of
the Treasury's Office of Foreign Assets Control,

<em>Defendants</em>.

---

19 Civ. 6139

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs US VC Partners GP LLC; US VC Partners Management, LLC; Israeli VC

Partners Ltd.; Israeli VC Partners Management, LLC; CN Odyssey GP LLC; CN MapAnything

GP LLC; Sparrow Capital Holdings LLC; Audubon Loan Funding GP LLC; CN Partners LLC;

and Andrew Intrater (collectively, "Plaintiffs"), in support of their complaint against Defendants

the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"); Steven

Mnuchin, in his official capacity as the Secretary of the United States Department of the Treasury;

and Andrea Gacki in her official capacity as the Director of the United States Department of the

Treasury's Office of Foreign Assets Control (collectively, "Defendants"), hereby allege as follows:

## INTRODUCTION

1.      This lawsuit arises out of the warrantless seizure and ongoing interference with property interests of United States citizens by the Government through the operation of economic sanctions programs directed at foreign nationals.  The harm to Plaintiffs, who are United States citizens or entities wholly-owned by United States citizens, has been magnified by the failure of the Government to issue authorizations to permit Plaintiffs to exercise their property rights. Specifically, OFAC has seized and continues to deprive Plaintiffs of their ability to use, control and manage certain investment funds (the "Investment Funds") and the assets held by the Investment Funds, and to collect money that is due to Plaintiffs from the Investment Funds.  OFAC has done so without any hearing or finding of wrongdoing by Plaintiffs, and without disputing that Plaintiffs are not themselves subject to sanctions.

2.      On April 6, 2018, OFAC imposed economic sanctions against Viktor Vekselberg ("Vekselberg"), Renova Group, a/k/a JSC Renova Group of Companies ("Renova"), and other Russian individuals and companies.  According to OFAC, the sanctions were imposed pursuant to an Executive Order that then-President Barack Obama issued in 2014, and the Countering America's Adversaries Through Sanctions Act.  The sanctions prohibited dealing in (or "blocked") the sanctioned parties' assets that are subject to U.S. jurisdiction, and by anyone subject to U.S. jurisdiction.

3.      As described more fully below, the Investment Funds at issue are jointly owned by certain Plaintiffs and, indirectly, by Vekselberg and/or Renova.  Certain other Plaintiffs are management companies retained to manage the Investment Funds.

4.      Pursuant to certain regulations discussed in more detail below, OFAC contends that the sanctions imposed on Vekselberg and Renova extend to the Investment Funds because Vekselberg and/or Renova holds a 50% or greater ownership interest in each Investment Fund at

issue.  Specifically, OFAC deems any entity in which a sanctioned person (a "Specially Designated National" or "SDN") has a 50% or greater ownership interest to be sanctioned or "blocked" as if that entity itself were an SDN (the "50% Rule").  *See* Ukraine Related Sanctions Regulations, 31 CFR § 589.406.  Because OFAC takes the position that a majority of the interests in the Investment Funds are owned indirectly by Vekselberg and/or Renova, Plaintiffs' property interests in the Investments Funds were seized by OFAC on April 6, 2018.

5.       Although OFAC has issued general regulations outlining administrative procedures to obtain the return of property blocked by reason of mistaken identity, *see* 31 C.F.R. §§ 501.806, 589.501, and to permit sanctioned persons to obtain a reconsideration of their designation on a sanctions list, *see* 31 C.F.R. § 501.807, OFAC has promulgated no rules by which U.S. persons or entities may seek return of or access to property interests subject to sanctions by reason of the 50% Rule.  The sole administrative remedy provided by OFAC in such circumstances is to apply for a license from OFAC that authorizes specific activities otherwise prohibited by its sanctions or regulations.

6.       Thus, beginning on April 16, 2018, in response to Defendants' seizure of Plaintiffs' property, Plaintiffs sought licenses from OFAC authorizing them to (i) manage and otherwise deal in their investments, and (ii) collect proceeds from the investments on behalf of the Investment Funds, and collect Plaintiffs' shares of those proceeds and the management fees due to them.  In their applications for such authorization, Plaintiffs committed to ensuring that none of the funds collected would be provided to any SDN.  For example, to the extent an SDN is entitled to proceeds from an investment, Plaintiffs made clear that they would place those proceeds in a blocked account.

7.       From April 16, 2018 to April 30, 2019, Plaintiffs submitted a series of specific

license applications, and numerous amendments and consolidations to those applications.  Despite repeated follow up inquiries with OFAC, with the exception of one aspect of a limited emergency application that is not a subject of this lawsuit,[1] and permission to pay a fraction of the expenses Plaintiffs owe to third-party service providers (including legal fees),[2] Defendants have neither granted nor denied Plaintiffs' applications.  Plaintiffs remain in complete limbo, unable to control, manage, use, or dispose of their property.

8.     Moreover, none of OFAC's rules, regulations, or public guidance provides any limit on the time within which OFAC must act on a license application by U.S. citizens to either unblock—and thereby effectively return—property seized from U.S. citizens, or to grant a license to permit U.S. citizens to manage and control their property that is subject to sanctions by reason of OFAC's 50% Rule.  Nor do OFAC's regulations set forth any legal standards that the agency must follow in determining whether to grant or deny license applications by U.S. citizens for the return of their property.

---

[1] On July 26, 2018, OFAC issued a specific license to Sparrow Capital (formerly known as Renova U.S. Management LLC d/b/a Columbus Nova) and certain of its affiliates authorizing them to sell holdings in a cryobank company (the "Cryobank License").  Sparrow Capital submitted the license application solely to the extent a license was required in the event that OFAC took the position that such a sale was prohibited because of the relevant entities' relationships with a trust that was settled by Vekselberg.  Plaintiffs have no reason to believe that Vekselberg has any interest in the relevant property or that such a license was necessary, and submitted the license application out of an abundance of caution.  Indeed, the license application, which sought additional relief beyond that granted by the Cryobank License, was subsequently withdrawn because, upon further review, Sparrow confirmed its understanding that neither Vekselberg nor any other SDN has an interest in the relevant trust, and that the property held by that trust is therefore not blocked.

[2] As discussed more fully below, on April 12, 2019, OFAC granted a license to US VC Partners, L.P. and Plaintiff US VC Partners Management, LLC to pay a fraction of their legal fees, and to engage in wind-down and negotiation activities in connection with assets blocked as a result of the designation of Vekselberg and/or Renova as SDNs, but not to dispose of or otherwise recover any portion of their own property.  Likewise, on May 31, 2019, OFAC granted Plaintiff Sparrow Capital Holdings LLC ("Sparrow Capital") a license to collect a limited amount of funds from the sale of a portfolio company that was minority-owned by a blocked Investment Fund that Sparrow Capital manages, so that Sparrow Capital could pay a small portion of the expenses it owes to legal and other professional service providers.  However, OFAC denied both Sparrow Capital's request to collect the management fees it is due, and Plaintiff CN MapAnything GP LLC's request to receive the portion of the proceeds from the sale of the portfolio company to which it is entitled as the general partner of the relevant Investment Fund.

9.     Defendants' complete, indefinite, and potentially permanent interferences with Plaintiffs' property interests are unreasonable seizures that violate the United States Constitution's Fourth Amendment.  By depriving Plaintiffs—innocent U.S. parties that have not been named as SDNs—of their property rights without any hearing, or finding of wrongdoing by Plaintiffs, and failing to provide an adequate administrative procedure or other means by which Plaintiffs can obtain the return of their property, Defendants have also violated Plaintiffs' rights under the Due Process Clause of the United States Constitution's Fifth Amendment.

## PARTIES

10.     Plaintiff US VC Partners GP LLC ("USVCP-GP") is the general partner of US VC Partners, L.P. ("USVCP").  USVCP is a multi-stage, technology Investment Fund that invests in equity and debt securities of domestic and international businesses.  USVCP-GP is a limited liability company organized under the laws of Delaware, and its principal place of business is 400 Madison Avenue, Suite 11A, New York, New York 10017.  USVCP-GP is 100% owned by United States citizens.  No SDN or any entity blocked pursuant the 50% Rule has any interest in, or control over, USVCP-GP.

11.     Plaintiff US VC Partners Management, LLC ("USVCP Management") is an investment management company with its principal place of business at 400 Madison Avenue, Suite 11A, New York, New York 10017.  USVCP Management is a limited liability company organized under the laws of Delaware.  USVCP Management is 100% owned by United States citizens.  No SDN or any entity blocked pursuant the 50% Rule has any direct or indirect ownership interest in, or control over, USVCP Management.

12.     Plaintiff Israeli VC Partners Ltd. ("IVCP-GP") was the general partner of Israeli VC Partners L.P. ("IVCP") until September 26, 2018, at which point IVCP-GP became a limited partner of IVCP.  IVCP is a multi-stage, technology Investment Fund that invests in equity and

debt securities of domestic and international businesses. The principal place of business of IVCP-GP is 400 Madison Avenue, Suite 11A, New York, New York 10017. IVCP-GP is a corporation organized under the laws of the Cayman Islands. IVCP-GP is 100% owned by United States citizens. No SDN or any entity blocked pursuant the 50% Rule has any direct or indirect ownership interest in, or control over, IVCP-GP.

13.  Plaintiff Israeli VC Partners Management, LLC ("IVCP Management") is an investment management company with its principal place of business at 400 Madison Avenue, Suite 11A, New York, New York 10017. IVCP Management is a limited liability company organized under the laws of Delaware. IVCP Management is 100% owned by United States citizens. No SDN or any entity blocked pursuant the 50% Rule has any direct or indirect ownership interest in, or control over, IVCP Management.

14.  Plaintiff CN Odyssey GP LLC ("CN Odyssey-GP") is the general partner of CN Odyssey Fund LP ("CN Odyssey LP"). CN Odyssey LP is an Investment Fund that was invested, through its wholly-owned subsidiary CN Odyssey LLC, in equity securities of Portfolio Company A. CN Odyssey-GP is a limited liability company organized under the laws of Delaware. The principal place of business of CN Odyssey-GP is 400 Madison Avenue, Suite 11A, New York, New York 10017. CN Odyssey-GP is 100% owned by United States citizens. No SDN or any entity blocked pursuant the 50% Rule has any interest in, or control over, CN Odyssey-GP.

15.  Plaintiff CN MapAnything GP LLC ("CN MapAnything-GP") is the general partner of CN MapAnything LP. CN MapAnything LP is an Investment Fund that is invested in equity securities of Portfolio Company B. CN MapAnything-GP is a limited liability company organized under the laws of Delaware. The principal place of business of CN MapAnything-GP is 400 Madison Avenue, Suite 11A, New York, New York 10017. CN MapAnything-GP is 100%

owned by United States citizens.  No SDN or any entity blocked pursuant the 50% Rule has any interest in, or control over, CN MapAnything-GP.

16.     Plaintiff Sparrow Capital Holdings LLC ("Sparrow Capital") is an investment management company with its principal place of business at 400 Madison Avenue, Suite 11A, New York, New York 10017.  Sparrow Capital is a limited liability company organized under the laws of Delaware.  Sparrow Capital is 100% owned by United States citizens.  Sparrow Capital was formerly known as Renova U.S. Management, which did business under the name Columbus Nova.  No SDN or any entity blocked pursuant the 50% Rule has any direct or indirect ownership interest in, or control over, Sparrow Capital.

