# EXHIBIT 17

**OPERATING AGREEMENT**

**OF**

**AUDUBON LOAN FUNDING LLC**

# OPERATING AGREEMENT

## OF

## AUDUBON LOAN FUNDING LLC

### Dated as of October 13, 2017

The undersigned hereby enter into this Operating Agreement (the "Agreement") of AUDUBON LOAN FUNDING LLC (the "Company"). The Company was formed as a limited partnership on January 10, 2017 upon the filing of a Certificate of Limited Partnership with the Secretary of State of the State of Delaware, and subsequently converted into a limited liability company on January 19, 2017, by the filing of a Certificate of Conversion, pursuant to the provisions of the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.) (the "Act").

## ARTICLE I.
## General Provisions

**Section 1.01**   Company Name and Address. The name of the Company is AUDUBON LOAN FUNDING LLC. Its principal office is located at 900 Third Avenue, New York, NY 10022 or at such other location as the Managing Members (as defined in Section 1.05) in the future may designate.

**Section 1.02**   Registered Office and Registered Agent. The address of the registered office of the Company in the State of Delaware is c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  The name and address of the registered agent of the Company in the State of Delaware is Corporation Service Company. The registered agent or office of the Company may be changed by the Managing Members from time to time through appropriate filings with the Secretary of State of the State of Delaware.

**Section 1.03**   Purposes of the Company. The purpose of the Company is to engage in any lawful activities deemed fit by the Managing Members.

**Section 1.04**   Units; Membership Units. The Company shall initially have 1,000 authorized units ("Units"), which at any time shall be allocated amongst the Members (as defined herein) on a pro rata basis commensurate to Members' Capital Contributions as a percentage of the total Capital Contributions ("Membership Units"). The number of Membership Units owned by a Member as a percentage of the total Membership Units shall be the Member's "Interests".

**Section 1.05**   The Members.

(a)   The names, addresses, Capital Contributions (as hereinafter defined) of the Members, including the number of Membership Units owned, are set forth on Exhibit A hereto and in the books and records of the Company. The initial Special Managing Members of the Company are Andrew Intrater and ███████████.   The Special Managing Members and others identified herein as a Managing Member are, collectively, the "Managing Members". The

Special Managing Members and Managing Members may be changed by the vote of a majority in Interests of the Members.

(b)     The Managing Members, the Non-Managing Members (any Member who is not a Managing Member or an Associated Non-Managing Member (as defined herein), shall be a "Non-Managing Member"), and the Associated Non-Managing Members are referred to herein as the "Members". As used in this Agreement, the term "former Member" refers to such persons or entities as hereafter from time to time cease to be a Member, whether voluntarily or otherwise, pursuant to the terms and provisions of this Agreement.  Except as otherwise specifically provided in this Agreement, each Associated Non-Managing Member shall have the rights, duties, and obligations and be treated in all respects as a Non-Managing Member.

Section 1.06   Fiscal Year. The fiscal year of the Company (the "Fiscal Year") shall end on December 31 of each year.

Section 1.07                Liability of Members.

(a)     The Members and former Members shall be liable for the repayment and discharge of all debts and obligations of the Company attributable to any Fiscal Year (or relevant portion thereof) during which they are or were Members of the Company only to the extent of their respective Capital Account in the Company in the Fiscal Year (or relevant portion thereof) to which any such debts and obligations are attributable.

(b)     The Members and all former Members shall share all losses, liabilities or expenses suffered or incurred, in the proportions of their respective Capital Account in the Company for the Fiscal Year (or relevant portion thereof) to which any debts or obligations of the Company are attributable. A Member's or former Member's share of all losses, liabilities or expenses shall not be greater than such Member's Interests in the Company for such Fiscal Year (or relevant portion thereof). The Company shall maintain directors and officers insurance for the Managing Members.

(c)     Notwithstanding any other provision in this Agreement, in no event shall any Member (or former Member) have any liability for the repayment and discharge of the debts and obligations of the Company (apart from such Member's Interest in the Company), except that a Member (or former Member) may be required, for purposes of meeting such Member's obligations under this Section 1.07, to make additional contributions or payments, respectively, up to, but in no event in excess of, the aggregate amount of returns of capital and other amounts actually received by him from the Company during or after the Fiscal Year to which any debt or obligation is attributable.

Section 1.08   Transfers. (a) Subject to clauses (b) and (c) below, no Member shall have the right to sell, assign, pledge, transfer or otherwise dispose of ("Transfer") all or any part of such Member's Interest in the Company without the consent of at least a majority of the Managing Members, which may be withheld in their sole and absolute discretion, and without otherwise complying with the terms of this Agreement. Any purported Transfer of all or any part

of any Membership Units in contravention of this Section 1.08 shall be null and void and of no force and effect.

(b)     Notwithstanding clause (a) above, each Managing Member may without the consent of the other Managing Members, Transfer all or any part of such Member's Membership Units to such Managing Member's spouse and/or children and/or to trusts or other estate planning entities of, or for the benefit of any of them and/or such Managing Member; provided, however, that (i) such transferees shall be admitted to the Company as Associated Non-Managing Members, (ii) except where such a transfer is made to a trust wholly revocable by such transferor Managing Member, the transferors shall retain at least a nominal interest in the Company, (iii) such transferor Managing Member must retain investment decision-making authority for any such trusts, and (iv) such Transfer is permissible under applicable law.  Such transferees shall be referred to in this Agreement as "Associated Non-Managing Members".

