# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

US VC PARTNERS *et al.*,

       Plaintiffs,

       v.

UNITED STATES DEPARTMENT OF THE TREASURY, OFFICE OF FOREIGN ASSETS CONTROL *et al.*,

       Defendants.

No. 19-cv-6139-GBD

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2739
*Attorney for Defendants*

DAVID S. JONES, Assistant United States
Attorney, *Of Counsel*

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................3

    A.    Legal Background of Relevant Sanctions and 50 Percent Rule ...........................3

    B.    Allegations Concerning Impact of Sanctions on Plaintiffs....................................5

    C.    Allegations Concerning Plaintiffs' License Applications......................................7

    D.    Asserted Harms Flowing from Effect of Blocking ...............................................11

    E.    Claims for Relief................................................................................................12

ARGUMENT ...........................................................................................................14

    I.    APPLICABLE STANDARDS OF REVIEW ........................................................14

    II.    PLAINTIFFS HAVE NOT STATED A FOURTH AMENDMENT CLAIM ......15

        A.    The Blocking of Assets Does Not Constitute a "Seizure"..........................15

        B.    Even If Plaintiffs Could Identify a "Seizure," the 50 Percent Rule Is Reasonable and Therefore Does Not Violate the Fourth Amendment.............................................................................................20

    III.    PLAINTIFFS HAVE NOT STATED A FIFTH AMENDMENT CLAIM..........24

    IV.    PLAINTIFFS' APA CLAIM IS PREMISED ON A NON-EXISTENT FOURTH AMENDMENT VIOLATION, AND SHOULD BE DISMISSED ....................30

CONCLUSION.........................................................................................................30

## TABLE OF AUTHORITIES

**CASES** **PAGE**

*Al Haramain Islamic Found., Inc. v. United States Dep't of the Treasury*,
686 F.3d 965 (9th Cir. 2012) .......................................................................................... *passim*

*Al Haramain Islamic Foundation, Inc. v. United States Dep't of the Treasury*,
No. 07-1155, 2009 WL 3756363 (D. Ore. Nov. 5, 2009) ........................................................ 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................ 14, 28

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 555 (2007) ..................................................................................................................... 14

*Boddie v. Connecticut*,
401 U.S. 371 (1971) ..................................................................................................................... 25

*Brigham City v. Stuart*,
547 U.S. 398 (2006) ..................................................................................................................... 21

*Calero-Toledo v. Pearson Yacht Leasing Co.*,
416 U.S. 663 (1974) ..................................................................................................................... 25

*Can v. United States*,
820 F. Supp. 106 (S.D.N.Y. 1993), *aff'd* 14 F.3d 160 (2d Cir. 1994) ...................................... 15

*Cassidy v. Chertoff*,
471 F.3d 67 (2d Cir. 2006) ......................................................................................................... 23

*Chandler v. Miller*,
520 U.S. 305 (1997) ..................................................................................................................... 22

*D.C. Precision, Inc. v. United States*,
73 F. Supp. 2d 338 (S.D.N.Y. 1999) .................................................................................. 16, 17

*Dames & Moore v Regan*,
453 U.S. 654 (1981) ..................................................................................................................... 16

*Demore v. Kim*,
538 U.S. 510 (2003) ..................................................................................................................... 29

iii

*Florida v. White*,
526 U.S. 559 (1999) ........................................................................... 20

*Global Relief Found., Inc. v. O'Neill*,
315 F.3d 748 (7th Cir. 2002) ............................................................. 25

*Griffin v. Wisconsin*,
483 U.S. 868 (1987) ..................................................................... 22, 24

*Haig v. Agee*,
453 U.S 280 (1981) ............................................................................ 21

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
219 F. Supp. 2d 57 (D.D.C. 2002)*, aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ................... 16, 17, 25

*Islamic American Relief Agency v. Unidentified FBI Agents*,
394 F. Supp. 2d 34 (D.D.C. 2005), *aff'd in part and remanded in part on other grounds*,
477 F.3d 728 (D.C. Cir. 2007) .......................................................... 16, 25

*Kadi v. Geithner*,
42 F. Supp. 3d 1 (D.D.C. 2012) ......................................................... 17

*KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*,
647 F. Supp. 2d 857 (N.D. Ohio 2006) ........................................ 17, 19, 20

*Ku v. U.S. Dep't of Housing and Urban Dev.*,
508 Fed. App'x 14 (2d Cir. 2013) ...................................................... 30

*Larson v. United States*,
888 F.3d 578 (2d Cir. 2018) .............................................................. 27

*MacWade v. Kelly*,
460 F.3d 260 (2d Cir. 2006) .............................................................. 23

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......................................................................... 24

*Milena Ship Management Co. v. Newcomb*,
804 F. Supp. 859 (E.D. La. 1992)*, aff'd*  995 F.2d 620 (5th Cir. 1993) .................... 29

*Minnesota v. Dickerson*,
508 U.S. 366 (1993) ...........................................................................20

iv

*Moor-Jankowski v. Board of Trustees of New York Univ.*,
No. 96-cv-5997-JFK, 1998 WL 274459 (S.D.N.Y. May 26, 1998) ......................................... 30

*Morrissey v. Brewer*,
408 U.S. 471 (1972) ......................................................... 24

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (2013) ........................................................... 14

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009)............................................. 14

*OKKO Business PE v. Lew*,
133 F. Supp. 3d 17 (D.D.C. 2015) ............................... 26, 29

*Orvis v. Brownell*,
345 U.S. 183 (1953) ......................................................... 16

*Propper v. Clark*,
337 U.S. 472 (1949) ................................................... 16, 30

*Regan v. Wald*,
468 U.S. 222 (1984) ................................................... 16, 30

*Rivera-Powell v. New York City Board of Elections*,
470 F.3d 458 (2d Cir. 2006).......................................... 27, 28

*Rusavianvest, OOO v. Mnuchin*,
No. 18-cv-5676 (PGG) (S.D.N.Y.) .................................. 26

*Selevan v. N.Y. Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009)............................................... 14

*Soldal v. Cook County, Ill.*,
506 U.S. 56 (1992) ........................................................... 16

*Tran Qui Than v. Regan*,
658 F.2d 1296 (9th Cir. 1981)..................................... 15, 17

*United States v. Jacobsen*,
466 U.S. 109 (1984) ................................................... 16, 20

*United States v. James Daniel Good Real Prop.*,
510 U.S. 43 (1993) ........................................................... 25

v

*United States v. Knights*,
    534 U.S. 112 (2001) ...........................................................................................21

*United States v. McKeeve*,
    131 F.3d 1 (1st Cir. 1997) ................................................................................ 23

*United States v. Miller*,
    425 U.S. 435 (1976) ........................................................................................ 20

*United States v. Place*,
    462 U.S. 696 (1983) ........................................................................................ 21

*Zarmach Oil Services v. U.S. Dep't of the Treasury*,
    750 F. Supp. 2d 150 (D.D.C. 2010) ............................................................... 29

*Zevallos v. Obama*,
    10 F. Supp. 3d 111 (D.D.C. 2014), *aff'd* 793 F.3d 106 (D.C. Cir. 2015)............................... 27

*Zevallos v. Obama*,
    793 F.3d 106 (D.C. Cir. 2015) ................................................................. 14, 25

*Zinermon v. Burch*,
    494 U.S. 113 (1990) .................................................................................. 25, 26