17.     Plaintiff Audubon Loan Funding GP LLC ("Audubon-GP") is the general partner of the Audubon Road Loan Funding LP ("Audubon Road"), which is the majority owner of Audubon Loan Funding, LLC ("Audubon LLC").  Audubon LLC is an Investment Fund that was formed for the sole purpose of providing, and whose sole material assets were, loans to three U.S. borrowers who were heirs (the "Heirs") to the estate of the deceased musical artist Prince Rogers Nelson ("Prince").  Audubon-GP is a limited liability company organized under the laws of Delaware.  The principal place of business of Audubon-GP is 400 Madison Avenue, Suite 11A, New York, New York 10017.  Audubon-GP is 100% owned by United States citizens.  No SDN or any entity blocked pursuant the 50% Rule has any interest in, or control over, Audubon-GP.

18.     Plaintiff CN Partners LLC ("CN Partners") is an investment management company with its principal place of business at 400 Madison Avenue, Suite 11A, New York, New York 10017.  CN Partners is a limited liability company organized under the laws of Delaware.  CN Partners is 100% owned by United States citizens.  No SDN or any entity blocked pursuant the 50% Rule has any direct or indirect ownership interest in, or control over, CN Partners.

19.     Plaintiff Andrew Intrater ("Intrater") is a United States citizen and resident of New York County, New York.  Intrater is not an SDN.

20.     Defendant the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC") is an office within the United States Department of the Treasury located at United States Department of the Treasury, 1500 Pennsylvania Avenue, N.W., Washington, D.C., 20220.

21.     Defendant Steven Mnuchin ("Mnuchin") is sued in his official capacity as the Secretary of the United States Department of the Treasury.  Pursuant to Executive Order 13662, Mnuchin, is his capacity as Secretary of the Treasury, is responsible for designating the persons who are blocked under that order.

22.     Defendant Andrea Gacki ("Gacki") is sued in her official capacity as the Director of the United States Department of the Treasury's Office of Foreign Assets Control.  Pursuant to the Secretary of the Treasury's power to delegate authority under 31 C.F.R. § 589.802, Gacki is responsible for designating persons blocked under Executive Order 13662.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution and the Administrative Procedure Act.

24.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B) and (C).

25.     This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and its inherent equitable powers.

26.     Sovereign immunity is waived under 5 U.S.C. § 702.

## FACTUAL BACKGROUND

### I.   Regulatory Background and the Sanctions

27.     Pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C § 1701 *et seq.*, the President is granted authority "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat."

28.     Under those circumstances, 50 U.S.C. § 1702(a)(1)(B) provides that, "the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise . . .

> investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any ***property in which any foreign country or a national thereof has any interest*** by any person, or with respect to any property, subject to the jurisdiction of the United States

(emphasis added).

29.     On March 20, 2014, the President issued Executive Order 13662 titled *Blocking Property of Additional Persons Contributing to the Situation in Ukraine*, to expand the scope of Executive Orders 13360 and 13361, issued on March 6, 2014 and March 16, 2014, respectively (collectively, "the Ukraine-Related Executive Orders").

30.     Executive Order 13362 blocked "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person" of any persons operating in certain sectors of the Russian Federation Economy (as determined by the Secretary of the Treasury, in

consultation with the Secretary of State) from being "transferred, paid, exported, withdrawn, or otherwise dealt in."

31.     Executive Order 13662 provides that its prohibitions include but are not limited to "(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and (b) the receipt of any contribution or provision of funds, goods, or services from any such person."

32.     The Ukraine-Related Executive Orders are codified at 31 C.F.R. § 589.201.  Note 1 to 31 C.F.R. § 589.201 provides that, "[t]he names of persons designated pursuant to the Ukraine-Related Executive Orders, whose property and interests in property therefore are blocked pursuant to this section, are published in the Federal Register and incorporated into OFAC's Specially Designated Nationals and Blocked Persons List."

33.     Under 31 C.F.R. § 589.204(b), "[p]roperty blocked pursuant to § 589.201 may, in the discretion of OFAC, be sold or liquidated and the net proceeds placed in a blocked interest-bearing account in the name of the owner of the property."

34.     An OFAC guidance document dated August 13, 2014 and titled *Revised Guidance on Entities Owned By Persons Whose Property and Interests in Property Are Blocked* (the 50% Rule) advises that:

> Persons whose property and interests in property are blocked pursuant to an Executive order or regulations administered by OFAC (blocked persons) are considered to have an interest in all property and interests in property of an entity in which such blocked persons own, whether individually or in the aggregate, directly or indirectly, a 50 percent or greater interest.  Consequently, any entity owned in the aggregate, directly or indirectly, 50 percent or more by one or more blocked persons is itself considered to be a blocked person.  The property and interests in property of such an entity are blocked regardless of whether the entity itself is listed in the annex

to an Executive order or otherwise placed on OFAC's list of Specially Designated Nationals ("SDNs").   Accordingly, a U.S. person generally may not engage in any transactions with such an entity, unless authorized by OFAC.

35.     The 50% Rule is codified at 31 C.F.R. § 589.406, which likewise provides:

A person whose property and interests in property are blocked pursuant to § 589.201 has an interest in all property and interests in property of an entity in which it owns, directly or indirectly, a 50 percent or greater interest.  The property and interests in property of such an entity, therefore, are blocked, and such an entity is a person whose property and interests in property are blocked pursuant to § 589.201, regardless of whether the name of the entity is incorporated into OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List").

36.     OFAC's 50% Rule constitutes "final agency action" as that term is used in the Administrative Procedure Act.  *See* 5 U.S.C. § 704.

37.     On April 6, 2018, pursuant to Executive Order 13662, as well as two other Executive Orders and the Countering America's Adversaries Through Sanctions Act, OFAC designated 24 individuals and 12 companies as SDNs.  As a result of the designations, all assets of the SDNs subject to U.S. jurisdiction were frozen.  By application of the 50% Rule, the assets of U.S. citizens who were minority owners of entities ultimately owned by an SDN in a proportion greater than 50% were similarly blocked.

38.     Among the SDNs designated pursuant to Executive Order 13662 were Vekselberg and Renova.  Pursuant to the 50% Rule, if Vekselberg and/or Renova owns at least 50% of an entity, that entity is blocked as if it were an SDN.

39.     OFAC has the authority to issue "general licenses," which, under specified terms and conditions, permit transactions and activities that are otherwise prohibited by OFAC's regulations or sanctions programs administered by OFAC.  *See* 31 C.F.R. §§ 501.801, 589.501.

40.     On April 6, 2018, OFAC issued General License 12, titled *Authorizing Certain*

*Activities Necessary to Maintenance or Wind Down of Operations or Existing Contracts*, which authorized transactions and activities ordinarily incident and necessary to maintain or wind down operations, contracts, or other agreements involving a number of SDNs, including Renova and any entity owned 50 percent or more by Renova.  OFAC clarified the authorizations in General License 12 in three subsequent general licenses:  (i) General License 12A on April 23, 2018; (ii) General License 12B on May 1, 2018; and (iii) General License 12C on May 22, 2018.  Each of those general licenses replaced, and superseded in full, the version of the general license that preceded it, such that, when General License 12C was issued it was the only effective version of the license. General License 12C expired at 12:01 a.m. eastern daylight time on June 5, 2018.

## II.    The U.S. Plaintiffs' Relationships with SDNs

### A.    The Investment Funds Majority-Owned by RIT

41.    Renova Innovation Technologies, Ltd. ("RIT") is the sole limited partner of the Investment Funds USVCP and CN Odyssey LP, and one of the limited partners of IVCP.  Pursuant to USVCP's, IVCP's, and CN Odyssey LP's partnership agreements, RIT's limited partnership interests entitle it to a majority of the proceeds of USVCP, IVCP, and CN Odyssey LP, respectively.

42.    OFAC takes the position that RIT is ultimately owned in a proportion greater than 50% by Renova, which is an SDN designated by OFAC on April 6, 2018.  Thus, pursuant to the 50% Rule, OFAC deems RIT blocked as if it were itself an SDN.

43.    Pursuant to OFAC's 50% Rule, because RIT possesses a majority interest in each of USVCP, IVCP, and CN Odyssey LP, OFAC deems those Investment Funds blocked as if they themselves were SDNs.

### 1.   **USVCP**

44.     Plaintiff USVCP-GP is entitled to a minority share of the proceeds of the Investment Fund USVCP, and controls USVCP as its general partner.

45.     Plaintiff USVCP Management is the management company for USVCP.   In exchange for a quarterly management fee, USVCP Management provides USVCP with, among other services, day-to-day managerial and administrative services.   USVCP-GP and USVCP Management are owned and controlled by U.S. citizens.

46.     USVCP is a minority investor in other companies, which are often referred to as "portfolio companies."   Upon information and belief, none of the portfolio companies in which USVCP has invested is itself subject to OFAC sanctions.

47.     The chart below shows Plaintiffs' understanding of the general structure of the ownership interests and principal contractual obligations among Plaintiffs USVCP-GP, USVCP Management; RIT; the Investment Fund USVCP; and the portfolio companies in which USVCP invests.



### 2.   **IVCP**

48.     Plaintiff IVCP-GP is entitled to a minority share of the proceeds of the Investment Fund IVCP, originally as its general partner until September 26, 2018, and now as a limited partner. Until September 26, 2018, IVCP-GP controlled IVCP as its general partner.

49.     Plaintiff IVCP Management was the management company for IVCP until September 26, 2018.  In exchange for a quarterly management fee, IVCP Management provided IVCP with, among other services, day-to-day managerial and administrative services.  IVCP-GP and IVCP Management are owned and controlled by U.S. citizens.

50.     IVCP is a minority investor in portfolio companies.  Upon information and belief, none of the portfolio companies in which IVCP has invested is itself subject to OFAC sanctions.

51.     The chart below shows Plaintiffs' understanding of the general structure of the ownership interests and principal contractual obligations among Plaintiffs IVCP-GP, IVCP Management; RIT; the Investment Fund IVCP; and the portfolio companies in which IVCP invests.



### 3. **CN Odyssey LP**

52.     Plaintiff CN Odyssey-GP is entitled to a minority share of the proceeds of the Investment Fund CN Odyssey LP, and controls CN Odyssey LP as its general partner.

53.     Plaintiff Sparrow Capital is the management company for CN Odyssey LP.  In exchange for a quarterly management fee, Sparrow Capital provides CN Odyssey LP with, among other services, day-to-day managerial and administrative services.  CN Odyssey-GP and Sparrow Capital are owned and controlled by U.S. citizens.

54.     CN Odyssey LP was invested, through its wholly-owned subsidiary CN Odyssey LLC, in a single portfolio company—Portfolio Company A.  Upon information and belief, Portfolio Company A is not itself subject to OFAC sanctions.