(c)     In addition, the personal representative, executor, administrator, guardian, conservator or other legal representative of a deceased or disabled Managing Member may exercise the rights of the Managing Member, and such Managing Member's Membership Units, as assignee for the purpose of administration of such deceased Managing Member's estate or such disabled Managing Member's property.  Any such assignee will be entitled only to receive distributions and allocations with respect to such Membership Units as set forth in this Agreement, and shall have no other rights, benefits or authority of a Managing Member under this Agreement or the Act, including, without limitation, no right to receive notices to which Managing Members are entitled under this Agreement, no right to vote, and no other rights of a Managing Member under the Act or this Agreement; provided, however, that the Membership Units of such assignee shall be subject to all of the restrictions, obligations and limitations under this Agreement and the Act, including, without limitation, the restrictions on Transfers of Membership Units.


## ARTICLE II.

### Management of the Company

**Section 2.01**   Management Generally. The power to make investment decisions and decisions with regard to the management of the Company shall be vested in the Managing Members as set forth herein.  The Managing Members shall have the power and authority, on behalf of the Company, to take any action of any kind not inconsistent with the provisions of this Agreement and do anything and everything they deem necessary or appropriate to carry on the business and purposes of the Company. The Managing Members shall have the rights and authority to act on behalf of the Company as expressly stated herein. Except as otherwise specifically stated herein, no consent of any other Member shall be required and references to matters being determined in the discretion of the Managing Member shall mean in their sole discretion unless otherwise stated. Unless otherwise explicitly stated herein, any actions to be

taken pursuant to powers granted to the Managing Members shall require the consent of a majority of the Managing Members.

**Section 2.02**    Authority of the Special Managing Members.

(a)    Except as otherwise expressly provided in this Agreement, the Special Managing Members acting in unison shall have the authority, on behalf of the Company, to take any action or make any decisions on behalf of the Company hereunder, to carry out any and all of the purposes of the Company set forth in Section 1.03 and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power:

(i)    to manage and direct the business affairs of the Company, to do any and all acts on behalf of the Company, and to exercise all rights of the Company with respect to its interest in any other person, corporation, partnership or other entity including without limitation, the voting of securities, participation in arrangements with creditors, the institution, defense and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(ii)    to acquire, own, lease, sublease, manage, hold, deal in, control or dispose of any interests or rights in real or personal property;

(iii)    to hire and fire consultants, attorneys, accountants, appraisers and other advisers for the Company;

(iv)    to hire and fire any and all employees of the Company;

(v)    to open, maintain and close bank accounts and draw checks or other orders for the payment of moneys;

(vi)    to make capital expenditures or incur any commitments for capital expenditures;

(vii)    to initiate any legal action for, or settle or release any claim involving, the Company;

(viii)    to enter into, amend or terminate any contract;

(ix)    to approve, authorize, pay or distribute any distributions by the Company (whether in cash, securities or other property) in respect of Membership Units;

(x)     to sell, lease, pledge or otherwise dispose of all or any of the assets of the Company;

(xi)    to borrow money or enter into any other financing arrangement;

(xii)   to direct the formulation of investment policies and strategies for, and perform all other acts on behalf of, the Company and any entities for which the Company acts as investment manager, adviser or in other similar capacities; and

(xiii)  to authorize any Member, officer, employee or other agent to act for and on behalf of the Company as to the foregoing and all matters pertaining thereto.

(b)     The signatures of all of the Special Managing Members shall be required to bind the Company with respect to any and all matters.

(c)     For the avoidance of doubt, the exercise by the Special Managing Members of any of the powers delegated to them herein shall require the consent of all Special Managing Members. In the event that there is an even number of Special Managing Members and they cannot agree on a course of action requiring unanimous consent (an "SMM Deadlock"), they shall use their best efforts to cooperate and resolve the SMM Deadlock in the best interests of the Company and its Members. If an SMM Deadlock persists for more than three (3) business days, any Special Managing Member may issue an SMM Deadlock notice to the other(s), whereupon the Special Managing Members shall as quickly as reasonably possible, consult with James C. Gorton, Esq. ("Gorton") in an attempt to resolve the SMM Deadlock; provided, that if the SMM Deadlock is still not resolved after consultation with Gorton, Gorton may chose a resolution mechanism to resolve the SMM Deadlock, the results of which shall constitute the final decision on the SMM Deadlock.

**Section 2.03**   Duties of Managing Members.

(a)     Anything herein to the contrary notwithstanding, the prior consent of all the Managing Members is required:

(i)     to take any action to merge or consolidate with or into any other entity, or to dissolve, liquidate or wind up the Company;

(ii)    to sell all or substantially all of the assets of the Company;

(iii)   subject to the provisions of this Agreement, to admit additional Members, or redeem, repurchase or otherwise acquire outstanding Membership Units and to accept additional Capital Contributions, and to amend Exhibit A hereto to reflect any such actions taken; and

(iv)    the adoption of investment policies and strategies.