**Statutes**

5 U.S.C. § 706(1) ..................................................................................... 27, 28, 29

5 U.S.C. § 706(2) ............................................................................................. 14

5 U.S.C. § 706(2)(A) ............................................................................... 13, 26, 27

50 U.S.C. § 1701 ............................................................................................. 4, 21

50 U.S.C. § 1702(a)(1)(B) .............................................................................. 4, 24

50 U.S.C. § 4301 ................................................................................................ 16

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................... 1, 14

*Regulations*

31 C.F.R. § 589.201 ................................................................................................................... 4, 5

31 C.F.R. § 589.406 ...................................................................................................................... 5

31 C.F.R. §§ 501.801 ...................................................................................................... 8, 26, 29

Defendants the United States Department of the Treasury, Office of Foreign Assets

Control ("OFAC"); the Honorable Steven Mnuchin, in his official capacity as Secretary of the

Treasury; and Andrea Gacki, in her official capacity as Director of OFAC (together, the

"Defendants" or "Government"), by their attorney, Geoffrey S. Berman, United States Attorney

for the Southern District of New York, respectfully submit this memorandum in support of their

motion to dismiss the complaint ("Compl.," ECF No. 1), pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

The Government's ability to impose effective economic sanctions on foreign persons and

entities has long been a critical national-security and foreign-relations tool.  The President is

statutorily authorized to impose economic sanctions in a variety of circumstances, and OFAC is

the Treasury Department component that has been delegated authority to administer and enforce

such sanctions.  Sanction regimes are imposed by the President in response to unusual and

extraordinary threats to the national security, foreign policy, or economy of the United States,

and they are administered in various ways, including by restricting the ability of sanctioned

persons to utilize the U.S. financial and commercial systems.  The sanctions at issue here, like

most OFAC-administered sanctions, do not deprive owners of title to or possession of their

assets, but they require U.S. persons to "block" affected assets[1] so that they cannot be sold or

transferred and are frozen in place pending a cessation of sanctions or OFAC issuance of an

authorization, such as a license permitting specific uses of the property.

The relief Plaintiffs seek through this case could seriously undermine the United States'

ability to ensure that its sanctions programs remain effective.  And the Complaint should be

dismissed because its claims are contrary to law.

---

[1] Specifically, assets of sanctioned persons or entities that are within U.S. jurisdiction or the possession or control of
a U.S. person.

Plaintiffs are U.S.-based entities and their U.S.-based principal, Andrew Intrater. They challenge the effect on them of a so-called "50 Percent Rule" under which certain international economic sanctions against persons who have been "listed" by OFAC as "Specially Designated Nationals" or "SDNs" are deemed to apply to entities that are 50 percent or more owned by the sanctioned persons. Here, upon the designation of an individual named Viktor Vekselberg, U.S. persons were required to block Vekselberg's property within U.S. jurisdiction or the possession or control of U.S. persons, including, pursuant to the Fifty Percent Rule, the property of entities in which Vekselberg held an ownership interest of 50 percent or more.

The 50 Percent Rule establishes a clear rule for when an SDN's ownership interest in an entity gives rise to a property interest sufficient to block the entire entity. It prevents uncertainty and makes sanctions evasion more difficult. Plaintiffs do not dispute that the Government can establish and administer the 50 Percent Rule. Instead, they argue that OFAC has insufficiently protected U.S.-based minority owners of assets that are blocked under the 50 Percent Rule.

The United States recognizes that economic sanctions impose restrictions on U.S. persons, and that those sanctions — including the 50 Percent Rule — may risk causing a degree of hardship. However, minority owners like Plaintiffs (among others) have an available avenue to seek relief by applying to OFAC for licenses to permit withdrawals from or transactions involving blocked assets.[2] Indeed, Plaintiffs acknowledge they have pursued and continue to seek relief via OFAC licenses, with partial success.

The Complaint should be dismissed in full for failure to state a claim. *First*, the Complaint fails to state a Fourth Amendment claim, both because the blocking of assets pursuant

---

[2] Another route for relief could be for such minority owners to obtain OFAC license to negotiate and execute an agreement with an SDN to reduce the SDN's interest in an entity blocked pursuant to the 50 Percent Rule to below 50 percent.

to sanctions statutes and regulations does not impose a "seizure" as a matter of law, and because, even if the SDN listing of Vekselberg could be said to have seized Plaintiffs' assets, such a seizure would be "reasonable" as a matter of law because it results from procedures that ensure the effectiveness of sanctions programs, while providing an avenue for relief through OFAC's licensing program and judicial review. *Second*, the Complaint fails to state a Fifth Amendment due process claim. Plaintiffs do not challenge the listing of Vekselberg as an SDN or the resulting blocking of Vekselberg's assets, and they were not entitled to notice before that blocking went into effect. And they have procedural protections that afford due process: they can apply (and have applied) to OFAC for licenses authorizing them to take whatever action they wish with respect to blocked assets, and they are statutorily entitled to sue over denials of license applications or what they perceive to be unreasonable OFAC delays in resolving license applications. *Third*, the Complaint fails to state a claim under the Administrative Procedure Act ("APA"). Plaintiffs do not even purport to bring a claim under the APA unreasonable-delay provision, Defendants' conduct has been reasonable as a matter of law, and the APA claim appears based on Plaintiffs' legally insufficient Fourth Amendment theories.

Notwithstanding Plaintiffs' objections, the sanctions regulations and 50 Percent Rule are reasonable and lawful. They ensure that sanctions cannot be readily circumvented by contrived entity ownership structures, and they provide clarity as to what degree of SDN ownership interest in an entity will render an entity's assets blocked as the SDN's property.

## BACKGROUND

### A. Legal Background of Relevant Sanctions and 50 Percent Rule

The President is statutorily authorized "to deal with any unusual and extraordinary threat, which has its source . . . outside the United States, to the national security, foreign policy, or

economy of the United States, if the President declares a national emergency with respect to such threat." International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq*. In such circumstances the President has sweeping powers, including to "block . . . any acquisition, holding, withholding, use, transfer, withdrawal, . . . or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or national thereof has any interest. . . ." *Id.* § 1702(a)(1)(B). In 2014, then-President Obama issued a series of executive orders (the "Ukraine-Related Executive Orders") sanctioning certain persons or categories of persons in connection with events in Ukraine, among other things by blocking those persons' "property and interests in property" within the United States or possessed or controlled by any U.S. person. *See generally* Compl. ¶¶ 29-32; 31 C.F.R. § 589.201. The "names of persons designated pursuant to the Ukraine-Related Executive Orders, whose property and interests in property therefore are blocked [], are published in the Federal Register and incorporated into OFAC's Specially Designated Nationals and Blocked Persons List." 31 C.F.R. § 589.201 note 1. In April 2018, Vekselberg and certain related entities were added to the SDN List under one of the 2014 Executive Orders, and, as a result, their assets subject to U.S. jurisdiction were blocked, including, pursuant to the 50 Percent Rule, the assets of entities in which they held a 50 percent or greater ownership interest. Compl. ¶¶ 2, 4.

In the sanctions context generally, the term "blocking" or "blocked" can also be referred to as "'freezing,'" and "is simply a way of controlling targeted property. Title to the blocked property remains with the target, but the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC. Blocking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property." https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx

(posted 09/10/2002; *last visited* Sept. 17, 2019).  The provision of services to a sanctioned person is also prohibited, unless authorized.  *See, e.g.*, Exec. Order ("E.O.") 13662 (2014), §§ 1(a) (blocking authority), 4 (interpreting blocking under section 1(a) to include a prohibition on services); 31 C.F.R. § 589.201 (Ukraine-related regulation applicable to Vekselberg incorporating these provisions).