55.     The chart below shows Plaintiffs' understanding of the general structure of the ownership interests and principal contractual obligations among Plaintiffs CN Odyssey-GP and Sparrow Capital; RIT; the Investment Fund CN Odyssey LP; CN Odyssey LLC (a direct, wholly-owned subsidiary of CN Odyssey LP); and Portfolio Company A, prior to the disposition pursuant to licenses granted to Portfolio Company A, discussed below in paragraphs 152-155.



**B.** **The Investment Funds Majority-Owned by Weft**

56.     OFAC takes the position that Vekselberg ultimately owns greater than 50% of Weft Global Ltd. ("Weft").  Because OFAC designated Vekselberg as an SDN on April 6, 2018, pursuant to the 50% Rule, OFAC deems Weft blocked as if it were itself an SDN.

**1.** **CN MapAnything LP**

57.     Weft is the sole limited partner of the Investment Fund CN MapAnything LP. Pursuant to CN MapAnything LP's partnership agreement, Weft's limited partnership interest entitles it to a majority of the proceeds of CN MapAnything LP.

58.     Pursuant to OFAC's 50% Rule, because Weft possesses a majority interest in CN MapAnything LP, OFAC deems CN MapAnything LP blocked as if it were itself an SDN.

59.     Plaintiff CN MapAnything-GP is entitled to a minority share of the proceeds of the Investment Fund CN MapAnything LP, and controls CN MapAnything LP as its general partner.

60.     Plaintiff Sparrow Capital is the management company for CN MapAnything LP. In exchange for a quarterly management fee, Sparrow Capital provides CN MapAnything LP with, among other services, day-to-day managerial and administrative services.  CN MapAnything-GP and Sparrow Capital are owned and controlled by U.S. citizens.

61.     CN MapAnything LP was invested in a single portfolio company—Portfolio Company B.  Upon information and belief, Portfolio Company B is not itself subject to OFAC sanctions.

62.     The chart below shows Plaintiffs' understanding of the general structure of the ownership interests and principal contractual obligations among Plaintiffs CN MapAnything-GP and Sparrow Capital; Weft; the Investment Fund CN MapAnything LP; and Portfolio Company B.



2. **Audubon**

63.     Weft wholly-owns Audubon Loan Funding Inc. ("Audubon Inc."), which is the sole limited partner of the Investment Fund Audubon Road.  Audubon Road is the majority owner of the Investment Fund Audubon LLC.  Pursuant to Audubon Road's partnership agreement, Audubon Inc.'s limited partnership interest entitles it to a majority of the proceeds of Audubon Road.

64.     Pursuant to OFAC's 50% Rule, because Weft wholly-owns Audubon Inc., OFAC deems Audubon Inc. blocked as if it were itself an SDN.  Because Audubon Inc. possesses a majority interest in Audubon Road, OFAC deems Audubon Road blocked as if it were itself an SDN.  And because Audubon Road possesses a majority interest in Audubon LLC, OFAC deems Audubon LLC blocked as if it were itself an SDN.

65.     Plaintiff Audubon-GP is entitled to a minority share of the proceeds of the Investment Fund Audubon Road through Audubon Road's majority ownership of the Investment Fund Audubon LLC.  Audubon-GP controls Audubon Road as its general partner.  Plaintiff Intrater owns 50% of Audubon-GP.  The other 50% of Audubon-GP is owned by U.S. Citizen 1.

66. Plaintiff CN Partners is the management company for Audubon Road. In exchange for a quarterly management fee, CN Partners provides Audubon Road with, among other services, day-to-day managerial and administrative services. Audubon-GP and CN Partners are owned and controlled by U.S. citizens.

67. Plaintiff Intrater and U.S. Citizen 1 are each entitled to a minority share of the proceeds of Audubon LLC, and control Audubon LLC as its managing members.

68. Audubon LLC was formed for the purpose of providing, and its sole material assets were, loans to three Heirs to the estate of Prince. Upon information and belief, none of the Heirs to Prince's estate is subject to OFAC sanctions.

69. The chart below shows Plaintiffs' understanding of the general structure of the ownership interests and principal contractual obligations among Plaintiffs Audubon-GP, CN Partners, and Intrater; U.S. Citizen 1; Weft; the Investment Funds Audubon Road and Audubon LLC; and the Heirs to Prince's estate.



### III.   The Specific License Applications

70.     In addition to general licenses, individuals and entities may apply to OFAC to obtain "specific licenses" to engage in transactions otherwise prohibited by OFAC's regulations or sanctions programs administered by OFAC.  *See* 31 C.F.R. §§ 501.801, 589.501.

71.     Beginning on April 16, 2018 and continuing through April 30, 2019, Plaintiffs submitted a series of specific license applications, and numerous amendments and consolidations, to OFAC seeking to collect proceeds and management fees that they are due, and manage their assets to prevent declines in value.  Plaintiffs have repeatedly expressed the urgency of the applications and followed up to inquire regarding the status of each application.  But OFAC has neither granted nor denied Plaintiffs' applications,[3] and Plaintiffs are left in limbo without information about when OFAC might act on their applications and whether it will do so at all.  All the while, Plaintiffs are deprived of their rights to control, manage, use, dispose of, and otherwise enjoy their property, which in many cases has caused the value of Plaintiffs' investments and other assets to decline in value.  This interference with Plaintiffs' property is a seizure under the Fourth Amendment.  The seizure is ongoing and indefinite—and potentially permanent—because none of OFAC's rules, regulations, or public guidance provides any limit on the time within which OFAC must act on a license application by U.S. citizens to either unblock—and thereby effectively return—property seized from U.S. citizens, or to grant a license.  Regardless of the reasonableness of the initial seizures by OFAC, the continuing seizures with no time limit is constitutionally unreasonable.

---

[3] With the exception of the limited licenses discussed *supra* at nn. 1-2.

A. **The Audubon License Application**

72.     On April 13, 2018, prior to the expiration of General License 12, counsel for Plaintiffs submitted a letter to OFAC (the "April 13, 2018 Letter") requesting that OFAC "issue guidance confirming that General License 12 . . . extends to activities with entities in the United States that are 50 percent or more owned by Viktor Vekselberg, even if they are outside the ownership structure of the Renova Group."  The letter alternatively requested "that OFAC amend General License 12 to expressly cover" such entities.  OFAC assigned the April 13, 2018 Letter the case number UKRAINE-EO13662-2018-352329-1.

73.     On April 16, 2018, counsel for Plaintiffs submitted a letter to OFAC (the "April 16, 2018 Letter") to supplement the requests in the April 13, 2018 Letter.  The April 16, 2018 Letter reiterated the request to expand General License 12 to apply to entities located in the United States that were believed to be owned in a proportion greater than 50 percent by Vekselberg, but outside the ownership structure of Renova, and identified examples of such entities, including Audubon LLC.  The letter further stated:

> In the alternative, if OFAC elects to handle these scenarios through specific licensing instead of an expansion of General License No. 12, we request that the facts presented herein be used by OFAC as the basis for a specific license authorizing U.S. persons to deal with Aud[u]bon [LLC] . . . to the same extent and subject to the same limitations and reporting requirements as set forth in General License No. 12.

74.     OFAC neither expanded General License 12 as requested in the April 13, 2018 Letter and in the April 16, 2018 Letter, nor granted or denied the specific license requested in the April 16, 2018 Letter.

75.     On May 2, 2018, Plaintiff Intrater and U.S. Citizen 1 submitted a specific license application to OFAC (the "Audubon License Application") seeking authorization for "[U.S. Citizen 1], Mr. Intrater, and other U.S. persons to engage in activities ordinarily incident and

necessary to the maintenance and operation of Audubon LLC and the existing loans between Audubon LLC and the Borrowers," *i.e.*, the Heirs to Prince's estate.  Specifically, they requested that OFAC "allow activities ordinarily incident and necessary to the maintenance and operation [of] Audubon LLC, including activities":  (i) "by Audubon LLC and its agents to communicate with the Borrowers regarding the Loans"; (ii) "by Audubon LLC and its agents to receive payments from the Borrowers, and deposit such payments in [a specified bank account]"; and (iii) "by the Borrowers to perform under the loans, including by prepaying or repaying amounts due under the Loans."  OFAC assigned the Audubon License Application the case number UKRAINE-EO13662-2018-352800-1.

76.     The Audubon License Application explained that Prince passed away on April 21, 2016.  Because Prince did not have a will when he passed away, his heirs were unable to take immediate possession of his estate.  On May 18, 2017, six individuals were adjudicated heirs to Prince's estate.  However, pursuant to applicable law, a one-year statute of limitations period had to expire before they could receive assets from the estate.

77.     Prior to the imposition of sanctions, three of the heirs (all of whom are U.S. persons) received three rounds of loans from Audubon LLC.  *First*, on or about January 11, 2017, while the identity of Prince's heirs was still being adjudicated, the three presumptive Heirs entered agreements to receive an initial round of loans from Audubon LLC using money provided by Plaintiff Intrater and U.S. Citizen 1.

78.     *Second*, in June 2017, Audubon LLC provided a second round of loans to two of the three Heirs.  The third of the three Heirs received a second loan from Audubon LLC in November 2017.  The loans that Audubon LLC provided to the Heirs in June 2017 and November 2017 were funded using money from Plaintiff Intrater and U.S. Citizen 1 (who are members of

Audubon LLC and sole owners of Audubon-GP), as well as by Audubon Inc. (which is 100% owned by Weft, an entity that OFAC believes to be ultimately owned in a proportion greater than 50% by Vekselberg).

79.     *Third*, on or about December 26, 2017, the Heirs entered agreements to receive a third round of loans from Audubon LLC that were secured by the Heirs' respective interests in Prince's estate.  The loans provided to the Heirs in December 2017 were funded by Audubon Inc.

80.     As explained in the Audubon License Application, the one-year statute of limitations waiting period for the Heirs to receive assets from Prince's estate was set to expire on May 18, 2018.  The application detailed that, pursuant to the terms of Audubon LLC's loans to the Heirs, "one or more of the Borrowers may be required . . . to repay Audubon LLC amounts due under the Loans as early as May 18, 2018."  Thus, "[b]ecause an OFAC specific license would be required for Audubon LLC to receive payments from the Borrowers, for the Borrowers to perform, and avoid defaulting, under the Loans, for Audubon LLC to manage the Loans, and for the parties to the Loans to otherwise deal in and maintain the Loans," the Audubon License Application asked "that OFAC issue its decision on this emergency request before May 18, 2018."

81.     The Audubon License Application attested that "[e]ach of Audubon LLC, Audubon Inc., [Audubon Road], [Audubon-GP], and CN Partners commits that in conducting the activities described above, no funds would be distributed to, and no transactions or dealings would otherwise involve, any person on the SDN list – including Mr. Vekselberg – or any entity directly or indirectly owned 50% or more by any such person . . . ."  It further provided that "all profits beyond operating expenses, debt service, and management fees will be maintained in a blocked account," and that "[e]ach of Audubon LLC, Audubon Inc., [Audubon Road], [Audubon-GP], and CN Partners is prepared to accept additional safeguards or oversight required by OFAC, including

periodic reporting and accounting of funds."