(b)    Without the prior consent of the Special Managing Members, any of the Managing Members may:

(i)    act for and on behalf of the Company in connection with the immaterial day to day operating activities of the Company;

(ii)    make investment recommendations to the Members;

(iii)    authorize any expense of the Company in an amount up to $10,000; and

(iv)    act on behalf of the Company in the negotiation of immaterial agreements in the ordinary course, including but not limited to, nondisclosure agreements.

(c)    For the avoidance of doubt, the exercise by the Managing Members of any of the powers delegated to them in Section 2.03(a) hereof shall require the consent of all the Managing Members. In the event that there is an even number of Managing Members and they cannot agree on a course of action requiring unanimous consent (an "MM Deadlock"), they shall use their best efforts to cooperate and resolve the MM Deadlock in the best interests of the Company and its Members. If an MM Deadlock persists for more than three (3) business days, any Managing Member may issue a Deadlock notice to the other(s), whereupon the Managing Members shall as quickly as reasonably possible, consult with Gorton in an attempt to resolve the MM Deadlock; provided, that if the MM Deadlock is still not resolved after consultation with Gorton, Gorton may chose a resolution mechanism to resolve the MM Deadlock, the results of which shall constitute the final decision on the MM Deadlock.

**Section 2.04**    Confidentiality; Nondisparagement; Other Activities.

(a)    Prior to the withdrawal of such Member as a member of the Company, and thereafter without limitation of time, no Member shall knowingly divulge, furnish, or make available to any third person or entity, without the Company's prior written consent, any trade secrets or other confidential information concerning the Company, any of its Affiliates or any of its customers, or any business of the foregoing, including, without limitation, (i) information concerning the operations, systems, services, personnel, financial affairs and investment returns, strategies and techniques of the Company or any of its Affiliates, (ii) computer software, forms, contracts, agreements, literature or other documents designed, developed or written by, for, with or on behalf of the Company, any of its Affiliates or any of their respective investors or customers, and (iii) the identity of any investors or investments of the Company or its Affiliates or other information about such investors or investments or information about any fund advised by the Company.  Notwithstanding the foregoing, nothing herein shall prevent a Member from responding to lawful subpoenas or court orders without the Company's prior written consent;

provided that such Member shall have given the Company prior written notice of any such subpoena promptly following receipt thereof.

(b)     Prior to the withdrawal of such Member as a member of the Company, and thereafter without limitation of time, no Member shall disparage or defame the Company, its Affiliates, current or former officers, directors, shareholders, partners or Members, in communications with investors, clients, potential clients, competitors, the media, or other persons or entities with whom any of the above do business or may do business.

(c)     Prior to the withdrawal of such Member as a member of the Company, and for a period of twelve (12) months thereafter, no Member shall directly or indirectly, on behalf of the Member or any other person or entity, (i) solicit, induce or encourage the resignation of any Member or employee of the Company or its Affiliates, or in any way interfere with the relationship between the Company and its Affiliates and any Member or employee, or hire any Member or employee whom the Company or its Affiliates employ at the time of the withdrawal of such Member, or had employed at any time during the six month period preceding the withdrawal of such Member; or (ii) interfere or attempt to interfere with the relationship between the Company and its limited partners or portfolio companies and any of their employees or clients.

(d)     Each Member acknowledges that the material breach or attempted or threatened breach by him or her of any provisions of this <u>Section 2.04</u> would cause irreparable injury to the Company not compensable in money damages and that the Company shall be entitled, in addition to all other applicable remedies (including liquidated damages separately agreed to in writing), to obtain a temporary and a permanent injunction and a decree for specific performance of this <u>Section 2.04</u> without being required to prove damages or furnish any bond or other security.   The provisions of this <u>Section 2.04</u> shall survive the termination of this Agreement.

**Section 2.05**   <u>Activity of the Managing Members</u>. The Managing Members shall devote so much of their time to the affairs of the Company as in the judgment of the Special Managing Members the conduct of the business of the Company shall reasonably require. Subject to <u>Section 2.04</u> above, nothing herein contained shall be deemed to preclude the Managing Members or their respective Affiliates from engaging, directly or indirectly, in any other business, and no Member shall have the right to participate in any manner in any profits or income earned or derived by or accruing to the Managing Members or their respective Affiliates from the conduct of any such other business.

**Section 2.06**   <u>Exculpation</u>.

(a)     No Member (including the Managing Members) or Affiliate thereof (collectively, the "<u>Indemnified Parties</u>") shall be liable to any Member or the Company for mistakes of judgment or for any action or inaction, unless such mistakes, action or inaction arise out of, or are attributable to, the gross negligence, willful misconduct or bad faith of the Indemnified Party; nor shall any Indemnified Party be liable to any Member or the Company for any action or inaction of any broker, or other agent of the Company or the Managing Members,

provided that such employee, broker or agent was selected, engaged or retained by such Indemnified Party with reasonable care. Any Indemnified Party may consult with counsel, accountants, investment bankers, financial advisers, appraisers and other specialized, reputable, professional consultants or advisers in respect of Company affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such persons, provided that they shall have been selected with reasonable care.

(b)     Notwithstanding any of the foregoing to the contrary, the provisions of this Section 2.06 shall not be construed so as to relieve (or attempt to relieve) the Indemnified Parties of any liability, to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section 2.06 to the fullest extent permitted by law.