Also in 2014, OFAC issued guidance titled *Revised Guidance on Entities Owned By Persons Whose Property and Interests in Property Are Blocked*.  Codified in connection with the Ukraine-related sanctions program in relevant part at 31 C.F.R. § 589.406, this guidance updated what is sometimes referred to as the "50 Percent Rule."  The regulation states that a "person whose property and interests in property are blocked pursuant to § 589.201 has an interest in all property and interests in property of an entity in which it owns, directly or indirectly, a 50 percent or greater interest," and "[t]he property and interests in property of such an entity, therefore, are blocked, . . . regardless of whether the name of the entity is incorporated into OFAC's Specially Designated Nationals and Blocked Persons List."  31 C.F.R. § 589.406.  The 50 Percent Rule is generally applicable to OFAC-administered sanctions programs, and is described extensively on OFAC's website.  *See* https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx (last visited Sept. 17, 2019).

## B.  Allegations Concerning Impact of Sanctions on Plaintiffs

Assuming the truth of the facts alleged in the Complaint, Plaintiffs are a number of U.S.-based investment-related entities (the "Investment Entity Plaintiffs") and their principal, Andrew Intrater.  Compl. ¶¶ 10-19.  Each Investment Entity Plaintiff is 100% owned by U.S. citizens, and not partially or indirectly owned or controlled by any SDN or blocked entity.  *Id.*  The Plaintiffs hold a variety of entitlements in funds or assets through blocked entities that are more

than 50 percent owned by Vekselberg. *See generally* Compl. Various plaintiffs also serve as general partner and/or manager of blocked investment funds. Compl. ¶¶ 10-19. Plaintiffs complain that, due to the 50 Percent Rule, the blocking of Vekselberg-owned entities has caused them to be unable to withdraw or obtain those entitlements; to collect management fees or other compensation or payments from such blocked entities; and to discharge management and general-partner functions by actively managing assets owned by such blocked entities, sometimes resulting in lost business opportunities or decreases in investment value. *See generally* Compl. ¶¶ 70-133. The Complaint does not assert that OFAC was mistaken in concluding that the relevant blocked entities are subject to the 50 Percent Rule.

For example, an entity blocked by the 50 Percent Rule based on the majority ownership of Vekselberg known as Renova Innovation Technologies, Ltd. ("RIT") itself has a majority interest in several investment funds—"USVCP," "IVCP," and "CN Odyssey LP"—that as a result of the respective RIT ownership interest are each blocked pursuant to the 50 Percent Rule. Compl. ¶¶ 41-43. One Investment Entity Plaintiff, "USVCP-GP," is entitled to a minority share of USVCP and also controls that blocked entity as its general partner, while Investment Entity Plaintiff "USVCP Management" is the management company for USVCP. Compl. ¶¶ 44-45. The blocked investment fund USVCP in turn invests in other companies, which are not themselves subject to OFAC sanctions. Compl. ¶¶ 46-47. Similarly, another Investment Entity Plaintiff, IVCP-GP, is entitled to a minority share of proceeds of IVCP, for which IVCP GP was the general partner and IVCP Management the management company until September 2018. Compl. ¶¶ 48-49. IVCP invests in other companies which are not subject to OFAC sanctions. Compl. ¶¶ 50-51. The Investment Entity Plaintiffs CN Odyssey-GP and Sparrow Capital have

similar relationships with the blocked investment fund CN Odyssey LP.[3]   Compl. ¶¶ 52-55.

Similarly, Weft Global Ltd. ("Weft") is considered by OFAC to be more than 50 percent Vekselberg-owned and therefore blocked pursuant to the 50 Percent Rule.  Compl. ¶ 56.  Certain Investment Entity Plaintiffs and Intrater have commercial relationships with CN MapAnything LP, Audubon Road, or Audubon LLC, which are each blocked pursuant to the Fifty Percent Rule due to Weft's majority ownership interests.  Compl. ¶¶ 57-69.  Investment Entity Plaintiff CN MapAnything-GP is entitled to a minority share of the proceeds of CN MapAnything LP and is the general partner of CN MapAnything LP, while Investment Entity Plaintiff Sparrow Capital is the management company for CN MapAnything LP.  Compl. ¶¶ 59-60.  Likewise, Investment Entity Plaintiff Audubon-GP is entitled to a minority share of Audubon Road's proceeds and is the general partner of Audubon Road; individual Plaintiff Intrater owns 50% of Audubon-GP and another U.S. citizen owns the other 50%.  Compl. ¶ 65.  Further, another Investment Entity Plaintiff, CN Partners, is the management company for Audubon Road.  Compl. ¶ 66.  The blocked Audubon Road entity owns a majority interest in Audubon LLC, which is therefore also blocked pursuant to the 50 Percent Rule, affecting minority ownership interests of Intrater and another U.S. citizen; one asset was loans issued to three heirs of the musician Prince.  Compl. ¶¶ 68-69.

C.  **Allegations Concerning Plaintiffs' License Applications**

The Complaint details Plaintiffs' efforts to obtain licenses from OFAC to allow them to receive payments and/or take management actions relating to various blocked entities.  *See* Compl. ¶¶ 70-133.  As the Complaint correctly explains, where assets are blocked, individuals and entities may apply to OFAC for "specific licenses" that, if granted, authorize parties to

---

[3] CN Odyssey LP was invested through a subsidiary in a single company not subject to sanctions.  Compl. ¶ 54.

engage in transactions that otherwise would be prohibited by sanctions. Compl. ¶ 70 (citing 31 C.F.R. §§ 501.801, 589.501).

Plaintiffs allege that, from April 2018 through April 2019, they made a series of applications to OFAC "seeking to collect proceeds and management fees that they are due, and [to] manage their assets to prevent declines in value." Compl. ¶ 71. Plaintiffs object that, with limited exceptions, OFAC "has neither granted nor denied Plaintiffs' applications." *Id.* The Complaint acknowledges a number of OFAC license grants in response to requests from certain Plaintiffs, detailed below, allowing among other things the use of blocked funds to pay certain legal fees and other management expenses, the management and wind-down of certain investment positions, and the negotiation of certain asset sales subject to required final approval of the resulting transaction. *See infra.* The Complaint also acknowledges that OFAC repeatedly issued specific licenses to third parties authorizing the sale of specific assets that were owned by the RIT and Weft-related blocked investment funds. Compl. ¶¶ 135-157.

Specifically, the Complaint details efforts by counsel to Plaintiffs in April 2018 to obtain broad licensing relief soon after Vekselberg's designation for maintenance and wind-down activities that would extend to the Investment Entity Plaintiffs relationships with blocked entities owned by RIT and Weft, and states OFAC has not granted or denied the request. Compl. ¶¶ 40, 72-74. Separately, on May 3, 2018, several Plaintiff Investment Entities with ties to the blocked USVCP/ICVP entities sought a license permitting them to engage in maintenance or management functions relating to those blocked entities' investment positions and operations, including voting shares, contributing capital to non-blocked "portfolio companies" owned by the blocked entities, allowing for sale of ownership interests in portfolio companies, and exercising or waiving various rights. Compl. ¶ 86. This application stated that any funds would not go to

anyone listed as an SDN.  Compl. ¶ 87.  This request was later amended, though it continued to seek broad authorization for the relevant Investment Entity Plaintiffs.  Compl. ¶ 90.