82.     On October 23, 2018, Plaintiff Intrater and U.S. Citizen 1 submitted an amendment to the Audubon License Application to OFAC "to request that OFAC also provide authorization for [U.S. Citizen 1] and Intrater to withdraw distributions from Audubon LLC to which they are contractually entitled."  Specifically, if OFAC granted the Audubon License Application to allow Intrater and U.S. Citizen 1 to communicate on behalf of Audubon LLC "with and receive Loan payments from the Borrowers" (*i.e.* the Heirs to Prince's estate), Intrater and U.S. Citizen 1 "would like to at that time withdraw from Audubon LLC funds to which they are contractually entitled as members of Audubon LLC and sole owners of [Audubon-GP]."

83.     The October 23, 2018 amendment detailed that, as of September 30, 2018, the total amount outstanding, inclusive of principal, interest, and fees, on loans that Audubon LLC provided to the three Heirs was $3,522,015, $3,501,413, and $3,398,043, respectively (*i.e.*, a total of $10,421,471).  It explained, however, that without OFAC authorization, Plaintiff Intrater, U.S. Citizen 1 (and Audubon-GP and CN Partners) were "unable to exercise their rights as lenders, meaning they have been unable to communicate with the Borrowers, work with the Borrowers to refinance or renegotiate [the] Loans, or engage with potential new lenders or investors who might seek to participate in the Loans."  It further explained that Intrater and U.S. Citizen 1 were unable to make investment and management decisions to preserve the value of their investment in Audubon LLC, or "to receive Loan payments from the Borrowers to recoup or profit from that investment."

84.     The October 23, 2018 amendment reiterated that Plaintiff Intrater and U.S. Citizen 1 committed that "no funds would be distributed to any person on the SDN list – including Mr. Vekselberg – or any entity controlled, or directly or indirectly owned 50% or more, by any such

person (such as [Audubon Road] or Audubon Inc.)."  It added that they were "prepared to accept additional safeguards or oversight required by OFAC, including reporting and accounting of funds."

85.    OFAC has not granted or denied the Audubon License Application as submitted on May 2, 2018, or as amended on October 23, 2018.

### B.    The Consolidated License Applications

#### 1.    The USVCP & IVCP License Application

86.    On May 3, 2018, USVCP-GP, USVCP Management, IVCP-GP, and IVCP Management submitted a specific license application to OFAC (the "USVCP & IVCP License Application") seeking "to undertake activities ordinarily incident and necessary to the maintenance (*i.e.*, management) of USVCP's and IVCP's investment positions and winding-down of the operations, contracts, and other agreements of USVCP and IVCP, to the extent not already authorized by General License 12B," including:

> a.    "The voting of shares and/or signing of documents which are required to be voted or signed by similarly situated owners of . . . [portfolio] companies to effectuate transactions affecting all such owners, in each case, which was not negotiated or otherwise arranged by, for or on behalf of any SDN";
>
> b.    "In respect of currently held investment positions [in portfolio companies], to allow for the contribution of capital in relation thereto to the extent contractual obligations to contribute such monies existed prior to the sanctioning of Renova Group, which, if not contributed, could result in a material impairment to such investment positions";
>
> c.    "To allow for the consent to sell all ownership interests of similarly situated owners in a transaction with respect to the applicable non-blocked [portfolio]

company (as opposed to a sale by any SDN of solely its interests), in each case, which was not negotiated or otherwise arranged by, for or on behalf of any SDN"; and

d.  "At the [portfolio] company level, the waiver of rights of first refusal or offer, waiver of tag along rights, exercise of consent rights with respect to the issuance of debt or equity securities to parties other than any SDN, the election of and/or service as directors, recapitalizations and/or reclassifications, in each case, which were not negotiated or otherwise arranged by, for or on behalf of any SDN."

87.    The USVCP & IVCP License Application explicitly stated that any funds received by USVCP or IVCP would be "used solely for maintenance (*i.e.*, management) or wind-down activities authorized under General License No. 12B" and would not be "distributed to any person on the SDN list – including Renova Group – or any entity directly or indirectly owned 50% or more by any such person."  It further stated that the specific license applicants were "prepared to accept additional safeguards or oversight required by OFAC, including periodic reporting and accounting of funds received by USVCP or IVCP over the course of any specific license granted" pursuant to the application.

88.    The USVCP & IVCP License Application made clear that time was "of the essence" and that, absent the requested license, Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, and IVCP Management, "which are not the target of U.S. sanctions, will suffer irreparable harm and the indirect economic stakes of their U.S. person owners will significantly diminish."  Specifically, it explained that, "many of the investment positions currently held by USVCP and IVCP will diminish in value due to, for example, the underlying [portfolio] company's

failure to consummate certain transactions" with non-SDN counterparties on the required timeline, as a result of the inability of Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, and IVCP Management "to exercise and/or waive certain contractual terms that such [portfolio] company, USVCP and/or IVCP must satisfy."

89.     OFAC assigned the USVCP & IVCP License Application the case number UKRAINE-EO13662-2018-352993-1.

90.     On June 18, 2018, because General License 12 and its amendments had expired, Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, and IVCP Management amended the USVCP & IVCP License Application to "request authorization to engage in all transactions and activities necessary to the maintenance (*i.e.*, management) or wind down of operations, contracts, or other agreements involving" USVCP, IVCP, and those entities' directly and indirectly held assets "(*i.e.*, activities that were permitted by General License No. 12C prior to its expiration) through April 6, 2019, or until the Blocked Assets are divested."  Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, and IVCP Management requested such authorization so that they could "perform day-to-day managerial and administrative services . . . and otherwise conduct day-to-day business . . . in the ordinary course consistent with agreements entered into before April 6, 2018," including accessing funds in USVCP's and IVCP's blocked accounts "that are contractually owed to [Plaintiffs] as compensation for managerial and administrative services."  The application further stated that the specific license applicants were committed "to ensuring . . . that no funds received by USVCP and/or IVCP would be distributed to any Specially Designated National or any entity directly or indirectly owned 50% or more by any such person."

### 2.      The Portfolio Company C License Application

91.     On May 17, 2018, IVCP-GP and IVCP Management submitted a specific license application to OFAC to supplement the USVCP & IVCP License Application (the "Portfolio

Company C License Application") seeking authorization to sell up to 4,414,866 ordinary shares of Portfolio Company C, an Israeli company, to Purchaser 1. Purchaser 1 is a venture fund in Israel with no relation to IVCP or Plaintiffs, and, upon information and belief, is not controlled, directly or indirectly by an SDN. The 4,414,866 ordinary shares that IVCP-GP and IVCP Management sought authorization to sell represented approximately 2.8% of the total issued and outstanding equity interests of Portfolio Company C, and the entirety of IVCP's ownership interest of Portfolio Company C. The license application explained that the proposed transaction contemplated a sale for $3.20 per share.

92.     The Portfolio Company C License Application stated that IVCP-GP and IVCP Management would ensure that the proceeds from the transaction proposed in the application would be "placed in a blocked account and that no portion of the Proceeds [would be] distributed to any entity or person on the SDN List – including Renova Group and Viktor Vekselberg – or any entity directly or indirectly owned 50% or more by any such person." The Portfolio Company C License Application further stated that IVCP-GP and IVCP Management were "prepared to accept additional safeguards or oversight required by OFAC, including periodic reporting and accounting of funds received by IVCP over the course of any specific license granted" pursuant to the application.

93.     The Portfolio Company C License Application explained that IVCP's investment positions would diminish in value if IVCP-GP and IVCP Management were not able to fully exercise their control and management of IVCP—in this instance, undertaking activities ordinarily incident and necessary to the contemplated sale.

94.     The Portfolio Company C License Application also expressed the belief of IVCP-GP and IVCP Management that Renova's indirect ownership in Portfolio Company C "may

continue to harm additional U.S. persons such as U.S. investors and U.S. employees of [Portfolio Company C] as [Portfolio Company C] could have trouble raising additional money to fund its operations and growth while such ownership interests remains." Thus, without the requested license, the value of IVCP-GP's investment (and in turn the proceeds to which it is entitled) "would likely diminish in value."

95.    On June 15, 2018, IVCP-GP and IVCP Management amended the Portfolio Company C License Application to provide updated information regarding the contemplated transaction. IVCP-GP and IVCP Management explained that two Portfolio Company C shareholders exercised their rights of first refusal to purchase certain Portfolio Company C shares owned by IVCP. Thus, IVCP-GP and IVCP Management requested OFAC authorization to sell Portfolio Company C shares to those two Portfolio Company C shareholders, as well as authorization to sell Portfolio Company C shares to Purchaser 1.

### 3.    The Negotiation License Application

96.    On May 25, 2018, Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, IVCP Management, CN Odyssey-GP, CN MapAnything-GP, Sparrow Capital (then doing business as Columbus Nova), Audubon-GP, and CN Partners submitted a specific license application to OFAC (the "Negotiation License Application") seeking authorization to, among other things, "engage in communications, negotiations, and all activities ordinarily incident and necessary to engaging in communications and negotiations, with third parties to reach a solution for the divestment or transfer of equity, debt and/or other holdings" that they "directly or indirectly control and manage" for RIT and/or Weft.

97.    Specifically the Negotiation License Application sought authorization "to communicate and negotiate either directly or indirectly," to the extent not already authorized pursuant to General License 12, with:

a. Representatives of RIT and Weft, potentially including Vekselberg and/or his designees or agents, and representatives of any entity owned in a proportion greater than 50% by RIT or Weft, "regarding the divestment or transfer of equity, debt and/or other holdings that" the license applicants control and manage for RIT and/or Weft; and

b. "[T]hird parties – who are not blocked persons – regarding the divestment or transfer of equity, debt and/or other holdings that" the license applicants control and manage on behalf of RIT and/or Weft.

98. The Negotiation License Application acknowledged that USVCP-GP, USVCP Management, IVCP-GP, IVCP Management, CN Odyssey-GP, CN MapAnything-GP, Columbus Nova, Audubon-GP, and CN Partners would need "additional, specific authorization from OFAC . . . to effect any divestment or transfers," but that, at this stage, they intended "only to negotiate." However, because they could not seek such specific authorization until a proposed divestment was negotiated, the Negotiation License Application was a necessary first step.

99. The Negotiation License Application explained that, "in the course of negotiations, no funds [would] be distributed to, and prior to any further authorization, no transactions or dealings [would] involve," any SDN or any entity subject to OFAC's 50% Rule, "other than activities ordinarily incident and necessary to communications and negotiations."

100. The Negotiation License Application "respectfully request[ed] expedited processing of this urgent request."

101. OFAC assigned the Negotiation License Application the case number UKRAINE-EO13662-2018-353776-1.

102. On June 19, 2018, because General License 12 and its amendments had expired,

Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, IVCP Management, CN Odyssey-GP, CN MapAnything-GP, Sparrow Capital, Audubon-GP, and CN Partners amended the Negotiation License Application to "request authorization to engage in all transactions and activities necessary to the maintenance (*i.e.*, management) or wind down of operations, contracts, or other agreements involving [assets] directly or indirectly controlled and/or managed by the [license applicants]" for RIT and/or Weft "through April 6, 2019, or until the [assets at issue] are divested."   The amendment requested such authorization so that the license applicants could "perform day-to-day managerial and administrative services . . . and otherwise conduct day-to-day business . . . in the ordinary course consistent with agreements entered into before April 6, 2018," including accessing funds in blocked accounts "that are contractually owed to [the license applicants] as compensation for managerial and administrative services."   The submission further stated that the license applicants were committed "to ensuring that . . . no funds received by [the license applicants] would be distributed to any Specially Designated National or any entity directly or indirectly owned 50% or more by any such person."