**Section 2.07**     Indemnification.

(a)     Each Indemnified Party shall, in accordance with this Section 2.07, be indemnified and held harmless by the Company from and against any and all losses, claims, damages, liabilities, expenses (including legal and other professional fees and disbursements), judgments, fines, settlements, and other amounts (collectively, the "Indemnification Obligations") arising from any and all claims, demands, actions, suits or proceedings (civil, criminal, administrative or investigative), actual or threatened, in which such Indemnified Party may be involved, as a party or otherwise, by reason of such person's service to or on behalf of, or management of the affairs of, the Company, or rendering of advice or consultation with respect thereto, or which relate to the Company, its properties, business or affairs, whether or not the Indemnified Party continues to be such at the time any such Indemnification Obligation is paid or incurred, provided that such Indemnification Obligation resulted from a mistake of judgment, or from action or inaction of such Indemnified Party that did not constitute gross negligence, willful misconduct or bad faith. The Company shall also indemnify and hold harmless an Indemnified Party from and against any Indemnification Obligation suffered or sustained by such Indemnified Party by reason of any action or inaction of any employee, broker or other agent of such Indemnified Party; provided, however, that such employee, broker or agent was selected, engaged or retained by such Indemnified Party with reasonable care. The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that such Indemnification Obligation resulted from the gross negligence, willful misconduct or bad faith of such Indemnified Party. Expenses (including legal and other professional fees and disbursements) incurred in any proceeding will be paid by the Company in advance of the final disposition of such proceeding upon receipt of an undertaking by or on behalf of such Indemnified Party to repay such amount if it shall ultimately be determined that such Indemnified Party is not entitled to be indemnified by the Company as authorized hereunder.

(b)     The indemnification provided by this Section 2.07 shall not be deemed to be exclusive of any other rights to which each Indemnified Party may be entitled under any agreement, or as a matter of law, or otherwise, both as to action in such Indemnified Party's official capacity and to action in another capacity, and shall continue as to such Indemnified

Party who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of a Managing Member, as the case may be, and shall inure to the benefit of the heirs, successors and administrators of such Indemnified Party.

(c)　　The Managing Members shall have the power to cause the Company to purchase and maintain insurance on behalf of each Indemnified Party, at the expense of the Company, against any liability which may be asserted against or incurred by them in any such capacity, whether or not the Company would have the power to indemnify the Indemnified Parties against such liability under the provisions of this Agreement.

(d)　　Notwithstanding any of the foregoing to the contrary, the provisions of this <u>Section 2.07</u> shall not be construed so as to provide for the indemnification of an Indemnified Party for any liability to the extent (but only to the extent) that such indemnification would be in violation of applicable law or that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this <u>Section 2.07</u> to the fullest extent permitted by law.

**Section 2.08**　　<u>Other Matters Concerning the Members.</u>

(a)　　Each Managing Member may rely, and shall be protected in acting or refraining from acting, upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)　　In the discretion of the Special Managing Members, the Company may enter into supplementary agreements with (i) one or more Managing Members regarding the rights and obligations of such Managing Member(s) with respect to the Company and/or (ii) one or more employees of the Company regarding the rights and obligations of such employee(s) with respect to the Company. Among other things, such agreements may provide for bonuses and other compensation to employees. The Members acknowledge and agree that, in the event of any conflict between the terms of such agreements and the terms of this Agreement with respect to the rights and obligations of such signatory Managing Member, the terms of such agreements shall control.

(c)　　If any Managing Member shall personally guarantee any liability or obligation of the Company, then such Managing Member shall have a right of contribution from the other Members for all amounts paid and all costs and expenses incurred as a result thereof, pro-rated as to each other Member based upon the relative Capital Contributions (as defined herein) of the Members.

**Section 2.09**　　<u>Expenses</u>. The Company shall be responsible for paying, and the Managing Members shall pay directly out of Company funds, all reasonable costs and expenses incurred in connection with the business of the Company, including, without limitation, any out-of-pocket expenses of any Managing Member incurred in connection with the business of the Company, liability and other insurance premiums, expenses incurred in the preparation of reports to the Members and legal, accounting and other professional fees and expenses, if any.

171006:1431

**Section 2.10**   <u>Limited Rights of Non-Managing Members</u>. Notwithstanding anything herein to the contrary, the following provisions shall apply with respect to each Non-Managing Member:

(a)     the rights of a Non-Managing Member hereunder shall be limited solely to such Non-Managing Member's right to receive distributions and allocations as more fully set forth herein;

(b)     except as otherwise provided by law, the Managing Members shall not be deemed to have any fiduciary or other duties to the Non-Managing Members, and**,** except as otherwise provided by law, none of the Non-Managing Members shall be beneficiaries of any terms or provisions of this Agreement (including, without limitation, any provisions setting forth any duties, covenants or undertakings on the part of a Managing Member, all of which duties, covenants and undertakings are set forth herein for the sole benefit of the other Managing Members); and

(c)     the Non-Managing Members shall not have any right to prevent or restrict any Managing Member from engaging in other business ventures or activities of any nature, whether or not competitive with the business of the Company, and the Non-Managing Members shall not have any rights whatsoever with respect to the income or profits derived therefrom. Nothing herein shall prevent the Managing Members from enforcing any non-competition or other provisions contained in other agreements to which the Company and a Member may be parties. In the event any such Non-Managing Member shall assert any claim or take any other action which is inconsistent with the foregoing provisions, such Non-Managing Member shall indemnify, defend and hold harmless the Company, the Managing Members and all other Non-Managing Members against any losses, claims, damages or liabilities (including, without limitation, legal fees and expenses) to which any of them may become subject as a result of such assertion or action.