On May 25, 2018, various Investment Entity Plaintiffs including the ones which had made the May 3, 2018 request sought an OFAC license to allow them to "engag[e] in communications [and] negotiations . . . with third parties to reach a solution for the divestment or transfer of equity, debt and/or other holdings" that they "control and manage" for "RIT and/or Weft," which are blocked under the 50 Percent Rule.  Compl. ¶¶ 96-97.  This license application sought permission "only to negotiate," and acknowledged that further OFAC authorization would be required before any deal could be consummated.  Compl. ¶ 98.  Plaintiff entities later amended this application to seek authorization to engage in maintenance or wind-down activities in relation to the assets owned directly or indirectly by RIT or Weft and to allow contractually owed payment to the Investment Entity Plaintiffs for "managerial and administrative services."  Compl. ¶ 102.  The Complaint alleges that the applications dated May 3, 2018 and May 25, 2018 were eventually consolidated by Plaintiff at OFAC's suggestion along with another request, and that OFAC neither granted nor denied the requested license.  Compl. ¶¶ 103-06.

As noted, the Complaint also details various efforts to obtain authorizations related to specific investment positions.  For example, the Complaint states that Plaintiff Intrater applied for a license with another U.S. citizen that would authorize U.S. persons to engage in operational and management activities in relation to the blocked entity Audubon LLC, including with respect to Prince's heirs.  Compl. ¶¶ 75-77.  Among other things, the request sought for OFAC to authorize activities in connection with repayment of obligations by Prince's heirs, while committing that no person on the SDN list would receive funds or be involved in the contemplated transactions.  Compl. ¶¶ 80-81.  Intrater also sought to withdraw distributions from

the blocked Audubon LLC.  Compl. ¶ 82.  Intrater explained in a submission to OFAC that

certain of the Plaintiffs could not make investment or management decisions to preserve the

value of their investment or to receive loan payments from the borrowers (*i.e.*, the heirs) to

"recoup or profit from that investment."  Compl. ¶¶ 82-83.  OFAC neither granted nor denied

this license application, either in its original form or as subsequently amended.  Compl. ¶¶ 84-85.

OFAC did, however, grant related relief by granting a license to Prince's heirs authorizing

activities for the repayment of the loan.  Compl. ¶¶ 136-137.

A separate IVCP-related license application sought authorization for IVCP to sell IVCP's

interest in "Portfolio Company C" to a non-sanctioned buyer, with the proceeds to be maintained

in a blocked account, and was later amended after a further commercial developments.  Compl.

¶¶ 91-95.  This application explained that the IVCP investment position would likely decline in

value if these steps were not taken.  Compl. ¶ 94.[4]

Finally, a series of investment-specific license applications relate to blocked entity CN

MapAnything LP, which owned 16.1% of the equity of non-blocked "Portfolio Entity B."

Compl. ¶¶ 118-133.  Portfolio Company B sought a license to permit negotiations regarding a

possible sale of assets that were owned by CN MapAnything LP, and sought a second license to

permit it to raise capital through a new investment.  Compl. ¶¶ 118-19.  OFAC issued two

licenses in response, authorizing negotiations "regarding a potential purchase of shares" in

Portfolio Company B and also regarding a potential new investment in Portfolio Company B, so

long as future dividend payments to Vekselberg or blocked entities were "placed into a blocked

interest-bearing account located in the United States."  *Id.*  OFAC did not, however, grant a

license application by Plaintiffs CN MapAnythingGP and Sparrow Capital seeking management

---

[4] This request was the third request that was eventually consolidated with the May 3, 2018 and May 25, 2018 applications described above and which the Complaint alleges OFAC has not acted upon.  Compl. ¶¶ 103-106.

fees and expenses and also for CN MapAnything GP to receive "its share, as general partner, of the sale proceeds . . . from the sale of Portfolio Company B," except that OFAC authorized Sparrow Capital to receive funds to cover specific expenses. Compl. ¶¶ 122-132.

In addition to the requests described above, Plaintiff USVCP Management has sought OFAC authorization to receive management fees, including seeking an "emergency authorization" to allow USVCP Management to receive payments from blocked USVCP accounts for management and administrative services and expenses. Compl. ¶¶ 107-08. Plaintiff USVCP Management explained that it sought to manage and wind down U.S. companies in which the blocked entity, USVCP, holds equity positions. Compl. ¶ 109. The total amount sought exceeded $4 million; OFAC granted the license in part, in the amount of approximately $1.6 million, for the payment of legal fees, but OFAC "d[id] not grant the principal relief that Plaintiff USVCP Management requested [] – the ability to collect its management fees." Compl. ¶¶ 110-17. The same license also authorized USVCP and USVCP Management to engage in all transactions ordinarily incident and necessary to (i) the wind-down of operations, contracts, or other agreements that were in effect prior to April 6, 2018 involving USVCP investment positions; and (ii) negotiate, but not execute, the sale of those positions. Compl. ¶ 114.

### D. Asserted Harms Flowing from Effect of Blocking

The Complaint asserts that the 50 Percent Rule has caused Plaintiffs three main categories of financial harm. First, various Investment Entity Plaintiffs served as general partner and/or manager to blocked entities, which in turn owned equity in various portfolio companies or other assets such as debt receivables. A number of asset sales or transactions involving the non-blocked portfolio companies or repayments of debt resulted in the deposit of cash proceeds into accounts that were blocked due to the interest of the blocked entity in the proceeds and the assets

that were reduced to cash. But for the requirement that these proceeds be maintained in blocked accounts, the Investment Entity Plaintiffs would be entitled to receive a share of the proceeds. Compl. ¶¶ 135-157. Plaintiffs allege that, while they cannot quantify the exact amount of such funds to which they would be entitled, the entitlement of this type typically would be "approximately 20 percent of the proceeds" of transactions of this type, and, further, that the blocked entities have received a total of $55,281,996.83 in affected transactions. Compl. ¶ 157.

Second, various Investment Entity Plaintiffs are unable to collect contractually owed management fees from entities whose assets are blocked under the 50 Percent Rule. Compl. ¶ 158. They assert that the amount of management fees that are due but unpaid totals $6,030,018, with additional expense reimbursements also due. Compl. ¶¶ 157 (chart), 159-63.

And third, the Complaint alleges that Plaintiffs "have been deprived of their rights, as general partners or managing members of the Investment Funds, to control and manage those Investment Funds, and in turn participate in the management of their investments, including portfolio companies" of the Investment Funds. Compl. ¶ 164. This inability caused some investments to "diminish in value" as, for example, Plaintiffs "cannot provide necessary consent . . . for portfolio companies to conduct certain business operations," such as "raising capital or selling a portfolio company." Compl. ¶ 165. The Complaint lists a number of transactions that were frustrated or prevented by the inability of blocked entities to take steps such as voting as a board member on questions that require unanimous board consent. Compl. ¶¶ 166-171. As a result, portfolio companies lost value and/or were unable to achieve profits they could have attained were the blocked investment companies not subject to sanctions. *Id.*

E. **Claims for Relief**

The Complaint asserts three causes of action.

First, Plaintiffs assert the continued blocking "of Plaintiff's property by operation of the 50 [Percent] Rule is a warrantless and unreasonable seizure of property under the Fourth Amendment, Compl. ¶ 173, and that Defendants' "failure to return or restore Plaintiffs' access to their property, by the grant of a license or otherwise, is a continuing unreasonable seizure" in violation of the Fourth Amendment, Compl. ¶ 174.

Second, Plaintiffs assert that "Defendants have violated Plaintiffs' Fifth Amendment due process rights" in five ways: failing to grant relief requested in various license applications; "failing to provide notice of the basis for not approving those specific license applications, a meaningful opportunity to be heard, and a prompt determination . . . "; "providing no time limit for when they will make a final determination with respect to the specific licenses"; "providing no public guidance . . . to constrain OFAC's exercise of its otherwise unfettered discretion to block the property interests of non-sanctioned U.S. citizens"; and "imposing unreasonable restrictions on Plaintiffs' rights to control and manage their property." Compl. ¶ 176.