103.   On June 25, 2018, at OFAC's suggestion, Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, IVCP Management, CN Odyssey-GP, CN MapAnything-GP, Sparrow Capital, Audubon-GP, and CN Partners submitted a letter to OFAC (the "June 25, 2018 Letter") requesting that their license applications assigned case numbers UKRAINE-EO13662-2018-352993-1 (*i.e.*, the USVCP & IVCP License Application and the Portfolio Company C License Application)   and   UKRAINE-EO13662-2018-353776-1   (*i.e.*,   the   Negotiation   License Application), and the amendments to those applications, be consolidated and merged under the latter case number (resulting in the "Consolidated License Applications").

104.   The June 25, 2018 Letter reiterated the substance of the earlier license applications.

Specifically, "to prevent irreparable harm to the [license applicants] and the U.S. person owners thereof," the letter "respectfully request[ed] emergency specific license authorization from OFAC to allow Applicants, directly and indirectly, to engage in":

    a.  "All transactions and activities otherwise prohibited by the Ukraine Related Sanctions Regulations, 31 C.F.R. part 589, that are ordinarily incident and necessary to the maintenance (*i.e.*, management) or wind down of operations, contracts, or other agreements, including the importation of goods, services, or technology into the United States, involving Weft, RIT, . . . and any entity in which Weft [or] RIT . . . owns, directly or indirectly, a 50 percent or greater interest, consistent with the previous authorization of expired General License No. 12C";

    b.  "Voting of shares and/or signing of documents which are required to be voted or signed by similarly situated owners of such [portfolio] companies to effectuate transactions affecting all such owners, in each case, which was not negotiated or otherwise arranged by, for, or on behalf of any SDN";

    c.  "For currently held investment positions, the contribution of capital in relation thereto to the extent contractual obligations to contribute such monies existed prior to the sanctioning of the Renova Group and Viktor Vekselberg, which, if not contributed, could result in a material impairment to such investment positions";

    d.  "Consent to sell all ownership interests of similarly situated owners in a transaction with respect to the applicable non-blocked [portfolio] company (as opposed to a sale by any SDN of solely its interests), in each case, which was not negotiated or otherwise arranged by, for or on behalf of any SDN";

    e.  "At the [portfolio] company level, the waiver of rights of first refusal or offer,

waiver of tag along rights, exercise of consent rights with respect to the issuance of debt or equity securities to parties other than any SDN, the election of and/or service as directors, recapitalizations and/or reclassifications, in each case, which were not negotiated or otherwise arranged by, for, or on behalf of any SDN"; and

f.    "Entry into, and—to the extent such activities implicate the prohibitions of the [31 C.F.R. part 589]—all transactions that are ordinarily incident to the negotiation of and the entry into, contingent agreements or contracts for the divestment or transfer of . . . [b]locked [a]ssets that Applicants directly or indirectly control and manage on behalf of blocked parties."

105.    The June 25, 2018 Letter further explained that Plaintiffs USVCP-GP, USVCP Management, IVCP-GP, IVCP Management, CN Odyssey-GP, CN MapAnything-GP, Sparrow Capital, Audubon-GP, and CN Partners "require these authorizations in order to perform day-to-day managerial and administrative services . . . and otherwise conduct day-to-day business . . . in the ordinary course consistent with agreements entered into before April 6, 2018."  The letter also provided that the license applicants "continue to commit to ensuring that . . . no funds received by" them "will be distributed to any Specially Designated Nationals or otherwise blocked parties," and explained that they were "prepared to accept additional safeguards or oversight that may be required by OFAC, including any periodic reporting or accounting of funds received pursuant to any specific license granted by OFAC."

106.    OFAC has not granted or denied any of the Consolidated License Applications, including the USVCP & IVCP License Application, the Portfolio Company C License Application, and the Negotiation License Application, and the amendments to those applications.

C.       **The Management Fees License Application**

107.    On August 14, 2018, during a discussion with counsel for Plaintiffs, OFAC's Licensing Division suggested that USVCP Management submit its own specific license application, separate from other license applicants, detailing the relief it requested.

108.    In turn, on August 23, 2018, Plaintiff USVCP Management submitted a specific license application to OFAC (the "Management Fees License Application") seeking "emergency authorization from OFAC to allow USVCP Management to access funds in blocked accounts of USVCP . . . that USVCP Management is contractually entitled to receive from USVCP for fiscal year 2018 in exchange for managerial and administrative services (including reimbursable expenses thereto) . . . ."

109.    The Management Fees License Application explained that the requested relief was critical for USVCP Management to continue "its management and the orderly winding down of U.S. companies in which USVCP holds equity positions."  It further detailed that,  "[s]ince the expiration of General License No. 12 (as amended), USVCP Management's activities with respect to USVCP have been limited to dealing with equity positions as authorized by OFAC" through specific licenses.  However, without the relief requested in the Management Fees License Application, USVCP Management is not "able to perform the wind-down activities necessary to divest all such equity positions . . . , which will result in irreparable harm and irreparable loss of value to such U.S. companies, their U.S. owners, and all U.S. persons employed by or that transact business with these companies."  The application explained that, "[a]s OFAC has been made aware from previously submitted blocking reports and applications, USVCP holds equity positions—all representing less than 50% ownership—in 21 U.S. companies, which have, in the aggregate, what we estimate to be hundreds if not thousands of U.S. employees and hundreds of U.S. investors, in addition to all of the U.S. landlords, U.S. vendors, U.S. suppliers, and U.S. service providers that

support those U.S. companies."

110.    The Management Fees License Application attached an exhibit detailing the "funds owed to USVCP Management from . . . USVCP for fiscal year 2018," including, among other things, payroll, employee benefits, and reimbursable expenses, such as legal fees.  The exhibit reflected that, at that time, USVCP Management was due $2,788,000 in management fees and $1,796,495 in reimbursable expenses.  Those amounts have increased substantially since August 23, 2018.  The Management Fee License Application also explained that, without the funds to which it is entitled, USVCP Management was forced to lay-off four full-time employees and provide notice to its California landlord that it would be vacating its office space because USVCP Management could not make further rent payments.

111.    The Management Fees License Application explained that "USVCP Management continues to commit to ensuring that no funds received by it will be distributed to any SDN or any entity directly or indirectly owned 50% [or] more by one or more SDNs."  It further stated that "USVCP Management is prepared to accept additional safeguards or oversight that may be required by OFAC, including any periodic reporting or accounting of funds received pursuant to any specific license granted by OFAC."

112.    OFAC assigned the Management Fees License Application the case number UKRAINE-EO13662-2018-355905-1.

113.    On April 12, 2019, OFAC granted USVCP and USVCP Management a specific license, License No. UKRAINE-EO13362-2018-355905-1 (the "USVCP Management License"), that OFAC wrote was "[b]ased upon the request dated August 23, 2018," and subsequent correspondence.

114.    The USVCP Management License authorized USVCP and USVCP Management

"to engage in all transactions ordinarily incident and necessary to **(i)** the wind-down of operations, contracts, or other agreements that were in effect prior to April 6, 2018 involving equity, debt and/or other holdings in their possession or control blocked on or after April 6, 2018 as a result of the designations of . . . Vekselberg and . . . Renova [as SDNs] . . . (the 'Blocked Positions') . . . ; and **(ii)** negotiate, but not execute, the sale of the Blocked Positions."

115.   The USVCP Management License also authorized that "[f]unds up to the sum of USD 1,631,495 in accounts of USVCP that are blocked originating from authorized payments to such accounts received on or after April 6, 2018 may be used for the payment of legal fees owed to Latham & Watkins LLP and Pearl Cohen Zedek Latzer Baratz LLP."

116.   The USVCP Management License set forth the following conditions:  "(a) Nothing in this license authorizes the performance of any agreements related to future divestments of any of the Blocked Positions of USVCP; any such divestments will require a separate license," and "(b) Any payment to or for the direct or indirect benefit of Viktor Vekselberg, the Renova Group, or any other person whose property and interests in property are blocked . . . must be made into a blocked, interest-bearing account located in the United States."

117.   The USVCP Management License does not grant the principal relief that Plaintiff USVCP Management requested in the Management Fees License Application—the ability to collect its management fees.  Indeed, pursuant to the terms of the license, USVCP Management is apparently expected to manage the wind down of the USVCP investment portfolio without any assurance of compensation or reimbursement for its efforts.  As a result, OFAC's interference with USVCP Management's property interests remains ongoing and indefinite.

     **D.**    **The CN MapAnything License Application**

118.   CN MapAnything LP owned approximately 16.1% of the equity interests of Portfolio Company B, a software provider that specializes in geolocation-based territory

management, route planning and organization, sales management, telematics and reporting using real-time, interactive maps.  On August 21, 2018, OFAC granted Portfolio Company B a specific license, License No. UKRAINE-EO13362-2018-355286-1 ("Portfolio Company B License No. 1"), authorizing it "to engage in all activities necessary and ordinarily incident to negotiate with CN MapAnything L.P. . . . regarding a potential purchase of shares in [Portfolio Company B] held by CN MapAnything [L.P.]"

119.    On September 5, 2018, Portfolio Company B submitted an application to OFAC for a second specific license seeking authorizations necessary for Portfolio Company B to raise capital through a new investment.  Specifically, certain documents needed to be executed on behalf of CN MapAnything LP so that it could provide its consent to the investment.  On September 24, 2018, OFAC granted Portfolio Company B and "any new or existing investors" a specific license, License No. UKRAINE-EO13362-2018-355286-2 ("Portfolio Company B License No. 2"), authorizing them "to engage in all activities necessary and ordinarily incident to negotiate and execute certain agreements and related documents with CN MapAnything LP . . . or . . . [CN MapAnything-GP], in connection with a new investment by [Investor 1]" in Portfolio Company B.[4]  Portfolio Company B License No. 2 provided that "[i]t is a condition of this License that any future dividend payments owed to [CN MapAnything LP], [CN MapAnything-GP], or Viktor Vekselberg be placed into a blocked interest-bearing account located in the United States."

120.    On April 24, 2019, OFAC granted Portfolio Company B, Purchaser 2, a Purchaser 2 affiliate, and any shareholders of Portfolio Company B, including CN MapAnything LP (either itself or through its general partner CN MapAnything-GP) a third specific license, License No.

---

[4] As a prerequisite to the Investor 1's investment, Investor 1 and other Portfolio Company B investors required CN MapAnything LP to convert its equity interests in Portfolio Company B into a new class of shares that required CN MapAnything LP to forfeit corporate rights, such as membership on the Portfolio Company B Board of Directors.