## <u>ARTICLE III.</u>

Capital Accounts of Members
and Operation Thereof

**Section 3.01**   <u>Definitions</u>. For the purposes of this Agreement, unless the context otherwise requires:

(a)     "<u>Affiliate</u>", when used with respect to any person, corporation, association, partnership, organization, business, individual, or government or political subdivision thereof or a governmental agency shall mean (a) any other person at the time directly or indirectly controlling, controlled by or under direct or indirect common control with such person, (b) any other person of which such person at the time owns, or has the right to acquire, directly or indirectly, 10% or more on a consolidated basis of the equity or beneficial interest of such person, (c) any other person which at the time owns, or has the right to acquire, directly or indirectly, 10% or more of any class of the capital stock or beneficial interest of such person, (d) any executive officer or director of such person, and (e) when used with respect to an individual,

shall include a spouse, any ancestor or descendant, or any other relative (by blood, adoption or marriage), within the second degree of such individual.

(b)     "Capital Contribution" shall mean, with respect to any Member, cash received by the Company from such Member in connection with such Member's Membership Units.

(c)     "Code" means the Internal Revenue Code of 1986, as amended.

(d)     "Net Income or Net Loss", as appropriate, means, for any Fiscal Year, the taxable income or tax loss of the Company for such period for Federal income tax purposes as determined by the Company's independent public accountants taking into account any separately stated items, increased by the amount of any tax-exempt income of the Company during such period and decreased by the amount of any Code Section 705(a)(2)(B) expenditures (within the meaning of Treasury Regulations Section 1.704-1(b)(2)(iv)(i)) of the Company. In the event that the Capital Accounts are adjusted pursuant to Section 3.04 the Net Income or Net Loss of the Company (and the constituent items of income, gain, loss and deduction) realized thereafter shall be computed in accordance with the principles of Treasury Regulations Section 1.704-1(b)(2)(iv)(f) and (g).

**Section 3.02**     Capital Contributions.

(a)     Each Member hereby agrees to make a Capital Contribution to the Company in the amount set forth on Exhibit A attached hereto.

(b)     The Members may make additional capital contributions to the Company at such times and in such amounts as shall be determined by the Managing Members.

(c)     No Member shall have any obligation to the Company or to any other Members to restore any negative balance in the Capital Account of such Member. No interest shall be paid by the Company on any Capital Contributions.

**Section 3.03**     Capital Accounts.

(a)     There shall be established for each Member on the books of the Company a capital account (a "Capital Account"), which shall be maintained and adjusted as provided in this Article III. The Capital Account of a Member shall be credited with (i) the amount of all cash Capital Contributions by such Member to the Company, (ii) the fair market value of any property contributed by such Member to the Company (net of any liabilities secured by such property that the Company is considered to assume or take subject to under Section 752 of the Code) and (iii) the amount of any Company liabilities assumed by the Member.

**Section 3.04**     Allocations. Net Income or Net Loss for each Fiscal Year (and from and after the Fiscal Year in which Company begins winding up, to the extent necessary, items of gross income or gross deduction) shall be allocated to the Members in the manner that the Managing Members determine will as nearly as possible cause each Member's Capital Account

to be equal to the amount such Member would receive if, immediately following such allocation, the Company sold all of its assets for cash equal to their tax "book" value, paid its liabilities (limited, in the case of a nonrecourse liability, to the fair market value of Company's assets security such liability) from such proceeds, and distributed its remaining assets in accordance with the terms of this Agreement (taking into account any allocations in connection with the deemed sale, but before the Capital Account is reduced for the liquidating distribution or any deemed distribution, and any Distributions that were previously made to such Member during the Fiscal Year to the extent they were not previously taken into account in determining such Member's Capital Account).

**Section 3.05**   Special Allocations.

(a)    Section 704(b) Allocation Limitations. Notwithstanding any other provisions of this Agreement to the contrary, the Company shall specially allocate Net Income, Net Loss or specific items of income, gain, loss or deduction when and to the extent required to satisfy the "qualified income offset" requirement within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(d).

(b)    Adjustment of Allocations. In the event that the Managing Members reasonably determine that the allocations otherwise required would not properly reflect the economic arrangement of the Members and would cause any inequitable or onerous result for any Members, then, notwithstanding any provision in this Agreement to the contrary, the Managing Members may adjust such allocations in such manner as the Managing Members reasonably determine to be required to prevent such result.

**Section 3.06**   Liabilities. Liabilities shall be determined in accordance with generally accepted accounting principles applied on a consistent basis; provided, however, that the Managing Members, in their sole discretion, may provide reserves for estimated accrued expenses, liabilities or contingencies, whether or not in accordance with generally accepted accounting principles.

**Section 3.07**   Allocation of Income and Loss for Tax Purposes. The Company's ordinary income and losses, capital gains and losses and other items as determined for Federal income tax purposes (and each item of income, gain, loss or deduction entering into the computation thereof) shall be allocated to the Members in proportions to their Interests

**Section 3.08**   Determination by the Managing Members of Certain Matters. All matters concerning valuations and the allocation of taxable income, deductions, credits, and Net Income or Net Loss among the Members, including taxes thereon and accounting procedures, not expressly provided for by the terms of this Agreement, shall be equitably determined in good faith by the Managing Members, whose determination shall be final, conclusive and binding as to all of the Members.