And third, Plaintiffs assert a violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and 2(B), on the theory that the SDN designations "as applied to Plaintiffs through OFAC's 50% Rule" are arbitrary and capricious, and are "final agency action that have caused an indefinite blocking of Plaintiff's property interests in violation of the prohibition on unreasonable seizures of property under the Fourth Amendment . . . ." Compl. ¶ 178.

Plaintiffs seek declaratory judgment, an order directing the unblocking of "Plaintiffs' property" and interests in property, and other relief. Compl. 56-57 (Prayer for Relief).

# ARGUMENT

## I.    APPLICABLE STANDARDS OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for "failure to state a claim upon which relief can be granted." On motions under Rule 12(b)(6), the Court must "assume all 'well-pleaded factual allegations' to be true, and 'determine whether they plausibly give rise to an entitlement to relief.'" *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Allegations that are "no more than conclusions[] are not entitled to the assumption of truth," and "'naked assertion[s]' devoid of 'further factual enhancement'" or "the-defendant-unlawfully-harmed-me accusation[s]" are not sufficient to show that a plaintiff is entitled to relief. *Iqbal*, 556 U.S. at 678-79 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 555, 557 (2007)).

The Administrative Procedure Act ("APA") provides that a final agency action may be held unlawful only if the Court concludes that the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). If there is a reviewable final agency action, this standard of review is deferential. *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) ("when we examine an agency's decision, we apply the APA's highly deferential standard, meaning that we may set aside Treasury's action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") (citations and punctuation omitted); *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (review under the section 706 arbitrary and capricious standard "is highly deferential, with a presumption in favor of finding the agency action valid"). The agency's decision must be upheld so long as it is rational and was based on a consideration of relevant factors. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42-43 (2013).

## II.     PLAINTIFFS HAVE NOT STATED A FOURTH AMENDMENT CLAIM
### A.  The Blocking of Assets Does Not Constitute a "Seizure"

Plaintiffs' Fourth Amendment claim should be dismissed for failure to state a claim because the blocking of assets pursuant to international economic sanctions like those at issue here does not constitute a "seizure" within the Fourth Amendment's meaning.  *See* U.S.Const. amend. IV (the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated").

As explained above, when property is "blocked" by operation of sanctions imposed under IEEPA, the property is not moved or taken into Government custody.  Rather, "blocking" which can also be referred to as "freezing," "is simply a way of controlling targeted property.  Title to the blocked property remains with the blocked person, but the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC.  Blocking immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property."  https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx (posted 09/10/2002; last visited Sept. 17, 2019); *see also Can v. United States*, 820 F. Supp. 106, 109 (S.D.N.Y. 1993), *aff'd*, 14 F.3d 160 (2d Cir. 1994) (in holding that a statutory remedy for seizures was unavailable, observing that blocked assets at issue "have never been seized, although the blocking order has remained in effect for eighteen years.  'The blocking of the assets,' however, 'does not affect the interest, right or title to them which [plaintiffs] may possess.'") (citing *Tran Qui Than v. Regan,* 658 F.2d 1296, 1301 (9th Cir. 1981)).  And, as the Supreme Court has explained, this blocking power is both important, and constitutionally sound:  "The power in peace and in war must be given generous

scope to accomplish its purpose. Through the Trading with the Enemy Act[5] . . . the nation

sought to deprive enemies, actual or potential, of the opportunity to secure advantages to

themselves or to perpetrate wrongs against the United States or its citizens through the use of

assets that happened to be in this country. To do so has necessitated some inconvenience to our

citizens and others who . . . are not involved in any actions adverse to the nation's interest. That

fact, however, cannot lead us to narrow the broad coverage of the Executive Order." *Propper v.*

*Clark*, 337 U.S. 472, 481-82 (1949). Thus, courts consistently have rejected challenges to

warrantless blocking actions carried out under IEEPA and TWEA. *See, e.g.*, *Regan v. Wald*, 468

U.S. 222, 232-33 (1984); *Dames & Moore v Regan*, 453 U.S. 654, 674 (1981); *Orvis v.*

*Brownell*, 345 U.S. 183, 187-88 (1953).

      In general, a "'seizure' of property . . . occurs when 'there is some meaningful

interference with an individual's *possessory* interests in that property.'" *Soldal v. Cook County,*

*Ill.*, 506 U.S. 56, 61 (1992) (emphasis added; quoting *United States v. Jacobsen,* 466 U.S. 109,

113 (1984)). Courts repeatedly have considered whether the blocking of assets under sanctions

programs—which does not entail taking title to, possession of, or physical control of affected

property—constitutes a seizure within this meaning, generally concluding that it does not. *See*

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 79 (D.D.C. 2002) ("the

freezing of [] accounts is not a seizure entitled to Fourth Amendment protection"), *aff'd*, 333

F.3d 156 (D.C. Cir. 2003); *Islamic American Relief Agency v. Unidentified FBI Agents*, 394 F.

Supp. 2d 34, 48 (D.D.C. 2005) ("OFAC's blocking of [] assets does not create a cognizable

claim under the Fourth Amendment"). *aff'd*, 477 F.3d 728 (D.C. Cir. 2007); *cf. D.C. Precision,*

---

[5] 50 U.S.C. §§ 4301 et seq. ("TWEA"), a statute that pre-dated IEEPA, and that, like IEEPA,
conferred broad economic sanctions powers on the President.

*Inc. v. United States*, 73 F. Supp. 2d 338, 343 n.1 (S.D.N.Y. 1999) ("Assets blocked under the Executive Orders are not seized or appropriated by the government. Rather, blocking temporarily prohibits transactions . . . ."); *see also Kadi v. Geithner*, 42 F. Supp. 3d 1, 36-38 (D.D.C. 2012).

In upholding blocking measures against varied challenges, courts have recognized "that blocking involves a deprivation of the enjoyment of a property interest." *Tran Qui Than*, 658 F.2d at 1304. That "deprivation is temporary," however, and, rather than transferring title to the Government, "prohibits temporarily, transactions involving those assets." *Id.* Thus, although courts "also recognize that an action intended by the government to be a temporary block on any transactions involving those assets may amount to an interminable denial of property to the individual who must await the often slow and labyrinthian course of international relations," *id.*, such sanctions have been upheld against virtually all legal challenges.

There is limited contrary authority emanating from OFAC regulatory actions taken against two separate U.S.-based entities, although even in that context other courts have disagreed. *See Al Haramain Islamic Found., Inc. v. United States Dep't of the Treasury*, 686 F.3d 965, 990-95 (9th Cir. 2012); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857 (N.D. Ohio 2006); *but see Holy Land*, 219 F. Supp. 2d at 79. Both cases—erroneously decided, in the government's view—are materially distinguishable in that they concerned the direct imposition by OFAC of a blocking incident to a possible or final designation of a target U.S.-based entity as itself directly subject to terrorism-related sanctions. Both decisions emphasized what the Court perceived to be the feasibility of OFAC's giving notice and an opportunity to be heard to the sanctioned U.S. entity and to the effect of OFAC's blocking of all of the U.S.-based entities' assets.

Moreover, the Ninth Circuit's decision in *Al Haramain* did not meaningfully analyze whether the blocking of the U.S. entity's assets that resulted from OFAC's direct designation of that U.S.-based entity under IEEPA constituted a Fourth Amendment seizure; the bulk of the decision was devoted to whether this presumed seizure was unreasonable under the Fourth Amendment. *See Al Haramain*, 686 F.3d at 990-95. Rather than analyzing whether the blocking of assets at issue actually constituted a "seizure,"[6] the Ninth Circuit simply assumed that it did. *See Al-Haramain*, 686 F.3d at 990 (taking as starting point for analysis of Fourth Amendment claim that "[i]n most circumstances, searches and seizures conducted without a warrant are 'per se unreasonable under the Fourth Amendment" with limited exceptions, and noting that OFAC "argues that its seizure falls within" such an exception).