UKRAINE-EO13661-2019-359447-1 ("Portfolio Company B License No. 3").  This license, granted at the request of Portfolio Company B, authorized Purchaser 2 and a Purchaser 2 affiliate "to engage in all activities ordinarily incident and necessary to acquiring all equity interests of [Portfolio Company B] that [Purchaser 2 and the Purchaser 2 affiliate do] not currently own, including those held by CN MapAnything LP . . . , including selling [CN MapAnything LP's] shares in [Portfolio Company B] to [Purchaser 2 and the Purchaser 2 affiliate]."  Portfolio Company B License No. 3 also authorized Purchaser 2, the Purchaser 2 affiliate, Portfolio Company B, and any Portfolio Company B shareholders "to engage in all activities ordinarily incident and necessary to close" the sale of Portfolio Company B to Purchaser 2 and its affiliate, including:

> **i)** holding back a portion of the proceeds (the "hold-back funds") otherwise payable to the holders of [Portfolio Company B's] Class B Common Stock, including [CN MapAnything LP]; **ii)** allowing [Purchaser 2 and the Purchaser 2 affiliate] to retain a portion of the hold-back funds to satisfy agreed-upon indemnification claims in connection with the transaction; and **iii)** releasing [CN MapAnything LP's] portion of the transaction proceeds at closing, and upon release of the hold-back funds, depositing such funds into a blocked, interest-bearing account at a financial institution located in the United States.

121.    Portfolio Company B License No. 3 provided:  "It is a condition of this License that any payments owed to [CN MapAnything LP], Viktor Vekselberg, or any other person whose property and interests in property are blocked . . . be placed into a blocked, interest-bearing account located in the United States."

122.    On April 30, 2019, pursuant to a discussion between counsel for Plaintiffs and OFAC's Licensing Division, Plaintiffs CN MapAnything-GP and Sparrow Capital submitted a specific license application to OFAC (the "CN MapAnything License Application") seeking authorization for Sparrow Capital "to receive management fees and expenses (which includes

expenses related to legal, accounting, and other administrative fees) totaling up to $3 million that it is owed," and for CN MapAnything GP "to receive its share, as general partner, of the sale proceeds received by CN MapAnything LP . . . from the anticipated sale of [Portfolio Company B] . . . , before such Proceeds become the blocked property of [CN MapAnything LP]."  The application explained that, "[b]ased largely on public media reports," Plaintiffs CN MapAnything-GP and Sparrow Capital understood that Portfolio Company B was "in the process of being sold to a third-party purchaser that is not subject to U.S. sanctions"—namely, Purchaser 2.

123.    The CN MapAnything License Application further explained that Plaintiffs CN MapAnything-GP and Sparrow Capital expected the "sale [of Portfolio Company B] to occur imminently," and therefore "respectfully request[ed] that OFAC provide the [r]equested [r]elief on an expedited basis."  It also provided that, if a sale were to occur before OFAC granted the relief requested, the proceeds, management fees, and expenses due to CN MapAnything-GP and Sparrow Capital would "become the blocked property of CN MapAnything L.P."  The application noted that, based on "communications from OFAC, U.S. parties that have an interest in property that will be blocked must access any proceeds owed before such proceeds become blocked."

124.    The CN MapAnything License Application set forth that, as the general partner of CN MapAnything LP, CN MapAnything-GP "has a property interest in a portion of" the proceeds from the sale of Portfolio Company B, and that, pursuant to the relevant partnership agreement, CN MapAnything-GP "is entitled to receive its share of the proceeds no later than January 10, 2020."

125.    The CN MapAnything License Application also confirmed that, "assuming a favorable response from OFAC to this request," CN MapAnything-GP and Sparrow Capital would ensure that the funds they receive "are not distributed, directly or indirectly, to any SDN or any

entity directly or indirectly owned 50% or more by one or more SDNs."

126.    OFAC assigned the CN MapAnything License Application the case number UKRAINE-EO13662-2019-360487-1.

127.    In or about May 2019, the sale of Portfolio Company B to Purchaser 2 was completed.

128.    On May 31, 2019, OFAC granted Sparrow Capital a specific license, License No. UKRAINE-EO13362-2019-360487-1 (the "CN MapAnything License"), that OFAC wrote was "[b]ased upon the request dated April 30, 2019," and subsequent correspondence.

129.    The CN MapAnything License authorized Sparrow Capital "to receive funds from the sale to [Purchaser 2] and [a Purchaser 2 affiliate] . . . of shares of [Portfolio Company B] held by CN MapAnything LP . . . in the following amounts and for the following uses:"

  a.    "Up to $250,000 for payment of already-incurred legal fees due to Latham & Watkins";

  b.    "Up to $200,000 for payment for legal fees for the sale";

  c.    "Up to $15,000 for registration and corporate fees";

  d.    "Up to $50,000 in accounting fees"; and

  e.    "Up to $300,000 in insurance related costs and fees."

130.    The CN MapAnything License set forth the following conditions:  "(a) After the payment of [the authorized] expenses enumerated . . . , any payment to or for the direct or indirect benefit of [CN MapAnything LP], Viktor Vekselberg, or any other person whose property and interests in property are blocked . . . must be placed into a blocked, interest-bearing account located in the United States"; and "(b) The authorization in [the CN MapAnything License] applies to funds that have not been transferred by [Purchaser 2 or the Purchaser 2 affiliate] to an account in

the name of [CN MapAnything LP] or another blocked person."

131.     The CN MapAnything License did not grant the relief that Plaintiff CN MapAnything-GP requested in the CN MapAnything License Application—namely, the ability to receive the portion of proceeds received by CN MapAnything LP from the sale of Portfolio Company B that are due to CN MapAnything-GP as the general partner of CN MapAnything LP. The CN MapAnything License also does not grant the principal relief that Plaintiff Sparrow Capital requested in the CN MapAnything License Application—the ability to collect its management fees.  As a result, OFAC's interference with CN MapAnything-GP's and Sparrow Capital's property interests remains ongoing and indefinite.

132.     In a cover letter to the CN MapAnything License, OFAC wrote to counsel for Plaintiffs:  "Please be advised, it would be contrary to current licensing policy, at this time, for OFAC to authorize the receipt of the requested holdback reserves, management fees, 'success fee,' or carried interest. . . . Accordingly, this portion of your request is hereby denied."  The terms "holdback reserves" and "carried interest," refer to the portion of proceeds received by CN MapAnything LP from the sale of Portfolio Company B that are due to CN MapAnything-GP as the general partner of CN MapAnything LP.  "Management fees" describes the amount due to Sparrow Capital for managing CN MapAnything LP, and the term "success fee" refers to an amount owed to Sparrow Capital by CN MapAnything LP in connection with the successful sale of Portfolio Company B.

133.     Plaintiffs have made repeated follow up inquiries with OFAC regarding the status of their license applications, and expressed the urgency of having the licenses granted.  However, apart from the Cryobank License, USVCP Management License, and CN MapAnything License, Defendants have not granted or denied the license applications set forth above.  None of OFAC's

rules, regulations, or public guidance provides any deadline by which OFAC must act on a license application by U.S. citizens. Nor do they require OFAC to act on such a license application. Thus, there is no time limit on how long OFAC may take to act on a license application, and no requirement that OFAC do so at all. Likewise, OFAC has promulgated no rules or regulations to set forth legal standards that OFAC must follow in determining whether to grant or deny license applications by U.S. persons for the return of their property. Rather, OFAC has unfettered discretion to grant or deny a license application. This has resulted in the complete, indefinite, and potentially permanent seizure of Plaintiffs' property.

## IV. Impact of OFAC's Sanctions and Failure to Grant the Specific Licenses

134. OFAC's sanctions and its failure to grant Plaintiffs' specific license applications have prevented Plaintiffs, all of whom are U.S. citizens or entities wholly-owned by U.S. citizens, from accessing, controlling, and/or managing their property. Specifically, Plaintiffs cannot collect money, including investment proceeds and management fees, that is their property. Likewise, Plaintiffs cannot exercise their management and control functions as general partners and managers of the Investment Funds to preserve the value of their investments, or sell their property or ownership interests.

### A. Blocked Cash

135. Money that is due to Plaintiffs Audubon-GP, CN Partners, Intrater, USVCP-GP, USVCP Management, and Sparrow Capital, as the general partners or management companies of the Investment Funds Audubon LLC, USVCP, or CN Odyssey LP, has been deposited in several blocked accounts. As a result of OFAC's sanctions and failure to grant Plaintiffs' specific licenses, those Plaintiffs cannot collect the share of the funds in those accounts that belong to them.

136. As explained above, Audubon LLC provided loans to three of the heirs to the estate of the deceased musical artist Prince. Although OFAC has failed to act on Plaintiffs' license

applications, OFAC did grant a license to the Heirs to Prince's estate.  On December 20, 2018, OFAC granted the Heirs a specific license, License No. UKRAINE-EO13362-2018-358201-1 (the "Prince Heirs License"), that authorized them "to engage in all activities necessary and ordinarily incident to negotiating and executing certain agreements and related activities with [Audubon LLC] . . . and/or [Audubon LLC's] representatives, including [Audubon Road] . . . , [Audubon Inc.], [Audubon-GP], [Administrative Agent 1], [U.S. Citizen 1], and Andrew Intrater, for the satisfaction of loans made by Audubon [LLC] to the Heirs in connection with the probate proceedings in the [Prince] Estate, including termination of [Audubon LLC's] security interests and rights of first refusal in the [Prince] Estate and the selection of a replacement lender."  The license provided that, "[i]t is a condition of this License that any payments owed to or in which there is otherwise an interest of Audubon [LLC], Audubon Road, [Audubon Inc.], [Audubon-GP], Weft Global Ltd., Viktor Vekselberg, or any other person whose property and interests in property are blocked be placed into a blocked interest-bearing account located in the United States."

137.    Pursuant to the Prince Heirs License, the Heirs refinanced the loans from Audubon LLC by borrowing money from a different lender so that they could repay Audubon LLC's loans. The Heirs then deposited $8,400,000 in a blocked account for Audubon LLC.  A share of that money is the property of Plaintiffs Audubon-GP, CN Partners, and Intrater.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, Plaintiffs Audubon-GP, CN Partners, and Intrater cannot collect the share of the money that is their property.

138.    USVCP owned approximately 18% of the equity interests of Portfolio Company D, a computer software company.  On July 5, 2018, OFAC granted Portfolio Company D, Purchaser 3, and their equity security holders a specific license, License No. UKRAINE-EO13362-2018-

354715-1 (the "Portfolio Company D License"), that authorized them "to engage in all transactions necessary and ordinarily incident to divest all outstanding shares in [Portfolio Company D] held by [USVCP] . . . . in connection with [Purchaser 3's] acquisition of [Portfolio Company D]."  The license provided that, "[i]t is a condition of this License that any proceeds from the divestment owed to [USVCP], Renova Innovation Technologies, Ltd. or the Renova Group be placed in a blocked interest-bearing account in the United States."