**Section 3.09**   Adjustments by the Managing Members to Take Account of Interim Year Events. In the event that a Member shall be admitted to, or shall withdraw from, the Company other than at the end of the Company's Fiscal Year, allocations among the Members and

accounting procedures shall be equitably determined in good faith by the Managing Members, whose determination shall be final, conclusive and binding as to all of the Members.

**Section 3.10** <u>Compliance with Treasury Regulations</u>. The foregoing provisions and other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent therewith. If the Managing Members determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with Regulations Section 1.704-1(b), the Managing Members may make such modification if it is not likely to have a material adverse effect on amounts distributable to any Member pursuant hereto on the dissolution of the Company. The Managing Members shall also make any appropriate modifications if unanticipated events might cause this Agreement not to comply with Regulations Section 1.704-1(b), and the Managing Members may make any elections provided for under such Regulations.

**Section 3.11** <u>Understanding of Each Member</u>. Each Member represents to the Company and the other Members that it understands the income tax consequences of the allocations made by <u>Article III</u> and agrees to be bound by such allocation provisions in reporting its share of income and loss for income tax purposes.

## <u>ARTICLE IV.</u>

### Loans to Members; Compensation of the Members;
### Loss and Distributions;
### Limitations on Withdrawals of Capital

**Section 4.01** <u>Loans to Members</u>. Without the consent of the Managing Members, whose consent may be withheld in their sole discretion, the Company shall not make loans to any Member.

**Section 4.02** <u>Compensation of the Members; Expenses</u>. In the sole discretion of the Managing Members, the Company may pay a salary or other compensation to any Member and the Company shall reimburse each Managing Member and any other Member for reasonable expenses incurred by them in connection with the business of the Company.

**Section 4.03** <u>Distributions</u>. Except as otherwise specified herein, distributions shall be distributed to Members in accordance with their respective Interests as of the date of distribution.

**Section 4.04** Notwithstanding any other provision in this <u>Section 4</u>, all amounts distributed in connection with a liquidation of the Company or the sale or other disposition of all or substantially all of the assets of the Company that leads to a liquidation of the Company shall be distributed to the Members in accordance with their respective Capital Account balances, as adjusted for all Company operations up to and including the date of such distribution.

**Section 4.05** At the sole discretion of the Managing Members, the Company may distribute any assets in kind. If cash and property are to be distributed in kind simultaneously, the

Company shall distribute such cash and property in kind in the same proportion to each Member, unless otherwise determined by the Managing Members. For purposes of determining amounts distributable to the respective Members under this Section 4.05, any property to be distributed in kind shall have the value assigned to such property by the Managing Members, and the amount of Net Income or Net Loss that would have been realized had such assets been sold at their fair market value shall be allocated to the Capital Accounts of the Members.

**Section 4.06**   Limitation on Distributions and Withdrawals. Distributions and permitted withdrawals are subject to the provision by the Company for (i) all Company liabilities in accordance with the Act and (ii) reserves for liabilities taken in accordance with Section 3.06 hereof. The unused portion of any cash reserve shall be distributed with interest at the prevailing savings bank rate for unrestricted deposits from time to time in effect in New York, New York, as determined by the Managing Members, after the Managing Members have determined that the need therefor shall have ceased.

**Section 4.07**   Withholding.  Each Member acknowledges and agrees that the Company may be required to deduct and withhold tax or to fulfill other obligations of such Member on any withdrawal or distribution under Section 4. All amounts withheld with respect to any withdrawal or distribution to a Member shall be treated as amounts withdrawn or distributed to such Member for all purposes under this Agreement.  If the Company is required to pay any amount to a governmental agency or any other person, or otherwise makes a payment, because of a Member's status or that is otherwise attributable to a Member (including federal withholding taxes with respect to any foreign Member, state and local personal property taxes and state and local unincorporated business taxes), then such Member shall indemnify each other Member and, if applicable, each Member's direct and indirect members, in full for the entire amount paid (including all interest, penalties and expenses associated with such payment). A Member's obligation to make payments to the Company and the other Members pursuant to this Section shall survive the dissolution, liquidation and termination of the Company.

## <u>ARTICLE V.</u>

### **Admission of New Members**

**Section 5.01**   New Members.

(a)     The Managing Members acting unanimously may at any time cause the Company to admit one or more new Members, subject to the condition that each such new Member shall execute (i) an appropriate supplement to this Agreement pursuant to which such Member agrees to be bound by the terms and provisions hereof and shall make a Capital Contribution to the Company of such amount as the Managing Members may require, and (ii) such other documentation as the Managing Members may require. The name and residence address of each new Member admitted to the Company under this Section 5.01 (and his or her Membership Units) shall be reflected on Exhibit A hereto and in the books and records of the Company as of the effective date of such Member's admission. Admission of a new Member shall not be a cause for dissolution of the Company.

    (b)  The consent of all the Managing Members shall be required to designate any new Member as a Managing Member.