Further, in denying reconsideration, the Ninth Circuit emphasized the unique concerns present by virtue of OFAC's having designated a U.S.-based organization as itself an SDN or terrorist, and the narrowness of the *Al Haramain* decision to circumstances not present here. The panel added a footnote to its original decision stating that OFAC's rehearing petition "raises interesting arguments about issues that we need not, and do not, decide. We address only the facts of this case: OFAC's seizure of assets as a result of its designation order of a United States entity located within the United States." *Al Haramain*, 686 F.3d at 970. Further, the panel "ma[d]e clear that our holding concerns OFAC's original designation order [*i.e.*, designating the plaintiff U.S. organization a sanctioned terrorist or SDN]; we do not address whether a warrant is required for subsequent orders." *Id.* Plaintiffs here, of course, do not challenge the underlying

---

[6] The district court decision on appeal concluded based on limited analysis that the blocking of assets of a U.S. entity constituted a seizure but then concluded that the blocking nevertheless was consistent with the Fourth Amendment. *See infra.* The ensuing appeal appears to have centered on the district court's reasonableness analysis.

blocking of Vekselberg and his assets, only the incidental effect on Plaintiffs.

Meanwhile, as noted, the district court decision that was appealed to the Ninth Circuit in *Al Haramain* held that OFAC's actions did *not* violate the Fourth Amendment. *See Al Haramain Islamic Foundation, Inc. v. United States Dep't of the Treasury*, No. 07-1155, 2009 WL 3756363, *9 (D. Ore. Nov. 5, 2009). The decision's conclusion that "the blocking is a seizure" thus both is *dicta* because the court ruled for the government on other grounds, and is essentially conclusory; it relies merely on OFAC's explanation of the effect of blocking and OFAC's filing of a notice that the sanctioned real property was "blocked pending investigation by the order of the United States Treasury Department." *See id.* Thus, the district court's since-reversed decision is not persuasive authority for the proposition that a blocking under IEEPA can effect a seizure. Moreover, the district court decision appears to have framed the issues considered on appeal, as the Ninth Circuit's decision focuses on whether the Fourth Amendment's "special needs exception" applies and that the presumed "seizure" of the sanctioned entity's assets "was reasonable within the meaning of the Fourth Amendment because it was supported by the special needs of the government." *Id.* *12-15.

The Northern District of Ohio's decision in *KindHearts* likewise is distinguishable in that it involved a direct designation of a U.S. entity that effectively shut down the sanctioned U.S. plaintiff entity. *See* 647 F. Supp. 2d at 867. The court emphasized that OFAC "blocked all of KindHearts' assets and property pending investigation into whether it was subject to designation." 647 F. Supp. 2d at 866. The court put substantial weight on the unique concerns when U.S.-based entities are directly subjected to the sweeping powers granted to the Government to act in connection with threats arising abroad: "KindHearts' situation differs strikingly and significantly from that of the foreign governments and foreign assets at issue in the

TWEA and IEEPA cases on which the government relies. . . . KindHearts is an American corporation based in Toledo, Ohio. Its assets, presumably, came from persons resident in this country. Those assets were in this country when the government seized them. This case does not involve a nation-targeted embargo." 647 F. Supp. 2d at 874 (footnote omitted).

Here, by contrast, the complained-of actions arise from the designation of Vekselberg, who is undisputedly a foreign national and whose designation and the resulting blocking of his property is not at issue in this litigation. And, while Plaintiffs allegedly bear a burden due to their minority interest in property blocked as a result of Vekselberg's interests by operation of law pursuant to the 50 Percent Rule, this situation differs fundamentally from the direct sanctioning of U.S.-based targets that has led to the only rulings known to the Government that OFAC action could effect a Fourth Amendment seizure, differences that, as explained above, even the *Al Haramain* and *KindHearts* courts considered critical.

### B. Even If Plaintiffs Could Identify a "Seizure," the 50 Percent Rule Is Reasonable and Therefore Does Not Violate the Fourth Amendment

Even if the Court were to deem the Vekselberg SDN designation coupled with the operation of the 50 Percent Rule to have effected a seizure of Plaintiffs' property or interests in property, Plaintiffs' Fourth Amendment claim still should be dismissed because the supposed seizure is reasonable as a matter of law.

As Fourth Amendment's text makes plain by barring only "unreasonable" searches and seizures, warrantless seizures that do not intrude on legitimate expectations of privacy are permissible if they are reasonable. *See, e.g.*, *Florida v. White*, 526 U.S. 559, 566 (1999); *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Jacobsen*, 466 U.S. 109, 121-22 (1984). Plaintiffs do not and cannot allege violation of a privacy interest here. *Cf. United States v. Miller*, 425 U.S. 435, 442 (1976) (no privacy interest in bank records).

Meanwhile, evaluating warrantless seizures requires balancing of the competing interests to determine the reasonableness of the type of seizure involved within the meaning of the Fourth Amendment's general proscription against unreasonable searches and seizures. *United States v. Place*, 462 U.S. 696, 703 (1983); *see also United States v. Knights*, 534 U.S. 112, 118-119 (2001) (reasonableness of search or seizure is determined by balancing intrusion upon privacy and need for promotion of legitimate governmental interests.). An action will be deemed reasonable "as long as the circumstances, viewed objectively, justify the action." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (quotation marks, citation, and alteration omitted).

IEEPA blocking orders easily survive scrutiny under this "reasonableness" balancing test. It is difficult to conceive of a governmental interest more weighty than ensuring the effectiveness of sanctions programs that are key elements of the national effort to combat terrorism, nuclear proliferation, severe human rights abuses, and other international threats to the national interest. *See Haig v. Agee*, 453 U.S 280, 307 (1981) ("no governmental interest is more compelling than the security of the Nation." (quotation marks and citation omitted)). And issuing IEEPA blocking orders requires an exacting process. First, under IEEPA, the President must first declare a national emergency. *See* 50 U.S.C. § 1701 (containing national emergency requirement), Exec. Order No. 13660 (declaring national emergency pursuant to which Vekselberg was designated). Second, applicable legal criteria must be set forth. *See, e.g.*, Exec. Order No. 13662 (2014) (containing the legal criteria under which Vekselberg was designated). Third, OFAC, acting through delegated authority, must both engage in interagency consultations, and sufficiently demonstrate that each individual (or entity) who is named an SDN meets a specific basis for designation, as set forth in an Executive Order.

Nor have Plaintiffs suggested that the 50 Percent Rule is not critical to the successful implementation of sanctions against designated foreign persons and entities. The rule provides a valuable bright-line rule as to which assets—whether entities or otherwise—will be deemed blocked. It also limits the ability of sanctioned parties to evade the effect of sanctions by placing assets in entities that they control through majority ownership.

The enormous public importance of the sanctions system outweighs the hardship that may be experienced by minority owners of blocked assets by routine operation of the 50 Percent Rule. This consequence is one that courts have repeatedly held is an acceptable and necessary feature of a critically important national-security tool. *See supra* at 15-16. This is made even more true because owners of blocked assets have an available avenue to seek relief by applying for specific licenses, as Plaintiffs acknowledge they repeatedly have done. While they are dissatisfied with the results to date, they have had license applications partially granted, and other aspects of their license applications remain under consideration.