139.    Pursuant to the Portfolio Company D License, following [Purchaser 3's] acquisition of Portfolio Company D, $12,400,000 was deposited in a blocked account for USVCP.[5] A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

140.    USVCP owned approximately 26% of the equity interests of Portfolio Company E, a company that provides Internet communication solutions for web-based applications.  On July 26, 2018, OFAC granted Portfolio Company E, Trust 1 (the "Trust") and their equity security holders a specific license, License No. UKRAINE-EO13362-2018-354213-1 (the "Portfolio Company E License"), authorizing them "to engage in all activities necessary and ordinarily incident to divest outstanding securities in [Portfolio Company E] held by [USVCP] in connection with [a] Securities Purchase Agreement between [USVCP] and the Trust."  The Portfolio Company E License provided that "[i]t is a condition of this License that any proceeds from the divestment owed to [USVCP], Renova Innovation Technologies, Ltd., or the Renova Group be

---

[5] Pursuant to the USVCP Management License, $1,631,495 of the $12,400,000 deposited in a block account following the sale of Portfolio Company D was released to pay Plaintiffs' legal fees.  The other $10,768,505 remains in the blocked account.

placed in a blocked interest-bearing account located in the United States."

141.    Pursuant to the Portfolio Company E License, Portfolio Company E deposited $353,834.81 in a blocked account for USVCP.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

142.    USVCP owned approximately 17.6% of the equity interests of Portfolio Company F, a computer software company that developed a platform to enable Windows applications to run online.  On July 27, 2018, OFAC granted Portfolio Company F, Purchaser 4, and their equity security holders a specific license, License No. UKRAINE-EO13362-2018-354356-1 (the "Portfolio Company F License"), authorizing them "to engage in all activities necessary and ordinarily incident to divest all outstanding shares in [Portfolio Company F] held by [USVCP] . . . in connection with [Purchaser 4's] acquisition of [Portfolio Company F]."   The Portfolio Company F License set forth two conditions:  (i) "that any proceeds, including securities, from the divestment owed to [USVCP], Renova Innovation Technologies, Ltd., or the Renova Group be placed in a blocked interest-bearing account located in the United States"; and (ii) "that any dividend payments that become payable to [USVCP], Renova Innovation Technologies, Ltd., or the Renova Group, will be placed in a blocked interest-bearing account located in the United States."

143.    Pursuant to the Portfolio Company F License, following Purchaser 4's acquisition of Portfolio Company F, $4,102,781.21 was deposited in a blocked account for USVCP.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion

of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

144.    USVCP owned less than 1% of the equity interests of Portfolio Company G, a cloud computing company.  Following the liquidation of Portfolio Company G, USVCP was entitled to a shareholder distribution.  Thus, USVCP Management received a $364,502.15 check, dated October 2, 2018, from Portfolio Company G for USVCP.  On or about May 7, 2019, pursuant to the USVCP Management License, USVCP Management attempted to deposit the check in a blocked account.  When it did so, USVCP Management was informed that the funds it was attempting to deposit were already being held in a blocked account.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

145.    USVCP owns approximately 8.58% of the equity interests of Portfolio Company H, a private investment fund.  Portfolio Company H's principal asset was an investment in Portfolio Company G.  Following the liquidation of Portfolio Company G, USVCP was entitled to a portion of a shareholder distribution paid to Portfolio Company H.  Thus, USVCP Management received a $88,882.15 check, dated December 19, 2018, from Portfolio Company H for USVCP.  On or about May 1, 2019, pursuant to the USVCP Management License, USVCP Management deposited the check in a blocked account.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

146.     USVCP owns approximately 30.27% of the equity interests of Portfolio Company I, a private investment fund.  Portfolio Company I's principal asset was an investment in Portfolio Company G.  Following the liquidation of Portfolio Company G, USVCP was entitled to a portion of a shareholder distribution to Portfolio Company I.   Thus, USVCP Management received a $994,298.69 check, dated December 19, 2018, from Portfolio Company I for USVCP.  On or about May 1, 2019, pursuant to the USVCP Management License, USVCP Management deposited the check in a blocked account.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

147.     USVCP directly and wholly owns Holding Company 1.  Holding Company 1's only material asset is its ownership of 6.3% of the equity interests of Portfolio Company J, which is an independent American record label.  On or about October 24, 2018, Portfolio Company J sent USVCP a tax distribution.  Specifically, USVCP Management received a $246,507 check, dated October 23, 2018, from Portfolio Company J for USVCP.  On or about May 1, 2019, pursuant to the USVCP Management License, USVCP Management deposited the check in a blocked account. A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

148.     In or about April 2017, Portfolio Company K was sold to a third party purchaser. At that time, USVCP was a shareholder of Portfolio Company K.  In connection with the sale, a portion of the purchase price was held back to cover contingent liabilities.  On or about May 10,

2019, USVCP's $1,232,264.63 share of the "holdback" was released and deposited in a blocked account.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

149.    USVCP owned debt and equity securities of Portfolio Company L, which filed for bankruptcy in or around June 2016.  Those debt and equity holdings entitled USVCP to certain cash distributions in connection with Portfolio Company L's bankruptcy.  On May 23, 2019, Portfolio Company L attempted to wire two payments to USVCP in the amounts of $750,000 and $805,621.98, respectively.  On June 6, 2019, pursuant to guidance provided by OFAC to the bank from which those payments originated, the payments were placed in blocked accounts for USVCP.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect the share of the money that is their property.

150.    USVCP's wholly-owned subsidiary Holding Company 2 owned approximately 40% of the equity interests in Portfolio Company M, which provides subscription-based on-demand music streaming services.  On August 10, 2018, OFAC granted Portfolio Company M and Purchaser 5 a specific license, License No. UKRAINE-EO13362-2018-354209-1 ("Portfolio Company M License No. 1"), authorizing them "to engage in all activities necessary and ordinarily incident to negotiate with the Renova Group and Viktor Vekselberg . . . regarding a potential purchase of shares in [Portfolio Company M] from [Holding Company 2] by [Purchaser 5]."  Pursuant to Portfolio Company M License No. 1, Purchaser 5 then reached an agreement in

principle to purchase all of Holding Company 2's interests in Portfolio Company M for a minimum of $15 million.  On December 18, 2018, OFAC granted Portfolio Company M, Purchaser 5, and their agents a second specific license, License No. UKRAINE-EO13362-2018-354209-2 ("Portfolio Company M License No. 2"), authorizing them "to engage in all activities necessary and ordinarily incident to execute and implement [a purchase agreement] with [Holding Company 2] . . . and [USVCP Management] . . . , including the purchase of all shares, options, and warrants in [Portfolio Company M] held by [Holding Company 2], as well as all loans to [Portfolio Company M] and other rights against or with respect to [Portfolio Company M]."[6]  Portfolio Company M License No. 2 provided that, "[i]t is a condition of this License that any payments owed to [Holding Company 2], the Renova Group, Victor Vekselberg or any other person whose property and interests in property are blocked be placed into a blocked interest-bearing account located in the United States."

151.   On or about January 18, 2019, pursuant to Portfolio Company M License No. 2, Purchaser 5 agreed to acquire Holding Company 2's interests in Portfolio Company M.  Under the agreement, the acquisition price must be paid to Holding Company 2 (a wholly-owned subsidiary of USVCP) in installments.  Specifically, $800,000 that is currently due to Holding Company 2 is being held back by Purchaser 5.  That amount is effectively blocked.  In addition, on each of the first five anniversaries of the purchase agreement (*i.e.*, each January), Purchaser 5 owes an additional $2,800,000 to Holding Company 2.  Absent the relief Plaintiffs seek, those amounts will also become blocked, or effectively blocked.  A share of that money is the property of Plaintiffs USVCP-GP and USVCP Management.  Because OFAC has failed to grant the licenses Plaintiffs

---

[6] On May 7, 2019, Purchaser 5 submitted an amended license application that, among other things, clarified that USVCP, not USVCP Management, owns Holding Company 2.

requested that would permit them to collect their portion of the blocked funds, USVCP-GP and USVCP Management cannot collect, and will not be able to collect, the share of the money that is their property.

152.   CN Odyssey LP directly and wholly-owns CN Odyssey LLC, which owned approximately 54.3% of the equity interests of Portfolio Company A.  On June 4, 2018, OFAC granted Portfolio Company A a specific license, License No. UKRAINE-EO13362-2018-352625-1 ("Portfolio Company A License No. 1"), authorizing it to:  (i) "engage in all transactions and activities that are ordinarily incident and necessary to the maintenance of operations, contracts, or other agreements in connection with [its] online marketing and advertising business, including but not limited to the payment of vendors and employees and the receipt of revenue," and (ii) "engage in and facilitate all transactions and activities necessary for the completion of the redemption of Class A Common Stock from CN Odyssey L.L.C. . . . sufficient to bring CN Odyssey L.L.C.'s ownership interest in the [Portfolio Company A] below 50 percent."

153.   Portfolio Company A License No. 1 set forth the following conditions:  (i) "that proceeds from the redemption of the Class A shares owed to CN Odyssey L.L.C. be placed in a blocked interest-bearing account located in the United States"; and (ii) "that if any dividend payments become payable to CN Odyssey L.L.C. while Renova Group remains designated, [Portfolio Company A] will place such payments in a blocked interest-bearing account located in the United States."

154.   On November 30, 2018, OFAC granted Portfolio Company A, CN Odyssey LLC, and others, a second specific license, License No.  UKRAINE-EO13361-2018-354896-1 ("Portfolio Company A License No. 2"), authorizing them to "engage in all activities necessary and ordinarily incident to negotiate and execute a Redemption Agreement with CN Odyssey

[LLC], . . . including the purchase of shares in [Portfolio Company A] held by CN Odyssey [LLC]." The license provided that, "[i]t is a condition of this License that any payments owed to CN Odyssey [LLC], Renova Group, or any other person whose property and interests in property are blocked be placed into a blocked interest-bearing account located in the United States."

155.    Pursuant to Portfolio Company A License No. 1 and Portfolio Company A License No. 2, Portfolio Company A fully redeemed CN Odyssey LLC's equity interests in Portfolio Company A, and made two deposits, totaling $60,251.58, in a blocked account for CN Odyssey LLC. A share of that money is the property of Plaintiff Sparrow Capital. Because OFAC has failed to grant the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, Sparrow Capital cannot collect the share of the money that is its property.

156.    As explained above, CN MapAnything LP owned approximately 16.1% of the equity interests of Portfolio Company B. In or about May 2019, Portfolio Company B was sold to Purchaser 2. Following that transaction and pursuant to Portfolio Company B License No. 3, $26,314,547.63 was deposited in a blocked account for CN MapAnything LP. A share of that money is the property of Plaintiffs CN MapAnything-GP and Sparrow Capital. Because OFAC denied the licenses Plaintiffs requested that would permit them to collect their portion of the blocked funds, CN MapAnything-GP and Sparrow Capital cannot collect the share of the money that is their property. In addition, as security for its acquisition of Portfolio Company B, Purchaser 2 is currently holding back another $4,087,329.86 that will be payable to CN MapAnything LP. CN MapAnything-GP and Sparrow Capital will likewise not be able to collect the share of that "holdback" amount that is their property.