**ARTICLE VI.**
**Withdrawal, Death, Disability, Termination of Employment**.

   **Section 6.01** <u>Withdrawal</u>. No Member may withdraw from the Company except with the consent of the Managing Members, which consent may be withheld in their sole and absolute discretion. The personal representative, executor, administrator, guardian, conservator or other legal representative of a deceased or disabled Member may exercise the rights of the Member as assignee as contemplated by <u>Section 1.07(c)</u> hereof. A Member who withdraws from the Company shall no longer have any rights as a Member, except as otherwise expressly provided herein.

**ARTICLE VII.**
Duration and Termination of the Company

   **Section 7.01** <u>Duration of Company</u>. The Company shall continue to operate until the earliest of the following dates: (i) such termination date designated by the Special Managing Members; (ii) termination of the Company as described in <u>Section 7.02</u>; or (iii) the effective date of a decree of judicial dissolution under the Act.

   **Section 7.02** <u>Termination of Company</u>. Upon the dissolution of the Company as provided in <u>Section 7.01</u>, the Special Managing Members or a Managing Member selected by Managing Members holding a majority of the Interests of the remaining Managing Members in the event there is no Special Managing Members, out of Company assets, shall pay first the expenses of winding-up, liquidation and dissolution of the Company, and thereafter all of the remaining assets of the Company shall be distributed in the following order:

    (a)  to creditors, in the order of priority as provided by law; and

    (b)  to all Members in accordance with <u>Section 4</u> hereof.

   Any Net Income or Net Loss attributable to the termination or dissolution of the Company shall be allocated among the Members in accordance with their Interests.

**ARTICLE VIII.**
**Tax Returns; Reports to Members**

   **Section 8.01** <u>Filing of Tax Returns</u>. The Special Managing Members, at the Company's expense, shall prepare and file, or cause the accountants of the Company to prepare and file, a federal information tax return in compliance with Section 6031 of the Code and any required state and local income tax and information returns for each tax year of the Company.

   **Section 8.02** <u>Reports to Current and Former Members</u>. Within 90 days after the end of each Fiscal Year, the Company shall prepare and mail, or cause its accountants to prepare and

mail, to each Member and, to the extent necessary, to each former Member (or his or her legal representative), a report setting forth in sufficient detail such information as shall enable such Member or former Member (or such Member's legal representative) to prepare such Member's federal income tax return in accordance with the laws, rules and regulations then prevailing together with a copy of financial information pertaining to the operations of the Company, prepared in accordance with the Company's method of accounting.

**Section 8.03**   Tax Matters Partner. Andrew Intrater shall be designated on the Company's annual federal information tax return as the Tax Matters Partner of the Company for purposes of Section 6231(a)(7) of the Code, unless another person is required to be designated as the Tax Matters Partner pursuant to the Code, regulations or administrative pronouncements by the Internal Revenue Service. Except with respect to an Associated Non-Managing Member, each person (for purposes of this Section 8.03, called a "Pass-Thru Member") that holds or controls an interest as a Member on behalf of, or for the benefit of another person or persons, or which Pass-Thru Member is beneficially owned (directly or indirectly) by another person or persons shall, within 30 days following receipt from the Tax Matters Partner of any notice, demand, request for information or similar document, convey such notice or other document in writing to all holders of beneficial interests in the Company holding such interests through such Pass-Thru Member. In the event the Company shall be the subject of an income tax audit by any federal, state or local authority, to the extent the Company is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for and his decision shall be final and binding upon, the Company and each Member thereof. All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Company.

**Section 8.04**   Tax Elections. The Special Managing Members shall, without any further consent of the Members being required (except as specifically required herein), make any and all elections for federal, state, local, and foreign tax purposes including, without limitation, any election, if permitted by applicable law: (i) to make the election provided for in Code Section 6231(a)(1)(B)(ii); (ii) to adjust the basis of property pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state, local, or foreign law, in connection with transfers of interests and Company distributions; (iii) with the consent of all of the Members, to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's federal, state, local, or foreign tax returns; (iv) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local, or foreign law, to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company or the Members in their capacities as Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members with respect to such tax matters or otherwise affect the rights of the Company and the Members; and (v) to make an election under proposed Regulation 1.83-3 with respect to partnership interests issued for services.

171006:1431

# ARTICLE IX.
## Miscellaneous

**Section 9.01** <u>General</u>. This Agreement: (a) shall be binding on the executors, administrators, estates, heirs, legal successors and representatives of the Members; and (b) may be executed, through the use of separate signature pages or in any number of counterparts with the same effect as if the parties executing such counterparts had all executed one counterpart; <u>provided</u>, <u>however</u>, that the counterparts, in the aggregate, shall have been signed by all of the Members.

**Section 9.02** <u>Power of Attorney</u>. Each of the Members hereby appoints the Special Managing Members with power of substitution as such Member's true and lawful representative and attorney-in-fact, in such Member's name, place and stead to make, execute, sign, acknowledge, swear to and file:

(a) any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Company;

(b) any business certificate, fictitious name certificate, amendment thereto, or other instrument or document of any kind necessary or desirable to accomplish the business, purpose and objectives of the Company, or required by any applicable federal, state or local law; and

(c) all amendments or modifications to the Agreement to the extent made in accordance with <u>Section 9.03</u> hereof.

The power of attorney hereby granted by each of the Members is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy or insolvency of such Member.