Even beyond the dispositive reasonableness of the IEEPA sanctions regime, that regime, including the 50 Percent Rule, is justified by the "special needs" exception to the Fourth Amendment's warrant requirement. This exception applies where (1) the primary purpose of the search or seizure is beyond ordinary criminal law enforcement, and (2) the circumstances make the Fourth Amendment's ordinary warrant and probable cause requirements impracticable. *See Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); *Chandler v. Miller*, 520 U.S. 305, 313 (1997). The Second Circuit has approved warrantless searches for reasons not dissimilar to those that require the imposition of sanctions, holding that the "special needs" exception authorizes warrantless searches of trunks on public ferries to prevent or deter "large-scale terrorist attacks,"

*Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006), and authorizes warrantless bag searches on subways to combat terrorism, *MacWade v. Kelly*, 460 F.3d 260, 271-72 (2d Cir. 2006).

Both requirements of the special needs exception are met here. The primary purpose of IEEPA-based sanctions is not the enforcement of the criminal laws; such sanctions merely block or freeze U.S.-based assets of individuals and entities who have been designated in keeping with a Presidential emergency declaration and legal criteria laid out in an Executive order, here relating to events in Ukraine. And—as the complex organizational and commercial relationships detailed in the Complaint make clear—it would be manifestly impracticable to require the United States to obtain warrants before each and every blocking of each asset covered by the 50 Percent Rule, or, more broadly, each asset that is blocked as a result of an SDN designation. *Contrast Al Haramain*, 686 F.3d at 970 (limiting holding to narrow context of "OFAC's seizure of assets as a result of its designation order of a United States entity located within the United States" where the assets in question were owned by the primary target of the sanctions and that target both had due process rights and could easily be given notice and a hearing). As the Complaint here alone illustrates by detailing the many interconnected entity and commercial relationships through which Plaintiffs have interests in blocked property, it would not be feasible for OFAC to trace all permutations of the blockings that result when it identifies a foreign individual or entity whose assets should be blocked. That is why IEEPA, reflecting "Congress's intent to confer broad and flexible powers upon the President to impose and enforce . . . sanctions against nations that the President deems a threat to national security interests," *United States v. McKeeve,* 131 F.3d 1, 10 (1st Cir. 1997), authorizes the sanctions program to work as it does—by authorizing the blocking of "any acquisition, holding, withholding, use, transfer, withdrawal, or . . dealing in, . . . or transactions involving, any property in which any foreign country or a national thereof has any

interest." 50 U.S.C. § 1702(a)(1)(B). There thus is no question that imposing a warrant requirement, or deeming the Fourth Amendment otherwise violated, in connection with the extension of blockings under IEEPA via the 50 Percent Rule, "would interfere to an appreciable degree with the [] system" for imposing economic sanctions during a national emergency, and the "delay inherent in obtaining a warrant would make it more difficult . . . to respond quickly to evidence of misconduct." *Griffin*, 483 U.S. at 876.

Thus, even if Plaintiffs had alleged facts suggesting the existence of a seizure, any such seizure would be reasonable as a matter of law, and consistent with the Fourth Amendment.

## III. PLAINTIFFS HAVE NOT STATED A FIFTH AMENDMENT CLAIM

Plaintiffs do not state a Fifth Amendment due process claim. Plaintiffs challenge only the effect of the 50 Percent Rule on their interests, not the underlying designation of Vekselberg and the entities he owns, and not OFAC's determination that the blocked entities identified in the complaint are in fact subject to the 50 Percent Rule. Nor do Plaintiffs assert that they should have received notice of these blockings before they went into effect. Rather, they object to OFAC's failure to grant license applications that have not yet been adjudicated; the lack of notice of "the basis for not approving" those license applications; the lack of specific, published time limits on OFAC's resolution of license applications; the lack of "public guidance" governing how OFAC exercises its "unfettered discretion" to block assets and decide license applications; and the supposedly "unreasonable restrictions on Plaintiffs' rights." Compl. ¶ 176.

Broadly, the Fifth Amendment's requirement of due process "is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (quotations omitted)); *id.* at 321 (quoting and citing *Morrissey*). As

Plaintiffs do not seem to dispute, advance notice of the blocking of the assets at issue was impracticable and not required. *See, e.g.*, *Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015) (under Due Process Clause, "there are 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event") (quoting *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). The need to postpone notice is particularly acute "where the seizure is aimed at 'property . . . of a sort that could be removed to another jurisdiction . . . or concealed, if advance warning . . . were given," *id.* (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 679 (1974)), because "[i]n that circumstance, [t]he ease with which an owner could frustrate the Government's interests . . . create[s] a 'special need for very prompt action' that justifie[s] the postponement of notice and hearing . . . ," *id.* (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 52 (1993)). Thus, there is no constitutional requirement that the Government provide advance notice and an opportunity to be heard before sanctions go into effect. *See Zevallos*, 793 F.3d at 116; *Holy Land*, 333 F.3d at 163-64; *Islamic A. Relief Agency (IARA) v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 49-50 (D.D.C. 2005), *aff'd in part and remanded in part on other grounds*, 477 F.3d 728 (D.C. Cir. 2007) (remanding for consideration of request to amend complaint); *Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002). As the district court in *Holy Land* explained, "prompt action by the Government was necessary to protect against the transfer of assets subject to the blocking order. [A]ny delay or pre-blocking notice would afford a designated entity the opportunity to transfer, spend, or conceal its assets, thereby making the IEEPA sanctions program virtually meaningless." *Holy Land*, 219 F. Supp. 2d at 77.

Thus, the question for the Court is whether the post-blocking procedural protections available to Plaintiffs afford due process. *See Zinermon v. Burch,* 494 U.S. 113, 126 (1990)

("[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate."). They do, and the Complaint reveals that Plaintiffs have availed themselves of many of these protections.

At the Complaint acknowledges, individuals affected by blockings may apply to OFAC for specific licenses for whatever use of blocked assets the applicant proposes. *See* Compl. ¶¶ 70-133, 31 C.F.R. §§ 501.801, 589.501. Plaintiffs have made numerous applications and engaged in extensive back-and-forth with OFAC. See Compl. ¶¶ 70-133. They have been granted licenses allowing use of roughly $1.6 million in blocked funds to pay for certain legal fees, Compl. ¶¶ 110-17, and to negotiate regarding a potential purchase of shares that a blocked entity held in an unblocked "Portfolio Company B" and to pursue a potential new investment in Portfolio Company B, Compl. ¶¶ 118-19. They also received authorization to negotiate wind-down transactions, subject to required further approvals of final negotiated proposed transactions. Compl. ¶ 114. And the Complaint makes clear that Plaintiffs have had extensive communications with OFAC about many of their license applications, with OFAC at times making suggestions and entertaining supplemental submissions and information provided by Plaintiffs. *E.g.*, Compl. ¶¶ 73, 82-84, 95, 103-105, 113, 122, 128-130.

Further, individuals whose license applications are denied may pursue judicial review of those denials. *See* 5 U.S.C. § 706(2)(A); *OKKO Business PE v. Lew*, 133 F. Supp. 3d 17, 23-27 (D.D.C. 2015) (resolving motion for summary judgment on section 706(2)(A) APA challenge to OFAC denial of license application); *Rusavianvest, OOO v. Mnuchin*, No. 18-cv-5676 (PGG) (S.D.N.Y.), Dkt. Nos. 37, 38, 45, 47, 48, 49 (APA section 706(2)(A) challenge to denial of OFAC license; cross-motions for summary judgment now pending). And applicants whose licenses remain undecided for what they believe is an excessive period may seek judicial review

under the APA's "unreasonabl[e] delay[]" provision, 5 U.S.C. § 706(1). *See Zevallos v. Obama*, 10 F. Supp. 3d 111, 123 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015). Plaintiffs have opted not to assert a section 706(1) unreasonable delay claim here. *See generally* Compl.