157.    In sum, the chart below reflects the total amount of the Investment Funds' currently blocked cash. As discussed above, because OFAC has denied or failed to grant the licenses

Plaintiffs requested, Plaintiffs cannot collect the share of the blocked cash that is their property. The chart also shows the management fees currently due to Plaintiffs USVCP Management, IVCP Management, CN Partners, and Sparrow Capital.  Subject to certain contractual adjustments, after an Investment Fund's assets are sufficiently monetized and the proceeds exceed certain thresholds, Plaintiffs who are general partners of the Investment Fund are generally entitled to approximately 20 percent of the proceeds.  However, the precise amount of a general partner's proceeds are historically negotiated with the limited partner to avoid disputes over the calculations.  Absent a license from OFAC, those negotiations with RIT and/or Weft cannot occur.  Thus, Plaintiffs cannot, at this time, determine the precise amount of the currently blocked cash that belongs to Plaintiffs who are general partners of the Investment Funds.

| Investment Fund | Blocked Cash | Management Company | Management Fees |
|---|---|---|---|
| USVCP | $20,507,197.62 | USVCP Management | $5,022,514 |
| IVCP | n/a | IVCP Management | $258,160 |
| CN Odyssey LP | $60,251.98 | Sparrow Capital | $250,000 |
| CN MapAnything LP | $26,314,547.63 | Sparrow Capital | $425,000 |
| Audubon LLC | $8,400,000 | CN Partners | $74,344 |
| **Total:** | $55,281,996.83 | **Total:** | $6,030,018 |

### B.    <u>Blocked Management Fees</u>

158.    As a result of OFAC's sanctions and failure to grant specific licenses, Plaintiffs USVCP Management, IVCP Management, CN Partners, and Sparrow Capital cannot collect management fees (in addition to other amounts, including reimbursable expenses) that are due to them from the Investment Funds that they manage.  As reflected in the chart above, those Plaintiffs are due the following amounts.

159.    As of June 30, 2019, in connection with its management of USVCP, Plaintiff USVCP Management was due a total of $5,022,514 in management fees, plus additional amounts for reimbursable expenses, including legal, accounting, and other third party vendor fees.

160.    As of September 26, 2018, in connection with its management of IVCP, Plaintiff IVCP Management was due a total of $258,160, plus additional amounts for reimbursable expenses, including legal, accounting, and other third party vendor fees.

161.    As of June 30, 2019, in connection with its management of CN Odyssey LP, Plaintiff Sparrow Capital was due $250,000 in management fees, plus additional amounts for reimbursable expenses, including legal, accounting, and other third party vendor fees.

162.    As of June 30, 2019, in connection with its management of CN MapAnything LP, Plaintiff Sparrow Capital was due $425,000 in management fees, plus additional amounts for a transaction success fee related to the sale of Portfolio Company B, and reimbursable expenses, including legal, accounting, and other third party vendor fees.

163.    As of June 30, 2019, in connection with its management of Audubon Road, Plaintiff CN Partners was due $74,344 in management fees, plus additional amounts for reimbursable expenses, including legal, accounting, and other third party vendor fees.

### C.    Interference with Management and Control Rights

164.    As a result of OFAC's sanctions and failure to grant specific licenses, Plaintiffs USVCP-GP, IVCP-GP, CN Odyssey-GP, CN MapAnything-GP, Audubon-GP, and Intrater have been deprived of their rights, as general partners or managing members of the Investment Funds, to control and manage those Investment Funds, and in turn participate in the management of their investments, including portfolio companies in which those Investment Funds own equity and/or debt interests.

165.    Upon information and belief, OFAC's sanctions and failure to grant licenses has

also caused certain investments in portfolio companies to diminish in value and threatened their ongoing viability because Plaintiffs, such as USVCP-GP and IVCP-GP, cannot provide necessary consent, as general partners, on behalf of the Investment Funds, for portfolio companies to conduct certain business operations.  For example, upon information and belief, as shareholders or Board members of certain portfolio companies, those Investment Funds must provide consent for certain ordinary course corporate actions, such as raising capital or selling a portfolio company.

166.   By way of example, the following is a non-exhaustive list of investments in portfolio companies by USVCP or IVCP (in addition to those identified above), with respect to which Plaintiffs USVCP-GP and IVCP-GP have been deprived of their management and control rights:

167.   USVCP owns approximately 14.3% of the equity interests of Portfolio Company N, a data analytics and solutions company.  USVCP occupies a seat on the Portfolio Company N Board of Directors.  Thus, Portfolio Company N cannot engage in any transactions that require unanimous Board consent.  Upon information and belief, as of March 28, 2019, USVCP's equity interests in Portfolio Company N had an estimated fair market value of approximately $9,732,229.

168.   IVCP owns approximately 15.4% of the equity interests of Portfolio Company O, a company that provides payment-processing services, such as currency settlement, online security, data management, and support services.  IVCP also holds a debt security in Portfolio Company O with a 15% interest rate and principal amount of $25,000,000.  Upon information and belief, as of March 28, 2019, IVCP's debt and equity interests in Portfolio Company O had a total estimated fair market value of approximately $69,000,000.  Portfolio Company O had an offer to sell an asset that it could not sell without IVCP's consent.  Because IVCP could not provide consent, the opportunity to sell the asset was lost.

169.     IVCP owns approximately 13.9% of the equity interests of Portfolio Company P, an Israeli cyber-security company.  IVCP resigned from its seat on the Portfolio Company P Board of Directors—a seat to which IVCP is entitled based on its equity holdings in Portfolio Company P—to allow Portfolio Company P to take actions that require unanimous Board consent, and Portfolio Company P is exploring ways to force a sale of IVCP shares to a third party.  Upon information and belief, as of March 28, 2019, IVCP's equity interests in Portfolio Company P had an estimated fair market value of approximately $28,500,000.

170.     IVCP is the limited partner and owns approximately 9.4% of the equity interests of Portfolio Company Q and 3.4% of the equity interests of Portfolio Company R, which invest in "digital life technologies" companies.  Upon information and belief, as of March 28, 2019, IVCP's equity interests in Portfolio Company Q and Portfolio Company R had a total estimated fair market value of approximately $5,899,000.  IVCP was blocked from making capital call payments of $330,000 it owed to Portfolio Company Q, and $45,000 it owed to Portfolio Company R, that were due on June 10, 2018.  As a result of those missed payments, the general partner of Portfolio Company Q and Portfolio Company R is entitled to force the sale of IVCP's interests in Portfolio Company Q and Portfolio Company R at discounted values.

171.     IVCP owned approximately 20.7% of the equity interests of Portfolio Company S, an Israeli company that developed artificial intelligence solutions for security and defense, and enterprise markets.  IVCP resigned from its seat on the Portfolio Company S Board of Directors— a seat to which IVCP was entitled based on its equity holdings in Portfolio Company S—to allow Portfolio Company S to take actions that require unanimous Board consent.  IVCP was therefore unable to participate in the management of Portfolio Company S.  Portfolio Company S is now out of business.

**FIRST CAUSE OF ACTION**
**(UNLAWFUL SEIZURE UNDER THE FOURTH AMENDMENT)**

172.     Plaintiffs repeat and reallege Paragraphs 1 through 171 above as set forth here in full.

173.     Defendants' blocking of Plaintiffs' property by operation of the 50% Rule is a warrantless and unreasonable seizure of property in violation of the Fourth Amendment of the United States Constitution.

174.     Defendants' failure to return or restore Plaintiffs' access to their property, by the grant of a license or otherwise, is a continuing unreasonable seizure in violation of the Fourth Amendment of the United States Constitution.

**SECOND CAUSE OF ACTION**
**(DUE PROCESS VIOLATION UNDER THE FIFTH AMENDMENT)**

175.     Plaintiffs repeat and reallege Paragraphs 1 through 174 above as set forth here in full.

176.     Defendants have violated Plaintiffs' Fifth Amendment due process rights by, *inter alia*, (i) failing to grant the relief requested in the Audubon License Application, Consolidated License Applications (including the USVCP & IVCP License Application, Portfolio Company C License Application, and Negotiation License Application), Management Fees License Application, and CN MapAnything License Application, and the amendments thereto; (ii) failing to provide notice of the basis for not approving those specific license applications, a meaningful opportunity to be heard, and a prompt determination of the specific license applications; (iii) providing no time limit for when they will make a final determination with respect to the specific licenses; (iv) providing no public guidance in rules and regulations to constrain OFAC's exercise of its otherwise unfettered discretion to block the property interests of non-sanctioned U.S. citizens; and (v) imposing unreasonable restrictions on Plaintiffs' rights to control and

manage their property.

### THIRD CAUSE OF ACTION
### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

177.   Plaintiffs repeat and reallege Paragraphs 1 through 176 above as set forth here in full.

178.   OFAC's designations of SDNs on April 6, 2018, as applied to Plaintiffs through OFAC's 50% Rule, is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to Plaintiffs' constitutional rights in violation of 5 U.S.C. §§ 706(2)(A) and (2)(B).  The sanctions designations and the 50% Rule are final agency action that have caused an indefinite blocking of Plaintiff's property interests in violation of the prohibition on unreasonable seizures of property under the Fourth Amendment of the United States Constitution.

### PRAYER FOR RELIEF

NOW WHEREFORE, Plaintiffs US VC Partners GP LLC, US VC Partners Management, LLC, Israeli VC Partners Ltd., Israeli VC Partners Management, LLC, CN Odyssey GP LLC, CN MapAnything GP LLC, Sparrow Capital Holdings LLC, Audubon Loan Funding GP LLC, CN Partners LLC, and Andrew Intrater pray this court to:

a.   Declare that OFAC's 50% Rule is unconstitutional and unlawful, as applied to restrain the property interests of U.S. persons and entities not otherwise subject to OFAC sanctions;

b.   Declare that Defendants unreasonably seized Plaintiffs' property in violation of the Fourth Amendment, and/or that Defendants continued restraint of such property is an unreasonable seizure in violation of the Fourth Amendment;

c.   Declare that Defendants have violated Plaintiffs' Fifth Amendment Due Process rights;

d.  Order Defendants to unblock or otherwise return Plaintiffs' property interests pursuant to Federal Rule of Criminal Procedure 41(g) and/or this Court's equitable powers;

e.  Order that Plaintiffs' property and interests in property held through the Investment Funds are not blocked pursuant to 31 C.F.R. § 589.406;

f.  Order that Plaintiffs may negotiate with the limited partners (and their representatives) of the Investment Funds to finalize the amount of the proceeds due to Plaintiffs from the Investment Funds;

g.  In the alternative to the relief sought by Paragraphs a through f above, declare that the Investment Funds are not blocked;

h.  Award Plaintiffs reasonable attorneys' fees and costs; and

i.  Grant any other relief the Court deems appropriate.

### **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby respectfully demand a jury trial.

Dated:       New York, New York
              July 1, 2019

LATHAM & WATKINS LLP


By /s/ Richard D. Owens
    Richard D. Owens
    Eric L. Taffet
    885 Third Avenue
    New York, New York 10022-4834
    Telephone:  (212) 906-1200
    Facsimile:  (212) 751-4864
    Richard.Owens@lw.com
    Eric.Taffet@lw.com

*Attorneys for Plaintiffs US VC Partners GP LLC, US VC Partners Management, LLC, Israeli VC Partners Ltd., Israeli VC Partners Management, LLC, CN Odyssey GP LLC, CN MapAnything GP LLC, Sparrow Capital Holdings LLC, Audubon Loan Funding GP LLC, CN Partners LLC, and Andrew Intrater*