**Section 9.03** <u>Amendments</u>. The terms and provisions of this Agreement may be modified or amended at any time and from time to time by vote of a majority of the Managing Members.

**Section 9.04** <u>CHOICE OF LAW; CONSENT TO JURISDICTION</u>. NOTWITHSTANDING THE PLACE WHERE THIS AGREEMENT MAY BE EXECUTED BY ANY OF THE PARTIES HERETO, THE PARTIES EXPRESSLY AGREE THAT ALL THE TERMS AND PROVISIONS HEREOF SHALL BE CONSTRUED UNDER THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CHOICE OF LAW RULES, AND, WITHOUT LIMITATION THEREOF, THAT THE ACT AS NOW ADOPTED OR AS MAY BE HEREAFTER AMENDED SHALL GOVERN THIS AGREEMENT. EACH MEMBER HEREBY IRREVOCABLY CONSENTS TO PERSONAL EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK WITH RESPECT TO MATTERS ARISING OUT OF OR RELATED TO THE ENFORCEMENT OF THE PROVISIONS OF THIS AGREEMENT.

171006:1431

**Section 9.05**   Notices. Each notice or other communication relating to this Agreement shall be in writing and delivered in person or by registered or certified mail, return receipt requested. All such communications addressed to a Member (or such Member's legal representative) shall be addressed to such Member at the address set forth on Exhibit A hereto. Any Member may designate a new address by notice to that effect given to the Company. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when mailed by registered or certified mail to the proper address or delivered in person.

**Section 9.06**   Goodwill. No value shall be placed on the name or goodwill of the Company.

**Section 9.07**   Headings. The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement.

**Section 9.08**   Arbitration

(a)      In the event of any dispute, claim, question or disagreement arising out of or relating to this Agreement, other than (x) such as may relate to a provision with respect to which the Managing Members may take or refuse to take any action in his sole discretion and (y) to enforce rights arising under Section 2.04 hereof (each such dispute, claim, question or disagreement being referred to as a "Dispute"), such Dispute shall be submitted to binding arbitration by one single arbitrator in accordance with the Comprehensive Arbitration Rules ("Rules") of JAMS, and the procedures set forth below.  In the event of any inconsistency between the Rules and the procedures set forth below, the procedures set forth below shall control.  Judgment upon the award rendered by the arbitrator may be enforced in any court having jurisdiction thereof.

(b)      The location of the arbitration shall be in New York, New York.

(c)      The arbitrator shall be chosen by mutual agreement of the parties hereto within 30 days of the initiation of the Dispute or, if they are unable to agree, by JAMS under its Rules.

(d)      The arbitrator may grant any legal or equitable remedy or relief that the arbitrator deems just and equitable, to the same extent that remedies or relief could be granted by a state or federal court in the United States.  The decision of the arbitrator shall be binding upon the parties.  It is the intention of the parties that the parties shall be entitled to reasonable discovery in accordance with the Federal Rules of Civil Procedure unless the arbitrator requires otherwise.

(e)      The expenses of the arbitration, including the arbitrator's fees, expert witness fess and attorneys' fees, may be awarded to the prevailing party, in the discretion of the arbitrator, or may be apportioned between the parties in any manner deemed appropriate by the arbitrator.  Unless and until the arbitrator decides that one party is to pay for all (or a portion) of

171006:1431

such expenses, both parties shall share equally in the payment of the arbitrator's fees as and when billed by the arbitrator.

(f) Except as set forth below, the parties shall keep confidential the fact of the arbitration, the dispute being arbitrated, and the decision of the arbitrator. Notwithstanding the foregoing, the parties may disclose information about the arbitration to persons who have a need to know, such as directors, trustees, management employees, witnesses, experts, investors, attorneys, lenders, insurers and others who may be directly affected.

**Section 9.09** <u>Severability; Blue Pencil</u>. In the event that any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected thereby. The parties hereto agree that the covenants contained herein are reasonable covenants under the circumstances, and further agree that if, in the opinion of any court of competent jurisdiction such covenants are not reasonable in any respect, such court shall have the right, power and authority to excise or modify such covenants as to the court shall appear not reasonable and to enforce the remainder of such covenants as so amended.

[Signature Page Follows.]

**IN WITNESS WHEREOF**, the undersigned have hereunto set their hands as of the date first set forth above.

**MEMBERS**:

Andrew Intrater

U.S. Citizen 1

Audubon Road Loan Funding LP

By: Audubon Loan Funding GP LLC

By: _____
Name: Andrew Intrater
Its: Special Managing Member

U.S. Citizen 1

**EXHIBIT A**

**(CAPITALIZATION AS OF THE DATE OF THIS AGREEMENT)**

| Name | Capital Contribution | Membership Units | Member's Interests | Notice Address |
|------|---------------------|------------------|-------------------|----------------|
| U.S. Citizen 1 | $1,000,000 | 167.6 | 16.76% | New York, NY 10021 Attn: U.S. Citizen 1 |
| Andrew Intrater | $1,000,000 | 167.6 | 16.76% | 900 Third Avenue, 19th Floor, New York, NY 10022 Attn: Andrew Intrater |
| Audubon Road Loan Funding LP | $3,965,000 | 664.8 | 66.48% | 900 Third Avenue, 19th Floor, New York, NY 10022 |
| **Total** | **$5,965,000** | **1000** | **100.0%** | |