Thus, Plaintiffs have available a robust combination of available avenues for agency redress (via the license process) and judicial review of denials of licenses or of unreasonable delay in agency action on license applications. Due process requires no more. *Cf. Larson v. United States*, 888 F.3d 578, 585-87 (2d Cir. 2018) (due process requirements met in IRS assessment process by availability of limited agency pre-payment review coupled with post-assessment litigation in district courts notwithstanding allegedly cost-prohibitive jurisdictional requirement that taxpayer first pay the full amount assessed as due by IRS; "adequate summary or administrative prepayment review of tax assessment—with adequate post-payment judicial review—provides the required constitutional procedural protections"); *Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458, 466-67 (2d Cir. 2006) (in review of non-OFAC agency action, due process satisfied by combination of Election Board consideration of candidate's objections prior to final agency decision, and availability of judicial review).

Plaintiffs' laundry list of asserted procedural deficiencies does not establish otherwise. First, Plaintiffs provide no authority or reasoned explanation for their objection that a "failure to grant" unspecified license applications somehow violates due process. Compl. ¶ 176. To the extent Plaintiffs' objection is that OFAC has not as of yet granted a still-unresolved application that they submitted, they identify no constitutional procedural deficiency, especially given the availability of bringing suit for unreasonable delay under the APA, which they have chosen not to pursue here. And, to the extent they assert that the mere fact of a denial of an application violates due process, that idea is antithetical to reasoned decision-making in any regulatory or

27

adjudicatory context, in which applications are routinely considered and either granted or denied.

Nor are due process deficiencies raised by Plaintiffs' second, compound objection, that OFAC has not informed them and is not required by regulation to inform them of the basis for "not approving" license applications, and that Plaintiffs were not afforded "a meaningful opportunity to be heard" or a "prompt determination" of specific license applications. Compl. ¶ 176. The Complaint itself belies the conclusory allegation that Plaintiffs had no "meaningful opportunity to be heard" by reciting in detail many submissions by Plaintiffs to OFAC and various follow-up communications with OFAC personnel. *See, e.g.*, *Iqbal*, 550 U.S. at 557 (mere legal labels insufficient to state a claim). And, to the extent Plaintiffs object to OFAC's not having explained why OFAC has not yet taken action on parts or all of a request, there is and can be no such requirement; certainly Plaintiffs identify none. Meanwhile, to the extent Plaintiffs object to a final decision by OFAC that denies a license application with insufficient explanation, they again fail to allege facts about specific OFAC communications being deficient in specific ways so as to back up their conclusory complaint. *See Iqbal*, 550 U.S. at 557. Moreover, due process would still be satisfied even if OFAC insufficiently explained a final decision denying a license given the availability of judicial review under APA section 706(2)(A). *See Rivera*-Powell, 470 F.3d 466-67. Finally, to the extent they object that OFAC has not acted rapidly enough on their applications (none of which was made prior to 2018), due process is afforded, at a minimum, by their entitlement to assert an APA "unreasonable delay" claim under section 706(1), which they have chosen not to plead in this case.

Third, Plaintiffs object that OFAC's regulations provide "no time limit for when they will make a final determination." Compl. ¶ 176. But the lack of a specified time limit alone does not violate due process; indeed, no statute or rule imposes a hard time limit for resolution of

most motions or applications to the federal courts.  Courts frequently reject due-process objections to far slower agency deliberations.  *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 523-530 (2003) (rejecting Fifth Amendment due process challenge to non-time-limited detention of aliens until completion of removal proceedings).  And, again, Plaintiffs aggrieved by agency delay can seek relief under APA section 706(1).

Plaintiffs likewise fail to state a due process claim by pointing to an asserted lack of "public guidance in rules and regulations to constrain OFAC's exercise of its otherwise unfettered discretion to block the interests of non-sanctioned U.S. citizens."  Compl. ¶ 176. Courts have long recognized and endorsed OFAC's broad discretion over blocking orders and licensing matters.  See, e.g,, 31 C.F.R. §§ 501.801, 589.501 (setting forth OFAC licensing requirements); *Milena Ship Management Co. v. Newcomb,* 804 F. Supp. 859, 861 (E.D. La. 1992) (denying challenge to OFAC refusal to unblock vessels owned by Yugoslav entities; "[i]nherent in the standard is a high degree of deference to the agency's decision, bordering on a presumption that the action taken is valid."), *aff'd,* 995 F.2d 620 (5th Cir. 1993) (citations omitted); *Okko*, 133 F. Supp. 3d at 23 (waiver of  decision by OFAC "extremely deferential"); *Zarmach Oil Services v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) (same).  And the necessary and inherent existence of broad discretion in this area poses no due process concerns, especially given that, whatever OFAC's degree of discretion, OFAC license denials and blocking listings have commonly been litigated, *see* supra at 26-27 (citing cases).

Finally, due process is not implicated by Plaintiffs' broad objection that they have been subjected to "unreasonable restrictions on [their] rights to control and manage their property." Compl. ¶ 176.  Plaintiffs' objection in essence is that it is unfair for them to suffer restrictions in their activities relating to blocked assets and their ability to take or use those assets, but this is

not a procedural objection; rather, it is a complaint that IEEPA sanctions cause them hardship. Again, though, courts have long recognized the impositions on U.S. and other innocent persons that may be caused by the imposition of sanctions, yet they uphold those sanctions measures as reasonable and permissible in the face of varied challenges. *See, e.g.*, *Propper*, 337 U.S. at 481-82 (declining to narrow sanctions-imposing Executive Order despite resulting "inconvenience to our citizens and others"); *Regan*, 468 U.S. at 232-33.

Thus, Plaintiffs' due process claim should be dismissed.

## IV. PLAINTIFFS' APA CLAIM IS PREMISED ON A NON-EXISTENT FOURTH AMENDMENT VIOLATION, AND SHOULD BE DISMISSED

The Court should dismiss the Complaint's third and final cause of action, for purported violations of the APA. This claim is based on no specific assertions other than that the "indefinite blocking of Plaintiff's property" violates the "prohibition on unreasonable seizures of property under the Fourth Amendment." Compl. ¶ 178. As explained above, the blocking of assets under IEEPA and related authorities does not constitute a seizure as a matter of law, and, even if it did, any such seizure would not be unreasonable. *See* Point II, *supra*. Because Plaintiffs' APA claim relies on the same theory as their legally insufficient Fourth Amendment claim, the APA claim also should be dismissed. *Cf. Ku v. U.S. Dep't of Housing and Urban Dev.*, 508 Fed. App'x 14, 16-17 (2d Cir. 2013) (affirming dismissal of APA claim "as a matter of law" where pleadings and background law made clear agency action was "rational," and thus not "arbitrary and capricious" under the APA); *see also Moor-Jankowski v. Board of Trustees of New York Univ.*, No. 96-cv-5997-JFK, 1998 WL 274459, *6 (S.D.N.Y. May 26, 1998)) (granting motion to dismiss APA claim; complaint insufficient to state a claim).

## CONCLUSION

The Court should dismiss the Complaint.

Dated:    New York, New York
          September 19, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for Defendants*

By:    /s/ *David S. Jones*
       DAVID S. JONES
       Assistant United States Attorney
       86 Chambers Street, Third Floor
       New York, New York  10007
       Telephone:  (212) 637-2739
       Facsimile:   (212) 637-2750