K8DQusvO

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   US VC PARTNERS GP LLC, et al.,

 4                  Plaintiffs,

 5           v.                              19 Civ. 6139 (GBD)
                                             ORAL ARGUMENT
 6

 7   UNITED STATES DEPARTMENT OF
     THE TREASURY, OFFICE OF
     FOREIGN ASSETS CONTROL, et
 8   al.,

 9                  Defendants.

10   ------------------------------x
                                             New York, N.Y.
11                                           August 13, 2020
                                             10:40 a.m.
12
     Before:
13
                          HON. GEORGE B. DANIELS,
14
                                             District Judge
15
                              APPEARANCES
16
     LATHAM & WATKINS LLP
17        Attorneys for Plaintiffs
     BY:  RICHARD D. OWENS
18
     UNITED STATES ATTORNEY'S OFFICE
19   SOUTHERN DISTRICT OF NEW YORK
          Assistant U.S. Attorney for Defendants
20   BY:  DAVID S. JONES

21

22

23

24

25
```

K8DQusvO

 1              (Case called; in open court)

 2              DEPUTY CLERK:  Will the parties please rise and give

 3     their appearances for the record, beginning with the plaintiff.

 4              MR. OWENS:  Good morning, your Honor.

 5              Richard Owens, Latham & Watkins.  With me is Andrew

 6     Intrater, one of the plaintiffs.

 7              THE COURT:  Good morning.

 8              MR. JONES:  Good morning, your Honor.

 9              David Jones, Assistant U.S. Attorney for the Southern

10     District of New York for defendants.

11              THE COURT:  Good morning.

12              Mr. Owens, why don't I hear from you first.

13              MR. OWENS:  Yes, your Honor.  Would you prefer me to

14     address the Court from here or move to the lecturn?

15              THE COURT:  Why don't we try the lectern because I

16     believe we have people on the line who will try and hear us and

17     you will have to speak loudly and into the microphone.

18              MR. OWENS:  Certainly.  Thank you, your Honor.

19              I should begin by apologizing for my technical

20     inabilities, which caused rescheduling and delay of our last

21     scheduled argument.  For that I'm sorry for the inconvenience

22     to the Court, Mr. Jones, and others who were in attendance on

23     the line that day.

24              I think the case here, your Honor, while novel, is

25     simple.  It's premised upon very basic laws, particularly the

K8DQusvO

Fourth Amendment and search and seizure.  At the core of this case is whether or not OFAC's blockings of my client's property interest and property that is jointly owned with a foreign national is subject to blocking and seizure in the manner that OFAC has done it, whether the continuing seizure of that property is permissible or whether the Constitution requires, as we believe it does, that the property be restored or at least those portions that are owned by the Americans be restored to them promptly, which OFAC has repeatedly refused to do.

So, let me start by outlining for the Court what I think is the basis of our Rule 41 motion, which I will address first; and then if it pleases the Court, I will let Mr. Jones address his motion to dismiss, and then I will respond to that.

So, our Rule 41 motion is premised, as I said, on a seizure.  The seizure as outlined in our moving papers was a blocking order, a series of blocking orders, issued by OFAC over two years ago, almost two years and three months, in April of 2018.  The orders related to the interests and property of a foreign national named Viktor Vekselberg for one of his companies, Renova.

And if that were all OFAC did, we wouldn't be here today, but OFAC has a rule called a 50 Percent Rule, which subjects property which is owned in an amount of 50 percent by a foreign national or SDN to the exact same strictures of

1    property that is 100 percent owned by the foreign national.

2    So, in our situation, we own a portion of property jointly with

3    this foreign national and were therefore subject under the

4    50 Percent Rule to the complete and total blocking of our

5    interests in that property.

6           If I could take a moment to describe, that might be

7    helpful to the Court, the nature of the property and our

8    relationship to it, I think it's set up fairly

9    straightforwardly in our moving papers, in Mr. Intrater's

10   affidavit, and in our --

11          THE COURT:  Is the premise of your motion that I

12   should hold the 50 Percent Rule is illegal?

13          MR. OWENS:  It is the premise of our motion that the

14   50 Percent Rule is unconstitutional as applied to property

15   that's owned by U.S. citizens, and that absent a warrant or

16   some judicial process, the property has to be returned.

17          THE COURT:  What you're asking me to do, no court has

18   ever done.

19          MR. OWENS:  That is absolutely correct, your Honor, in

20   the context of OFAC and the 50 Percent Rule.  But it is by no

21   means unusual for the Court to order the government to return

22   property that's been seized illegally.

23          THE COURT:  There is a process for that though by the

24   licenses.

25          MR. OWENS:  There is, your Honor, and that process is

K8DQusvO

1    completely deficient under the basic standards of due process.

2              THE COURT:  But you're not here attacking that

3    process.  You're here trying to set aside the 50 percent

4    blocking rule altogether.

5              MR. OWENS:  Well, there are two components to my

6    argument, your Honor.  The first component is that the

7    seizure -- the initial seizure because of the 50 Percent Rule

8    and because it is unconstitutional meant that the seizure

9    violated the Fourth Amendment.  That's part one.

10             Part two is even if there were some basis the

11   government could articulate that that warrantless seizure was

12   reasonable under the Constitution, it's not reasonable today,

13   two years and three months later.  Both of those analyses we

14   believe require the Court to find that OFAC's and the executive

15   branch's conduct here violated the Constitution and our

16   property should be returned.  But the same result should apply

17   under either argument.

18             If the seizure was initially unconstitutional, we get

19   our property back.  If it's matured into being unreasonable

20   because it has taken so long for OFAC to act -- and in many

21   respects today they still have not acted with respect to our

22   licensing requests -- then we should be restored to our

23   property rights.

24             THE COURT:  Isn't your second argument, isn't that

25   addressed by the licensing process and procedure and appeals?

1          MR. OWENS:  No, your Honor.  And the reason it's not

2     is threefold.

3          One, because property interests are involved, the

4     duration of the seizure is important.  That's hornbook search

5     and seizure law.

6          THE COURT:  The duration is the same duration whether

7     or not it is blocked pursuant to the rule or not returned

8     pursuant to the license.

9          MR. OWENS:  The duration in fact vis-a-vis us and its

10    impact on us is the same, but the constitutional analysis of

11    what is and is not reasonable differs in both instances.

12         THE COURT:  Well, the reason I want to go there first

13    is because my first analysis is that if the 50 percent blocking

14    rule is applied, is there a reasonably available process for an

15    entity or person whose property is blocked under the

16    50 Percent Rule to obtain that property and is that reasonable

17    seizure under the license?

18         MR. OWENS:  Let me address that directly, your Honor.

19    The answer is no.  The answer is if OFAC's procedures were

20    analyzed under the principles set forth by the Second Circuit

21    in the *Krimstock* case which we cited to the Court, these

22    procedures would undoubtedly fail, and they would fail for

23    three reasons.

24         One, there is no time limit imposed upon OFAC within

25    which they have to act on a license.  We have multiple licenses

K8DQusvO

1    pending before OFAC that have been pending since May of 2018.

2             THE COURT:  But then that raises two questions though.

3    Then isn't that a reasonableness test?  And, two, isn't there a

4    process to appeal the denial of such a return of money pursuant

5    to a license?

6             MR. OWENS:  It would be an avenue of appeal if the

7    license applications were denied.  They haven't been denied,

8    your Honor.  They just haven't been acted on.

9             The Second Circuit said in *Krimstock* that a 24-day

10   delay in adjudicating and determining whether or not an

11   innocent owner or someone accused of a crime was entitled to

12   have their car back when it had been seized by the City of New

13   York was not sufficiently prompt given the property interests

14   at stake.

15            THE COURT:  But why is that an attack on the blocking

16   rule itself, the 50 percent blocking rule itself?  That's not

17   an attack on the rule.  That's an attack on reasonableness of

18   acting on the license.

19            MR. OWENS:  That is absolutely correct, your Honor.

20   The relationship between the two is as follows:  For the

21   government to execute a seizure, the government has to have a

22   warrant.  If it doesn't have a warrant, there has to be a

23   recognized exception, or the test has to be -- or it has to be

24   subject to a reasonableness test.  In determining whether or

25   not that initial seizure was reasonable, we have to look at

1    what happens to the person who's property is seized down the

2    road.  They can't be completely separated --

3            THE COURT:  But the initial disagreement you have with

4    them is your characterization of it as a seizure.  What you

5    just -- to block assets, an entity who blocks assets, whether

6    it's the government or some other entity that is trying to

7    collect on a judgment, doesn't have to have a warrant.

8            MR. OWENS:  That's correct, your Honor.  If there is a

9    judgment, there is court intervention.

10           THE COURT:  You don't think that the designation of an

11   entity being on the OFAC list is as strong as a judgment?

12           MR. OWENS:  No, it's not.  There is no adjudicative

13   process.  There is no adversarial system.  There is no

14   presentation of evidence by the people whose property is

15   blocked.  There is no record of the decision.  There is no

16   judgment rendered.  It is just an administrative action by the

17   executive branch, and that is not sufficient.

18           THE COURT:  But that's an argument that the government

19   has no authority to block assets, and I'm not sure you are

20   going that far.

21           MR. OWENS:  I am not going so far as to say that the

22   government does not have authority to block the assets of

23   foreigners.  I'm not even going so far as to say the government

24   has no authority to block the assets of Americans.  I'm only

25   saying the government's authority to block must be reasonable.

K8DQusvO

1    When they block the property of American citizens who are not

2    themselves SDNs, the government's efforts must be reasonable

3    within the strictures of the Fourth Amendment.

4                THE COURT:  And the unreasonable part of it that

5    you're identifying is the licensing process or the lack of some

6    other due process in the block -- in the length of time that

7    the property is blocked?

8                MR. OWENS:  Again, your Honor, there are two aspects

9    to my argument.  The first has to do with the initial seizure,

10   and the second has to do with the absence of a remedial

11   procedure afterwards and the duration.

12               THE COURT:  So, the initial seizure -- let's start

13   with initial seizure.  The initial seizure the government finds

14   an entity that they say has assets that should be blocked under

15   the statute.  They block -- their argument is they don't seize

16   the property.  They tell the financial institutions to block

17   those assets in the sense that they cannot be disposed of

18   during the period of time that it's blocked.  They're not the

19   government's assets.  They're just assets that are frozen.  So,

20   in order to do that, you say that they have to do what?

21               MR. OWENS:  Well, would it be helpful first to address

22   this issue, your Honor, whether or not the law supports our

23   contention that this in fact was a seizure?

24               THE COURT:  Sure.

25               MR. OWENS:  Or is your Honor --

K8DQusvO

1      THE COURT:  Sure, we can address that briefly.  I'm

2  not sure that's determinative, but go ahead.

3      MR. OWENS:  There are two cases which I think put to

4  rest the issue of whether or not what the government -- what

5  OFAC did here constituted a seizure.  The first is *Soldal* in

6  Cook County, which we cite in our brief, and the second is

7  *United States v. Cosme*, which, if I were a better lawyer, I

8  would have found it before we filed our brief, but I have found

9  it since.  And I can either give your Honor the cite or hand it

10  up.  But let me discuss first *Soldal* and the facts of *Soldal*

11  because they speak to the issue of whether or not seizure and

12  circumstances where the government doesn't take custody of the

13  property is nonetheless a seizure within the meaning of the

14  Fourth Amendment.

15      The facts of *Soldal* were that Mr. Soldal had fallen

16  behind in his rent payments for his mobile home trailer lot.

17  The landlord went to court, instituted eviction proceedings.

18  Before the eviction proceedings had rendered a judgment, the

19  landlord called the local sheriff's department and said, "I'm

20  going to remove this guy's trailer.  Will you come out and keep

21  him out of my way while I do it?"  And the sheriff's department

22  did that.  They came to the scene.  They didn't touch the

23  trailer.  They didn't take the trailer.  All they did was tell

24  the plaintiff, Mr. Soldal, not to interfere while the landlord

25  carried the trailer away and evicted the man from his

K8DQusvO

1     possessory interest in the leasehold in the lot.

2             The Supreme Court -- I believe it was the Seventh

3     Circuit said there was no seizure here.  The Supreme Court

4     found exactly the opposite and ruled that there was a seizure

5     within the Fourth Amendment, the state was involved, and

6     permitted Soldal's 1983 claims to proceed.

7             Here, like in *Soldal*, even more explicitly than in

8     *Soldal*, the government, like the deputy sheriffs in Cook

9     County, told the third party "do not let the owner touch his

10    property."  That's what the blocking order does.  It would be

11    one thing if it said "do not let the SDN touch his property"

12    but it's also saying "don't let us touch his property."

13            THE COURT:  But that argument the way you express it

14    generally would apply to both an entity that they clearly

15    identified under the statute that economic sanctions should be

16    imposed against.  Your argument would be, well, you can't

17    impose economic sanctions on anyone.

18            MR. OWENS:  No, your Honor, because I'm only

19    addressing the issue of whether or not it constitutes a

20    seizure.  That doesn't make it per se unconstitutional.

21            THE COURT:  That's what I'm trying to understand.  Is

22    your first argument that it is unconstitutional to seize -- to

23    block property of entities in which the government has imposed

24    economic sanctions?

25            MR. OWENS:  It's improper, yes, to block the interests

K8DQusvO

1      of American citizens who are not themselves designated as SDNs.

2                THE COURT:  No, that wasn't my question.  That's what

3      I'm trying to understand.  You're not making this argument as a

4      general argument saying that the government doesn't have the

5      authority without a warrant to block property against entities

6      that had been determined to be under economic sanctions.

7                MR. OWENS:  I'm not asking the Court to go that far.

8                THE COURT:  You're saying that they can't do that with

9      regard to those entities not designated as the target of the

10     economic sanction.

11               MR. OWENS:  Where those entities are American or owned

12     by Americans and therefore protected by the Fourth Amendment.

13               THE COURT:  And you say -- and that's limited to

14     American -- you're limiting your argument to American citizens.

15               MR. OWENS:  I believe it would also apply to people

16     who are here legally as resident aliens.

17               THE COURT:  Well, I'm not sure I understand the

18     distinction between American citizens, resident aliens, and

19     others.

20               MR. OWENS:  The distinction I'm trying to draw, your

21     Honor, is simply one that the Constitution protections and the

22     Fourth Amendment don't extend to everyone in the world, only to

23     U.S. citizens.  And I haven't researched this, but I don't want

24     to say that I only think it applies to citizens.  I think there

25     are circumstances where the Fourth Amendment's protections

1    apply to non-citizens who are present here legally.

2              THE COURT:  They don't have to be residents here.  I

3    mean, I can be --

4              MR. OWENS:  Correct.

5              THE COURT:  That's what I was trying to figure out how

6    you define citizens and residents.  I mean, the Fourth

7    Amendment applies to anyone who happens to be in the United

8    States and their property is taken illegally.

9              MR. OWENS:  Correct.

10             THE COURT:  All right.  So, you say that --

11             MR. OWENS:  Judge, to go back, if I may, to the

12   seizure point.  There is a more recent case in the Second

13   Circuit that I mentioned before, *U.S. v. Cosme*, where the facts

14   before the circuit were very much on point to the facts here.

15   In that case the U.S. Attorney's Office of the Southern

16   District had, prior to obtaining a seizure warrant, wrote to a

17   bank and said, "Do not release these funds.  We are going to go

18   get a seizure warrant."  And the Second Circuit ruled that was

19   a seizure within the Fourth Amendment and, furthermore, under

20   the circumstances in that case it was unlawful because it was

21   warrantless.  The U.S. Attorney's Office didn't follow up

22   getting a warrant and the bank never released the funds, and

23   that was part of the problem.

24             But I think those two cases put to rest the issue of

25   whether or not OFAC's blocking orders are seizure.

K8DQusvO

1          THE COURT:  Do you have *Cosme*?  Did you cite that in

2     your brief?

3          MR. OWENS:  I did not, your Honor.  I have a copy for

4     the Court.  And I provided a copy several weeks ago to

5     Mr. Jones.

6          MR. JONES:  Do you happen to have an additional copy?

7          MR. OWENS:  The other copy I have is the slip ops, so

8     the pages are going to be a little bit off.  I apologize.

9          So, your Honor, I think that puts -- I don't want to

10    interrupt your Honor if your Honor wants to read.

11         THE COURT:  Go ahead.

12         MR. OWENS:  I think that puts to rest the seizure

13    issue, which now takes us to what I think is the next question

14    that your Honor wanted to raise, which is why is it that we

15    think that this blocking order was a violation of the Fourth

16    Amendment initially?

17         And the reason for that is simply as follows:  Your

18    Honor, it is unreasonable because it is utterly unnecessary.

19    Why do I say that?  Let's imagine in the context of this case

20    that the SDN's ownership interests in these investment

21    partnerships was 49 percent.  How would the world -- how would

22    OFAC's rules work?  OFAC's rules would work as follows:  The

23    investment partnership itself would not be sanctioned.  My

24    client's property interests would not be affected.  My client's

25    ability to manage the investment funds, to reap whatever

K8DQusvO

1    benefits come from that, to take out -- to pay creditors, to

2    pay salaries, to pay obligations of the investment fund would

3    be unaffected.  He would be, however, completely and totally

4    blocked from remitting the proceeds of the investment fund, any

5    dividends, any capital gains, or listening to any directions of

6    the SDN.  The SDN would be blocked out.  That's what OFAC's

7    rules require when there's 49 percent ownership by the SDN.

8            When there's more than 50 percent, different story.

9    The Americans lose their ability to control the property.  They

10   lose their ability to avoid the economic harm of a downturn in

11   the economy.  They lose the ability to profit from an upturn in

12   the economy or the value of their assets.  They even lose the

13   ability to do such things as file taxes on behalf of the

14   entity, to make capital calls that are required to maintain

15   their investments and to keep them from defaulting on their

16   debts and their obligations which can wipe out all of the value

17   underlying assets in a portfolio fund.

18           This Draconian, Draconian impact is prompted by

19   nothing more than the shift from less than 50, to 50 or more

20   percent ownership by the SDN, and what OFAC hasn't done in its

21   responsive papers is to articulate why that is a rational and

22   therefore reasonable rule.  The best the government says is:

23   We can block things, we have that power, and this gives us a

24   bright-line test.  Yes, but that doesn't mean that you need the

25   test.  They haven't articulated why the test is necessary.

K8DQusvO

1   They haven't articulated why the impact on Americans is ever

2   necessary when the remaining tools in OFAC's arsenal --

3              THE COURT:  Well, but they -- the rationale seems to

4   be not very complex.  The rationale is that if there is an

5   entity that the government has imposed sanctions against and

6   that entity owns the majority interest in another entity, that

7   person or entity owns a majority interest in another entity,

8   that they can block the assets of the entity that they are the

9   majority stakeholder in.  And that is basically the rationale.

10             It's as if to say if you and I decided we were going

11  to buy a car together, and I put up $6,000 for the car and you

12  put up $4,000 for the car to buy it for $10,000, the question

13  is:  Is it reasonable for the government to say to me, well,

14  you know, we're going to not allow you to dispose of this car

15  because you are the majority owner of this car and we have the

16  right to block your asset.  Why isn't the rationale any more --

17  why is it more complicated than that?

18             MR. OWENS:  For several reasons, your Honor.  One,

19  some of these assets are cash and are therefore readily

20  divisible such that the interests of the SDN can be segregated

21  much more than in the case of a car.

22             THE COURT:  Right.

23             MR. OWENS:  Furthermore, why should the government be

24  permitted to stop me from driving a car if I own 40 percent of

25  it and I haven't done anything wrong?

1          THE COURT:  They can't stop you from driving the car.

2     They're stopping you from selling the car.  They're stopping

3     you from disposing of the value of the car.  And the answer to

4     that question, to the why question is because it gives the

5     entity or the person who is under sanctions the opportunity to

6     manipulate that ownership so that you can make -- they can make

7     the argument that they don't deserve to make -- an argument

8     that you may deserve to make, but they don't deserve to make

9     the argument that, oh, look, I'm sorry, I don't own a hundred

10    percent of this company, I only own 99 percent of this company,

11    and so, therefore, you can't block the assets of this company.

12    That seems to me to be the rationale behind it, the reasonable

13    rationale behind that.

14          MR. OWENS:  That may be expedient for the government

15    to avoid having to deal with those sorts of arguments.  It may

16    be expedient for the government to avoid having to engage in

17    the factual inquiry to determine whether or not I really have

18    an ownership interest, but that's not a reasonable basis under

19    the Fourth Amendment to stop me from driving and using the car.

20    And it is important to understand, your Honor, that the way the

21    blocking works as it affects my clients is they can't drive the

22    car.  Not just that they can't sell it.  They can't drive it.

23    They can't use it.  They can't change the oil.  They can't put

24    gas in it.  They can't even pay the parking lot to keep it out

25    of the rain.

1          THE COURT:  I'm not sure -- I don't know totally what

2     property is at issue here.  I thought primarily, if not

3     totally, the property that was at issue here were dollars.

4          MR. OWENS:  It's a combination of cash and interest in

5     other investments, either other companies that they bought

6     position in --

7          THE COURT:  It's ultimately cash.

8          MR. OWENS:  It can ultimately be sold and turned into

9     cash, correct.  But it's not just cash.  There are stocks in

10    other companies that are owned.  There are interests in limited

11    partnerships that are owned and things of that nature.  It's an

12    investment fund that holds investments in other entities in a

13    variety of forms.

14         THE COURT:  Isn't the critical question whether the

15    licensing procedure gives you the opportunity to do exactly

16    what you say you're entitled to do to demonstrate that your

17    portion -- to identify your portion of the assets and to argue

18    to the government that they should give you some ability or

19    some access to your portion of the assets, and if the

20    government disagrees, that you have a forum and a process to

21    resolve that disagreement, that dispute with the government?

22         MR. OWENS:  I believe that OFAC could probably create

23    a licensing regime and regulatory framework that would pass

24    constitutional muster, and that would make these sorts of

25    seizures potentially reasonable.

K8DQusvO

| | |
|---|---|
| 1 | THE COURT:  OK.  What's wrong with their process other |
| 2 | than you say that they have not -- they're slow to act upon it? |
| 3 | MR. OWENS:  There is no time limitation. |
| 4 | THE COURT:  Right.  You said they're slow to act. |
| 5 | MR. OWENS:  There's no requirement that OFAC |
| 6 | articulate the reasons for its decisions.  And, most |
| 7 | importantly, your Honor, and what is fundamentally flawed here, |
| 8 | is you can read the entire section of OFAC's regulations in the |
| 9 | CFR, and you will never find the rule or standard by which OFAC |
| 10 | should decide these applications.  There is no principled basis |
| 11 | for which or under which OFAC must make its decisions. |
| 12 | THE COURT:  And have you had in this case applications |
| 13 | that were denied? |
| 14 | MR. OWENS:  No, applications have not been denied. |
| 15 | They have only been not acted on.  So we don't have a right -- |
| 16 | some have been granted, your Honor, to be clear. |
| 17 | THE COURT:  That's what I was going to say.  You can't |
| 18 | say -- that's not the facts as I understand them.  It's not |
| 19 | that they haven't been acted upon.  The ones that have been -- |
| 20 | you've requested, there have been a significant amount of those |
| 21 | requests that have been granted, right? |
| 22 | MR. OWENS:  I would not say a significant amount. |
| 23 | THE COURT:  Well, I take that back.  You've applied |
| 24 | for licenses, and you have -- they have agreed -- |
| 25 | MR. OWENS:  In some limited instances, yes. |

1          THE COURT:  But there is no instance where you've

2     applied for a license and they said no.

3          MR. OWENS:  That's correct.

4          THE COURT:  But the part that you say is inadequate is

5     that you've applied for a license, and you've gotten no answer.

6          MR. OWENS:  Correct.  And there is no time limitation.

7     That's the first part.  The second part we talked about, they

8     don't have to give a reason for why a license is either not

9     granted, not acted on, or denied, or granted in a form

10    different from what you've asked.  They don't have to

11    articulate their reason.  But, again, the fundamental

12    constitutional infirmity from a due process perspective is that

13    none of this is consistent with the rule of law because there

14    is no rule that OFAC has to follow.  Let me give you I think a

15    great example from what has happened to us in this case.

16         Shortly before we had oral argument scheduled in early

17    July, OFAC granted a license that was a wind-down license and a

18    license that allowed us to get our back-management fees, fees

19    that we were owed for work that had been done.  We had asked

20    for a certain amount of back-management fees and documented why

21    we were entitled to that to OFAC.  We asked for authority to

22    wind down these portfolios so that we could put the SDN's money

23    to one side, take our money, and be done with it, and we asked

24    for payment of our management fees while we were doing the

25    wind-down.

K8DQusvO

1           What we got was 80 percent of our back-management

2   fees.  No explanation why to this day we're only entitled to

3   80 percent of our money, why OFAC gets to continue to hold

4   20 percent of our money.  No explanation of why we're not

5   entitled to management fees while we do the wind-down, none.

6   And there's nothing in the rule or the statute that requires

7   that, suggests that, counsels that, mandates or forbids OFAC

8   from deciding on Tuesday, well, you could have 80 percent; on

9   Wednesday, well, you could have 70 percent; on Friday, well,

10  you could have 90 percent.  It's a class example of what is the

11  arbitrary and capricious nature of what OFAC is permitted, not

12  constrained from, what they're permitted to do under their

13  statutory regime which makes the licensing process

14  constitutionally insufficient as a matter of due process.

15          THE COURT:  Well, you don't say to me that you

16  appealed that determination and you've gotten some sort of

17  adverse decision of your appeal.  You can't just say -- if

18  there's a process and a review process, you can't just say to

19  me that the system doesn't work because they said no, and you

20  didn't seek review of that determination and make the same

21  arguments that you're making, the specific arguments about the

22  specific decision in that process.

23          MR. OWENS:  I believe I can, your Honor.  I believe I

24  can, because what I'm challenging is the structural inadequacy

25  of the regulatory scheme from a constitutional perspective.

K8DQusvO

1    THE COURT:  How have you suffered from that inadequacy

2    if you haven't utilized the process that's available to you to

3    right that situation?

4    MR. OWENS:  Well, partly because we have -- we came to

5    this court a year before OFAC took this action and began this

6    action to try to get our property back, and it sort of puts us

7    in a weird position that having challenged OFAC in court

8    because of the constitutional infirmity of the structure of

9    their statute, they can give us a license a week or so before

10   an anticipated oral argument date and then use that to claim

11   this issue isn't ripe before the court.

12   THE COURT:  I know, but you're giving me two sets of

13   inconsistent facts.  Either you've asked for a license and it

14   has been denied or you haven't asked for a license that has

15   been denied.  You say to me, well, they haven't acted on

16   certain requests, but they've agreed to other requests.  And

17   then I asked you, well, was there any request that you made

18   that was denied, and then you say, well, they gave us

19   80 percent instead of a hundred percent.

20   MR. OWENS:  Well, your Honor, to be clear, these

21   various licenses deal with different pieces of property and

22   different businesses.

23   THE COURT:  I understand that.  So has there been an

24   adverse determination in the licensing process in which you

25   requested something and it was denied and you sought review of

K8DQusvO

1   that determination?

2           MR. OWENS:  Yes, there has been something that was

3   denied.  We have not sought administrative review.

4           THE COURT:  Is there a reason not to seek

5   administrative review?

6           MR. OWENS:  Because we had this case pending before

7   your Honor before those denials and believed that this was an

8   adequate forum for us and the government to resolve the

9   constitutional claims and that the claims -- because the nature

10  of the claims had to do with the structure of the statute and

11  the regulations and the infirmity on the face of those, that

12  the issue was ripe for this Court to address.

13          THE COURT:  But the only infirmity that you are

14  articulating is that there isn't an adequate standing because

15  you're not arguing that you're here because you're seeking

16  review of a particular adverse determination.

17          MR. OWENS:  Correct.

18          THE COURT:  You're here saying, well, we don't think

19  we even have to do that under the review process because we

20  think since they don't have a reasonable standing that they

21  should, as they say, throw out the baby with the bath water.

22          MR. OWENS:  Yes, your Honor, absent a reasonable

23  standard to make the decisions under the licensing application

24  process, the licensing application process does not pass

25  constitutional muster and does not otherwise provide a remedy

1  that saves a warrantless search from violating the Constitution

2  and the Fourth Amendment.

3      THE COURT:  So, what are you supposed to

4  demonstrate -- and I'll ask them the same thing -- what are you

5  supposed to demonstrate in order to convince them to grant you

6  a license?

7      MR. OWENS:  I have no idea because they have no

8  standard that they've published at all.  I don't know why they

9  gave us 80 percent rather than a hundred percent of our

10  management fees.  I don't know why they don't permit us to take

11  management fees going forward.

12      An example of what strikes me as a completely

13  reasonable request made and not acted on since, I believe, May

14  of 2018 is a request to make a capital call.  Some of our

15  investments are in limited partnerships, and when you make that

16  investment, you are required over time to put more money into

17  that investment to keep it going when you get "capital call"

18  from the general partner.  If you don't make that capital call

19  when requested, your entire interest can be forfeited by reason

20  of your failure to make the capital call.

21      THE COURT:  You're not saying they prevented you from

22  making the capital call.

23      MR. OWENS:  They just haven't acted on it.

24      THE COURT:  I'm not sure what it is under the capital

25  call, that you have to add assets just like a margin call.

K8DQusvO

1          MR. OWENS:  Yes.

2          THE COURT:  So you could get -- the fact that you have

3     to do that doesn't necessarily mean that that asset has to come

4     out of any particular entity.

5          MR. OWENS:  Yes.  It has to come out of the investment

6     fund.

7          THE COURT:  Well, why?  It comes out of your pocket,

8     right?  I mean, there's nothing that says it has to come out of

9     the investment fund.  The thing -- the reason I raise that is

10    because the thing I didn't understand is -- I understand about

11    the management fees, but the management fees aren't classic

12    assets.  They're owed.  They're a debt that's owed.  The

13    management fees is something that you earned that you say

14    should be paid.  Now, I understand the process that you -- the

15    usual process is you get paid out of the assets of that entity,

16    but there's nothing that prevents the entity that is under

17    economic sanctions to pay you from another fund your management

18    fees.

19          Management fees that are earned, you know -- I mean,

20    that's like saying if I mow your lawn and you owe me 50 bucks

21    for mowing your lawn, that that money has to come out of your

22    Chase bank account.  No.  It's an obligation you owe me.  It

23    doesn't have to come out of any particular fund.  There may be

24    a process -- that's the usual process that it just comes out

25    when you distribute those funds, but that's just an obligation.

K8DQusvO

```
 1    That's not part of the asset.  The management fees aren't part
 2    of the assets of that company that's being blocked or the
 3    assets that are being blocked.  You're just saying, well, I
 4    want that money -- I want to get paid out of that fund, but
 5    that's not the asset itself.
 6              MR. OWENS:  My argument from a legal perspective and a
 7    constitutional perspective is a little more subtle, your Honor.
 8    It's not that we're entitled to get it out of that fund because
 9    that's our assets.  The argument is we are the general partner
10    of the investment fund --
11              THE COURT:  Right.
12              MR. OWENS:  -- as well as the manager.  As the general
13    partner, our property interests include our ability to control
14    the fund.
15              THE COURT:  Right.
16              MR. OWENS:  Including paying its assets out, using its
17    cash to pay its expenses, one of which is our own management
18    fees.  That's our contractual right.  It's our property
19    ability.  The management fees are the contractual right of the
20    management company.  The ability to direct the funds to make
21    the payment is a property right, the right of control of
22    possessory interest of the GP.
23              THE COURT:  But that obligation is the obligation of
24    the partnership.
25              MR. OWENS:  Correct.
```

1          THE COURT:  And the partnership of which the entity

2     that is under economic sanctions owns the majority of that

3     asset.

4          MR. OWENS:  Correct, but why may we not pay -- make

5     the decision given our property interests, our right of

6     control, why can we not make that decision?  That is what we

7     have been divested of here.  It's not sufficient to say to us

8     that we could just go get money from somewhere else.

9          Under the Fourth Amendment, imagine a man who's

10    standing outside of his house, who wants to go in his house and

11    the police have told him you can't go in your house, and he

12    goes -- because we're going to go get a search warrant.  And he

13    goes to court and says, "Your Honor, the Fourth Amendment

14    allows me to go inside my house," and the judge said, "You

15    know, sir, just go to a hotel.  We'll worry about it later.

16    Get somebody to find you a hotel room.  There are plenty of

17    houses in this town.  What's the big deal there?"  The big deal

18    is the Fourth Amendment doesn't work that way, your Honor.  The

19    Fourth Amendment says our property is our property unless the

20    government has a reasonable basis to take it from us.

21         THE COURT:  But your property here -- the difference

22    between the analogy you're trying to draw is we're talking

23    about joint property and we're talking about joint property in

24    which the entity that's under economic sanctions owns the

25    majority of that property.

1          MR. OWENS:  And let's say I'm a tenant by the

2     entirety, and my wife is in big fat trouble, and the cops won't

3     let me in.  And the court says, "Sorry, your wife's in big fat

4     trouble, find a hotel room, because she owns 50 percent."

5          THE COURT:  There are circumstances where that is

6     appropriate.  If we think your wife is a drug dealer and she's

7     got drugs in the house, and we find out it's her house but she

8     jointly owns it with you, the government can say, "No you can't

9     go into the house until we decide what we're going to do with

10    what we suspect are her illegal assets in the house."

11         MR. OWENS:  That is absolutely correct, your Honor,

12    subject to some very important restrictions on the government's

13    exercise of that power that are not present here.  There is a

14    requirement that there is a judicial finding of probable cause

15    provided that each of the factual predicates your Honor laid

16    out was true.  There is a right to contest it through Rule 41

17    afterwards if the person believes -- if I believe having been

18    excluded from my house that this was done in error, and there

19    is a standard, a clear legal standard about when the government

20    can and can't do that.  All of those things are missing here,

21    and that's why this violates the Fourth Amendment.

22         THE COURT:  And are you relying on Fourth Amendment

23    law in the criminal context or are you relying on some other

24    broader application of the Fourth Amendment?

25         MR. OWENS:  Your Honor, the Fourth Amendment is the

K8DQusvO

Fourth Amendment.  Whether it's a criminal context or a civil

context, it applies the same standards and requirements.  That

is clear from the case I discussed earlier, *Soldal*.  There was

nothing criminal involved in *Soldal*.  It was a civil eviction

proceeding.  There is no difference in the limitations the

Fourth Amendment imposes upon what the government can seize and

not seize in a criminal case versus a civil case.  The analysis

of what is and is not different may be -- sorry -- what is and

is not reasonable may be different in a civil case from a

criminal case.

Typically, in a criminal the case the government's

required showing is a little easier for the government because

criminal enterprises, criminal conduct, public safety are often

an imminent risk, as your Honor just alluded to in the drugs in

the house.  Public safety is imminently at risk.  Public safety

here is not imminently at risk.  There is no criminal conduct

we are alleged to have engaged in.

THE COURT:  But, I mean, it's not the allegation even

in the criminal context that you are engaged in the illegal

activity.  And, quite frankly, I'm not sure I can say that

behind all economic sanctions imposed by the government there

isn't criminal conduct behind some of those sanctions.

MR. OWENS:  That is absolutely true in many sanctions.

It's not true here.  It's not true in the sanction program

which resulted in the seizure of our assets.  The seizure of

K8DQusvO

1    our assets were part of the Ukraine sanctions program, which is

2    a foreign policy program.  It's not a terrorist program.  It's

3    not a drug-trafficking program.  There are such sanctions

4    programs.  The analysis of what is or is not reasonable could

5    be different in those programs, but that's not what we have

6    here.  And that's why the 50 Percent Rule, I think, your Honor,

7    deserves rigorous scrutiny from the Court about why it is

8    necessary when it imposes such immense obligations and such

9    immense impairments on American citizens and their property

10   rights.

11          It's one thing to take the position as the government

12   has, and that I wouldn't disagree with, that sanction programs

13   are important.  The government needs the ability to use the

14   sanctions tool for a variety of foreign and domestic policy

15   regimes, but it is not sufficient to say that that tool can be

16   wielded by the government with as little regard for the rights

17   of American citizens who are not themselves subject to

18   sanctions as the government has done here.

19          THE COURT:  So, what do you say is the solution?

20          MR. OWENS:  The solution is to tell the government

21   that as applied in this case, the 50 Percent Rule is

22   unconstitutional.  It is unreasonable.  It works an

23   unreasonable restraint on the property of Americans.  We will

24   then be in the same position as we would have been if the

25   ownership was 49 percent.  We are prohibited under penalty of

K8DQusvO

1    law from remitting any benefits or proceeds from the management

2    and operation of the investment funds to the SDN, but we can

3    manage the fund as we see fit.  We can dispose of the assets.

4    We can take our share, and we can keep them from declining in

5    value and try to maximize their value, and we can pay ourselves

6    our management fees, keep our people on the payroll, keep the

7    lights on.

8            THE COURT:  It is unclear to me what is the --

9    practically, what is the unreasonable restriction at this point

10   that is being imposed?

11           MR. OWENS:  So, for example, it's unclear that we can

12   make these capital calls.

13           THE COURT:  When you say it's unclear --

14           MR. OWENS:  Yes, because --

15           THE COURT:  You attempted to do so, and they blocked

16   your ability do so?

17           MR. OWENS:  It doesn't work that way, Judge.

18           THE COURT:  That's what I'm trying to understand how

19   it works.

20           MR. OWENS:  The way it works is you go to the bank and

21   you say to the bank, "Will you release these funds to pay X?"

22   And the bank will say, "You've got to talk to OFAC."  And then

23   we call OFAC and OFAC says, "Well, I don't know about making a

24   capital call.  We'll get back to you."  And they never get back

25   to you.

K8DQusvO

1          THE COURT:  OK.

2          MR. OWENS:  Or they say, "Call our compliance

3    hotline," and you call the hotline and they say, "We'll get

4    back to you."

5          THE COURT:  I'm trying to understand if you're giving

6    me a real situation or a hypothetical.

7          MR. OWENS:  I'm giving you a real situation.

8          THE COURT:  Is this what has happened?

9          MR. OWENS:  Yes, this is what has happened.  This is

10   the impairment that we have been trying to function under and

11   keep from having to lay off everybody who works there, although

12   many have had to be laid off over the last two years and three

13   months since these sanctions have been imposed.  We had

14   opportunities -- before this license was granted in July there

15   were opportunities where people came to us and wanted to buy

16   assets, and we said, "We can't talk to you.  We can't even

17   negotiate on behalf of the investment funds or deal with you

18   without a license because the fund is blocked."

19         THE COURT:  But in those instances, did you seek such

20   a license?

21         MR. OWENS:  In instances, we did.  Some were acted on.

22   Some were never acted on.  In other instances where we sought a

23   license, our license was never acted on, but the third party

24   who wanted to acquire the assets, their license was acted on,

25   and we said to OFAC, "Well, if we're selling this asset out of

1    the fund, can we use the proceeds from that sale to pay our

2    management fees?"  No.  "Can we use the proceeds to pay out our

3    20 percent interest in the fund that we're entitled to as a

4    general partner?"  No answer.  That's the world we have been

5    working under, your Honor.  It's an unfair and unrealistic

6    world.

7              THE COURT:  I understand your position with regard to

8    a request that is never responded to.  But I don't hear -- it's

9    unclear to me as you go back and forth whether or not you've

10   ever received a no from the government.

11             MR. OWENS:  May I have one moment, your Honor?

12             THE COURT:  Yes.

13             (Pause)

14             MR. OWENS:  Thank you, your Honor.

15             My client has reminded me of two instances where we

16   were told no.  One involved a license granted to a third party

17   to purchase the interest of Audubon, which was the entity that

18   had loaned money to the prince heirs, and we asked that in the

19   context of that license, we be permitted to receive our share

20   of the proceeds of the sale, and the answer was no.

21             There was another instance where when an asset called

22   MapAnything was sold, we asked for permission to pay ourselves

23   back-management fees out of the proceeds from that sale.

24   Again, the answer was no.

25             THE COURT:  Let me hear from Mr. Jones.

1          MR. OWENS:  Thank you, your Honor.

2          MR. JONES:  Thank you, your Honor.

3          And may it please the Court, I have to say that was a

4    very lengthy and wide-ranging discussion.  And I want to be

5    helpful to the Court, and I will honestly say there is a lot

6    that surprised me greatly in this discussion, and I feel a lot

7    of discussion that is really kind of divorced from reality or

8    at least certainly from how the government perceives this

9    situation.  So, if it's helpful to the Court, I would like to

10   make a few points.

11         First, very specifically, I think your Honor's

12   questions were very well taken about whether plaintiffs have

13   pursued available remedies when told no; have pursued a firm no

14   if they have an ambiguous answer; have sought review of adverse

15   decisions, because the answer is they have not.  And there is

16   an important doctrine, I'm sure familiar to the Court, called a

17   Constitutional Avoidance where parties are expected to pursue

18   all non-constitutional remedies first before asking courts to

19   take the profound and weighty and very consequential step of

20   ruling executive action unconstitutional, and that's especially

21   critical in this context where we have a challenge to the

22   working of long-standing sanctions regimes that have been a

23   cornerstone and a court-approved cornerstone of American policy

24   and national security efforts for many, many decades.  So, the

25   plaintiffs are trying to bypass viable and available and

K8DQusvO

1  effective processes and come to this court and get a ruling

2  that can have very sweeping and harmful programmatic impact,

3  and that should not be permitted.  I recognize their cripples

4  and I'll talk about whether available processes are in fact

5  viable, in fact are appropriate, and in fact are feasible and

6  available to them, and I'll explain why the answer is yes.

7          I'm also concerned that plaintiff's arguments and

8  presentation ignore facts, both as alleged in their complaint

9  and then as have developed since the filing of the complaint,

10  and I guess I'm responding in part, or at least in part, to the

11  motion for turnover of assets.  So I guess I'm not fully

12  confined to the four corners of the complaint.

13          But OFAC tells me they have issued at least 29

14  separate licenses involving the blocked property of Viktor

15  Vekselberg that is at issue in the complaint.  I'm going to

16  talk about that and how that has worked.  The picture is not

17  nearly as bleak as plaintiffs paint.

18          I do want to talk about my motion to dismiss.  There

19  is really a fundamental disconnect that we do not agree that

20  OFAC took any action with respect to any property interest of

21  plaintiff.  They blocked Viktor Vekselberg and his companies,

22  and the 50 Percent Rule -- sorry -- the effect of that blocking

23  of Mr. Vekselberg and his entities is to make it unlawful for

24  transactions to occur involving his property.  And what the

25  50 Percent Rule does is simply definitional.  It creates a

K8DQusvO

1    bright-line rule so that everyone dealing with any assets in

2    the neighborhood of Mr. Vekselberg will know if it's 50 percent

3    or more owned by him, it's just automatically by operation of

4    law deemed his for purposes of the sanctions programs.  That's

5    what that does.  That's reasonable.  And I can talk about the

6    operation of that and how that is made to be -- what

7    protections are in place for U.S. persons with interest.

8         I also note again in connection with the

9    50 Percent Rule, we don't concede that anything constituting

10   plaintiff's "property" actually was affected by this.  What was

11   affected by the blocking of Mr. Vekselberg is plaintiff's

12   entitlement to be paid out of these entities.  And, in fact,

13   OFAC would license payments by any other pot of money to

14   plaintiffs on account of amounts owed to them by Mr. Vekselberg

15   or his entities.  Plaintiffs have never accepted that as a

16   viable alternative.  Assuming Mr. Vekselberg were to pay, that

17   would presumably come from funds that he has offshore, and he

18   is reportedly a multibillionaire with assets all over the

19   world.  OFAC is prepared to facilitate a make good payment to

20   plaintiffs of whatever amounts are due to them as long as it's

21   not coming from blocked funds.  OFAC doesn't want blocked funds

22   to be depleted by allowing plaintiffs to tap into those, and

23   they're encouraging him to pursue other sources of payment.

24        THE COURT:  I'm not sure how -- I don't understand how

25   you are handling his ownership interest in these entities.  I

understand your argument with regard to payments owed to him,
but he has an ownership interest in property that has been
blocked, and his argument is that he has lost control over
making those entities profitable or disposing of those -- his
interest in those entities if that's appropriate.

          MR. JONES:  Understood, your Honor.  I want to say at
least two things about that, one of which may be a curve ball,
but I'm going to start with it anyway.  And that is in just
preparing for today, I looked back at the complaint to see in
paragraphs 44 through maybe 59 or so, defined -- actually, more
than that -- define the parties -- the plaintiff's entitlements
as against these blocked entities, and, for example, they
follow the same drafting pattern.  And your Honor is right
that, for example, paragraph 45 talks about plaintiff having --
serving as management company for a Vekselberg-owned entity and
talks about management fees and entitlements like that.  So,
that's the easy part.

          And paragraph 44, the immediately preceding paragraph,
does not say plaintiff US VC GP is a minority owner.  They say
that plaintiff is entitled to a minority share of the proceeds.
It's unclear to me if that is a direct ownership interest or if
it's some contractual interest entitling them to a cut of the
proceeds.

          They follow that drafting exact wording in describing
every single transaction.  So, I don't want to bog the Court

K8DQusvO

down on that excessively, but I do want to point out that there
is not necessarily an allegation that plaintiffs actually own
these entities or have an ownership interest in these entities.
Now, if they do, and certainly, I have great respect and long
familiarity and friendship with Mr. Owens, so assuming there is
a minority ownership interest there, despite their complaint's
wording, what is being -- you know, their actual ownership
interest in the entity has not been acted on by OFAC.  They are
just unable to receive payments on account of whatever their
interest is or entitlement are, and that's different in OFAC's
view.

THE COURT:  But they're also unable to dispose of
their interest --

MR. JONES:  Thank you.  And let me address that.

THE COURT:  By selling or --

MR. JONES:  Right.  Their complaint is twofold.
Basically, it's "we can't get money out of these things" and
"we can't run them the way we want to do."  And it is true part
of the effect of sanctions is that U.S. persons aren't entitled
to provide services to these blocked entities without a
license.  That's just part of how the sanctions work.  It's
because it's not targeted at the U.S. person; it's targeted at
the blocked person, and so, you can't benefit from the U.S.
economy, you're sanctioned.  You know, you are an engine of a
national emergency, and you're not allowed to benefit from our

K8DQusvO

1    economy unless we say so.

2           But this is -- when I referenced that OFAC tells me

3    they've issued 29 licenses, and Mr. Owens acknowledged multiple

4    licenses early on at a granular level permitting sometimes

5    third parties to engage in negotiations, sometimes permitting

6    plaintiffs to engage in negotiations, OFAC adopted a pattern of

7    authorizing negotiations toward eventual resolution or sales of

8    portfolio companies held in these blocked entities, while

9    reserving the ability to approve or disapprove the final deal

10   that was negotiated.

11          That is not the act of a regulator, and the complaint

12   doesn't support the view that OFAC was completely handcuffing

13   these folks, although I know their feelings are very strong,

14   and they are very frustrated by the impact of sanctions on

15   them, but OFAC did not act in a way that was intended to or

16   that did preclude all activity regarding these investments.  If

17   they have particular disagreements, they could have challenged

18   it and should have in the ordinary course, including through

19   litigation.

20          If they weren't allowed to make a capital call -- and

21   I'm unfamiliar with that specific example -- they could and

22   should have pursued -- gone back to OFAC and said, "Look, this

23   needs to happen, this is harming me."  And if they got a no or

24   if they could say I will construe this as a no unless I hear

25   from you by day X, they could have gone to court to challenge

K8DQusvO

 1    what then would have been a final adverse agency action under

 2    the APA.  But they didn't wait for that.

 3         So OFAC has not been non-responsive.  They did

 4    issue -- and I also want to acknowledge frustration, yes,

 5    dissatisfaction with how OFAC handled things, yes, but OFAC has

 6    given these plaintiffs very extensive attention over a

 7    continuous period, and, importantly, these licenses that were

 8    issued this year provide even more sweeping relief.  Plaintiffs

 9    over time have been licensed to receive payouts totaling by my

10    math approximately $11 million in several installments.  So,

11    although they're dissatisfied that they didn't get the full

12    amount they sought approval for, they got substantial payment

13    including on account of both management fees and distribution

14    of accrued earnings that they said they were owed, and they

15    also received a separate license authorizing them to engage in

16    wind-down operations, negotiations, negotiate and execute sales

17    of blocked positions.

18         So, they now have a broad prospective license

19    permitting them to do the management activities of the type

20    they say they need to do and have been frustrated from doing.

21    And, in addition to that, they have been told by OFAC that

22    although they're not being given prospective management fees or

23    prospective authorizations to receive payouts from these

24    entities going forward, that OFAC has said they are predisposed

25    to look favorably on applications for that once the

1    negotiations they're pursuing close.  OFAC just wants to see

2    that the transactions actually happen and be satisfied that

3    future payouts are supported by reasonable management costs or

4    fees or expenses or contractual entitlements of some sort for

5    the plaintiffs, but they've said they're open to providing

6    this.

7              THE COURT:  Where does one go to look at to know what

8    standards that OFAC is using in making these determinations?

9              MR. JONES:  Let's see.  Your Honor, first off, if

10   you're talking about standards that OFAC applies in deciding

11   license applications, is that the question?

12             THE COURT:  Yes.

13             MR. JONES:  Right.  So, your Honor, every sanctions

14   program, including the Ukraine program, has regulations in the

15   CFR that are published, and, further, there's an OFAC website

16   with a lot of Q's and A's, and OFAC is available for

17   consultations.

18             I believe plaintiffs are correct that there is not a

19   detailed quasi-legislative statement of considerations *and if X*

20   *happens, OFAC will do Y* and so forth.  OFAC has very broad

21   discretion, and our argument is that that is appropriate and

22   permissible.  It's consistent with the design of IEEPA, which

23   is the statute under which the sanctions are promulgated, and

24   which is necessary because the way sanctions work is very

25   sweeping, and it happens automatically by operation of law.

K8DQusvO

|    |    |
|----|----|
| 1  | If someone is subject to sanctions, all property and |
| 2  | rights in property subject to U.S. jurisdiction that they have |
| 3  | is blocked.  It can't be bought, sold, transferred, acted on, |
| 4  | moved.  It's just frozen in place.  The government doesn't |
| 5  | necessarily know what all that is.  In fact, it probably |
| 6  | doesn't.  And that can have very sweeping and varied effects, |
| 7  | and any number of people will be affected by that.  Any of |
| 8  | those people affected by any of those permutations can come to |
| 9  | OFAC for relief, and I -- my inference -- well, I'll just say |
| 10 | it would be unworkable to design a very detailed playbook for |
| 11 | defining the exact situations that might arise and exactly what |
| 12 | OFAC might do.  So that's part of my answer.  They have broad |
| 13 | discretion, but that's of necessity. |
| 14 | The other thing I would say is they are available. |
| 15 | They have been responsive.  The complaint demonstrates they |
| 16 | have had repeated discussions with plaintiffs, and so their |
| 17 | concerns they are willing to discuss and make known their |
| 18 | concerns, and they do have a track -- a reasonable track record |
| 19 | that's fairly well-known by practitioners in this area of what |
| 20 | they're willing to do and what they're not. |
| 21 | THE COURT:  Well, it is still unclear to me where the |
| 22 | two of you have butt heads and where you have come into |
| 23 | conflict over any particular issue. |
| 24 | MR. JONES:  As to these motions and this case?  I'm |
| 25 | trying to talk about -- |

K8DQusvO

1          THE COURT:  No, as to any particular thing that they

2     wanted to do that you either told them they couldn't do or you

3     have ignored them.

4          MR. JONES:  Your Honor, my sense is that OFAC has

5     worked very hard to preserve the functioning of its sanction

6     system but also to listen to and meet the concerns of

7     plaintiffs.  I think that plaintiffs are very upset and

8     aggrieved because substantial time has gone by.  Their economic

9     operations, their business operations, have been severely

10    impacted because, just like any other counterparty to a blocked

11    person, all of a sudden they're not able to do the things they

12    expected to do, and they're not able to collect the money they

13    thought they would be collecting when they thought they'd be

14    collecting it.  But that means they're a disadvantaged

15    counterparty.  It doesn't mean they've suffered a seizure.

16         And so I will say OFAC has gone a long way to

17    addressing what it understands the concerns of plaintiffs to

18    be.  It took a long time, and it's not as good as they wanted,

19    but what they wanted is distribution of management fees to

20    their pockets, distribution of realized cash proceeds of

21    transactions by blocked entities to their pockets as those

22    entities owed them both proceeds to the plaintiffs, and then

23    they wanted an ability to manage these assets and conduct

24    wind-down negotiations and transactions because I think your

25    Honor has it but basically all of these entities are investment

K8DQusvO

1    vehicles that Vekselberg owns, most or all of, that plaintiffs

2    manage.  They all hold portfolio assets of some kind or other

3    that are investments, so probably not cash.  I mean, they're

4    shares in companies or other forms of assets that have to be

5    managed as investments, ultimately liquidated, and cashed out,

6    and then the money flows in whatever proportion to Vekselberg

7    or the plaintiffs.

8             So, that's what all of these things are about.  And so

9    their frustration is they haven't been able to do deals like

10   they wanted, and they haven't been able to pull their money out

11   as they're contractually entitled to do.

12            Sorry, so I'm doing a long wind-up.  OFAC now has done

13   licenses that allow these folks to receive a substantial

14   payment of their management fees, although not all, that is

15   correct, they're not getting quite full pay, but a substantial

16   chunk of money.  They're also getting money on account of what

17   OFAC refers to as carried interest, their investment

18   entitlements flowing from these entities, and they're also

19   getting authorization to finalize these wind-down negotiations.

20   OFAC wants these assets liquidated too, and OFAC has told them,

21   when you do that, we will let you pull further money out, but

22   we're just not going to give you a front commitment that you

23   can have X dollars on such and such a timetable.  Finish the

24   negotiations, generate the revenues, get the deals done, and

25   we'll let you have more money.

K8DQusvO

1          I think your Honor's question is well taken that it is

2     not the case that as we stand here today OFAC is wildly off the

3     mark and is failing to take reasonable action in response to

4     plaintiff's concerns.  It doesn't satisfy plaintiffs.  They

5     want full pay, not 80 percent pay, and they want advanced --

6     you know, they want a continuing revenue stream to be approved

7     without having to wait for post-closing blessing by OFAC.  But

8     that's a very limited and different kind of impact than what

9     they are describing or suggesting.

10          THE COURT:  Is it your understanding that this is a

11     fight about money owed or is this a fight about money or

12     property owned?

13          MR. JONES:  Money owed, your Honor.

14          In speaking with -- I will tell you, this has

15     attracted a lot of interest and focus within the Treasury

16     Department and the OFAC folks.  People are working very hard

17     and very engaged with these plaintiffs and in this case, and

18     the refrain I hear, and I believe it's correct, is, look, these

19     plaintiffs are, in our view, dressing up what's happened to

20     them as a Fourth Amendment seizure of what they call their

21     property, but we don't think it's that.  We think these are

22     counterparties to blocked entities that are validly blocked.

23     They don't challenge the validity of the blocking, and they're

24     understandably frustrated because they've been delayed or

25     prevented from pulling money that those entities owe them out

K8DQusvO

1    into their own pockets.  And we get that that is very

2    frustrating and difficult.

3              But the case law again and again recognizes that

4    sanctions programs are valid and important.  They have impacts

5    on counterparties that can be harmful and frustrating and

6    painful, but that is part and parcel of the process.  And on

7    top of that, OFAC is attempting to make accommodations and

8    facilitate at least partial measures to take care of

9    plaintiff's worst concerns.

10             I think if there were a particular situation, you

11   know, one topic of discussion was, gosh, this entity owes real

12   estate taxes, you know, OFAC is very open to a specific license

13   application to meet a particular operational need.  OFAC is not

14   out to sabotage these businesses or cause needless

15   counterproductive ways.

16             OFAC's goal is very simple.  They want to impose

17   blocking regulations according to law.  Whatever assets are

18   blocked, they try to preserve them.  They don't want them to be

19   dissipated.  They encourage anyone who is an innocent affected

20   counterparty to try to get paid out of non-blocked money, money

21   that their counterparty has available elsewhere because that

22   leaves OFAC with the pot of assets that it uses as leverage in

23   trying to negotiate and improve the world or eliminate the harm

24   that led to the sanctions in the first place.

25             If that's not possible, they'll go case by case and

K8DQusvO

see -- you know, consider appropriate relief for the affected
non-sanctioned person and sometimes with a sanctioned person
too if they seek it.  All of that is a long, established
functioning process and regime.  It's available to plaintiffs.
I know they're frustrated and dissatisfied, but their proper
recourse if they're dissatisfied is to pursue what they want
with OFAC.  If they get simply no answer and they're
dissatisfied about that, the APA gives them another
non-constitutional avenue to pursue if they want to plead it
that way, which they haven't done, because the APA lets you sue
for unreasonably delayed action.  Again, they haven't brought
such a statutory claim.

          And if you're dissatisfied with a final action agency
action, it has to be a final agency action under 5 U.S.C. 704,
then you can sue saying it's arbitrary and capricious, and our
papers do cite cases where OFAC was sued by various people who
were affected by the sanctions and allege what affected was
arbitrary and capricious, and OFAC won.  But the fact that
those lawsuits happened demonstrate a couple of things.  One is
that OFAC engages in reasonable decision-making, at least
sufficiently to permit review, and the other is that the Court
should know OFAC understands that it has an obligation to
decide things and be responsive and make responsible defensible
decisions.  And OFAC lives at risk of a lawsuit if it makes a
final decision that is contrary to the APA standard and review.

1      Sorry, that was a horrible sentence.  If OFAC does

2  something arbitrary, capricious or indefensible, OFAC knows

3  that it's liability to be sued on account of that once its

4  final action has occurred.  So, that procedural right protects

5  plaintiffs and people and that OFAC living with that knowledge

6  is an incentive and inducement to make sure that OFAC actually

7  does reasonable defensible things.

8      So, your Honor, that is -- I feel like we hit a pause

9  in our conversation, and I hope I've addressed the Court's

10  questions.

11      THE COURT:  You have.

12      MR. JONES:  I would like to take a moment and really

13  hit hard on the question of whether OFAC has done a seizure,

14  what OFAC has done can constitute a Fourth Amendment seizure,

15  because that is of very great programmatic importance to OFAC.

16  And the answer is no.

17      So, we basically have in our briefing talked a lot

18  essentially about four main cases.  There were two out of D.C.,

19  *HolyLand* and *Islamic American Charity* versus the two that the

20  plaintiffs favor, one called *Al Haramain* and another one called

21  *KindHearts*.  Those are out of the Ninth Circuit and the

22  Northern District of Ohio.  Those are all on the question

23  whether OFAC seized somebody's property in the course of

24  designating, I think those all involved terrorist actors, and

25  causing all their assets to be blocked.

K8DQusvO

1          We think the D.C. cases are correct, but all four are
2     completely distinguishable and fundamentally different from
3     what's going on here because those cases all involved the
4     unusual circumstance of the government designating as a
5     terrorist and imposing sanctions against a U.S. organization.
6     They're all U.S.-based organizations on both sides of that
7     legal debate, and so they had available the argument that, my
8     gosh, my government, the U.S. Government, came and targeted me
9     and deemed me a terrorist, renegade outlaw and essentially made
10    me -- that was like a corporate death sentence immediately
11    because they couldn't engage in operations.  They couldn't
12    access or use any of their assets.  Their operations were
13    immediately terminated.

14          And for the two courts that come out plaintiff's way,
15    that was a bridge too far.  That was -- like *Soldal*, that was a
16    government's countenance direct interference with the property
17    rights of U.S. people so that had to meet Fourth Amendment
18    requirements.

19          The D.C. courts said recognizing the severity of that
20    situation, government action has to a U.S. person,
21    nevertheless, not a seizure because all OFAC does is immobilize
22    assets, and that doesn't constitute -- rise to the level of a
23    Fourth Amendment sanction.  But -- so, we think the D.C. courts
24    have the better of that.

25          But, regardless, this situation is different because

K8DQusvO

1    plaintiffs were not sanctioned.  Vekselberg was sanctioned.

2    His entities were sanctioned.  And then by operation of the

3    50 Percent Rule's role here was simply to say, oh, what

4    constitutes Vekselberg's property that is seized -- or, excuse

5    me -- that is blocked by operation of law once he's has been

6    sanctioned.   And so that is fundamentally different because

7    there is no governmental action directed at plaintiffs or

8    anyone but Vekselberg and the effect is different and much less

9    sweeping.

10        Mr. Intrater, whatever property Mr. Intrater has or

11   the plaintiff entities have is not blocked.  All that's

12   blocked -- that is, all that is blocked is the entities from

13   which they're owed money and which they say they have a

14   minority ownership share or entitlement to receive proceeds.

15        So, that is just a fundamentally different situation.

16   And to hold that that's a seizure would -- could really just

17   wreak havoc on the operation of sanctions programs because that

18   just opens up the possibility that anyone who has any dealings

19   that would be frustrated with any sanctioned narco trafficker,

20   terrorist, foreign, you know, rogue foreign official, whatever

21   it is, any person affected by government action against those

22   types of actors would have a Fourth Amendment seizure claim and

23   potentially warrant obligation flowing to the government and/or

24   very unadministrable and unnecessary procedural avenues would

25   be opened up.

K8DQusvO

1        What they've got is, they are frustrated

2   counterparties.  They are protected by the OFAC licensing

3   process and by the ability to receive payment from their

4   counterparties by other sources of funds, and that process

5   should not be disturbed.

6        Your Honor, I'm not sensing any questions coming.  If

7   I can have a moment to make sure -- the one other thing I want

8   to touch on is the inapplicability of Criminal Rule 41 to this

9   situation.  We briefed that, but plaintiffs acknowledge

10  Criminal Rule 41 has never been applied in a context remotely

11  like this.  They insist, and rightly, that some case law

12  recognizes that if there is no criminal proceeding pending in

13  which such an application for relief can be brought, the Court

14  does have authority to deem something a civil equitable

15  proceeding.

16        But every time -- first off, the Second Circuit says

17  that should only be done -- in the *DeAlmeida* case that should

18  only be done sparingly and with extreme caution and can never

19  be done if there's an available legal remedy, which there is

20  here under the APA.  And it has always been done in connection

21  with criminal investigations or forfeitures, you know,

22  potentially in the context of civil forfeiture but always in

23  the law enforcement context.  It's always when law enforcement

24  takes something, typically tangible property or cash, from a

25  person and is unlawfully retaining it.  Either it couldn't be

K8DQusvO

1    taken in the first place or it was held too long, you can get

2    it back.  That is not this.  These are all designed to serve

3    the purpose of protecting people from overzealous

4    unconstitutional acts in connection with law enforcement

5    matters and that is simply not this.  So, relief under Criminal

6    Rule 41 should not be afforded in this case even if the

7    complaint were dismissed.  And, of course, if the complaint is

8    dismissed, there's no proceeding here to append that to.

9              If the Court has no further questions, I think I've

10   covered the guts of what I wanted to.  I thank the Court.

11             THE COURT:  Thank you.

12             Mr. Owens, do you have anything further?

13             MR. OWENS:  Yes, if I may, your Honor.

14             THE COURT:  Sure.

15             MR. OWENS:  I think it's important, your Honor, to go

16   back to what I think appears to be now the central disagreement

17   between OFAC's view of the world and our view of the world that

18   we're asking the Court to resolve.  That is, whether or not we

19   are, as OFAC describes it, simply a disgruntled counterparty or

20   whether we are, as we assert, owners here whose property has

21   been seized and impacted.

22             Mr. Jones is not correct that we have not alleged our

23   property interests in the complaint.  The complaint alleges in

24   each instance for each of the investment funds at issue that we

25   are the general partner.  The general partnership interest is

K8DQusvO

1    an ownership interest in the fund.  Partnership interests are

2    property and have been recognized as such for eons in the

3    courts of New York.  We are owners of the fund.  The ultimate

4    payout that we may be entitled to is the subject of a

5    contractual agreement with a limited partner based upon how the

6    funds performs.  But whether or not there is some variability

7    in our ultimate payment doesn't change our ownership interest.

8         If I own a share of stock in a company, the value of

9    that stock may change every day, but I have a property interest

10   in that stock.  The same is true for our general partnership

11   interest here, and that general partnership interest, unlike a

12   share of stock, comes with additional rights, and those are the

13   rights of control.  Those are the rights that have been

14   squelched by the 50 Percent Rule.  Those are the rights we have

15   been deprived.  Those rights ultimately allow us to either gain

16   money or lose money based upon our own decisions about how to

17   run the business, and that's what we've been deprived of by

18   OFAC.

19        To some extent, your Honor, I think the discussion of

20   how many licenses have been granted versus how many licenses

21   haven't been granted is a bit of a red herring.  They could

22   have granted every license that we asked for save one, and if

23   that one affected our property interests, we would still have a

24   valid claim and could stand in court and ask the Court to

25   address that.  OFAC can't defend the constitutionality of their

K8DQusvO

1    regulatory regime by saying, well, we're pretty good.  We're

2    better than 500.  That's not an answer to the constitutional

3    claim we have raised.

4          By my count, they've only granted 25 licenses rather

5    than 29.  Maybe I'm not counting extensions.  He's counting

6    differently.  And some of those licenses involve entities that

7    are not subjects of this lawsuit but are separately managed

8    entities that we don't have an ownership interest in and so

9    have not brought claims of the sort we have brought in this

10   lawsuit.

11         But, again, if what this case turns on is, as

12   Mr. Jones seems to suggest, whether or not OFAC is doing a good

13   enough job rather than whether or not their application

14   process, their blocking process meets as a matter of law

15   constitutional requirements, then it seems to me his motion to

16   dismiss is doomed because then we're remitted to discovery and

17   a hearing on the facts to determine whether or not what

18   Mr. Jones says about how good or reasonable OFAC has been is

19   true or not.

20         I don't think we have to go there because I think your

21   Honor can resolve the case on grounds set out in our Rule 41

22   motion application because we show that any way you slice it,

23   the application of the 50 Percent Rule to American owners with

24   no prior judicial finding of fact is unreasonable and

25   unnecessary, because there is no reason to treat 50 percent

K8DQusvO

1    co-owners different from 49 percent co-owners.  It's not

2    necessary to protect OFAC's policy that the duration -- because

3    there's no limitation on how long they can sit on a license,

4    even if it's just one license out of many applications is still

5    a violation of the Fourth Amendment, because the extent of the

6    seizure has to be reasonable temporally as discussed in

7    multiple cases that we've cited to the Court.  And, most

8    fundamentally, this sanctions program does not comport with the

9    rule of law as it affects the rights of Americans because there

10   is no promulgated standard for decision-making by the

11   administrative agency.

12          Your Honor very pointedly asked Mr. Jones to point you

13   in the direction, he mentioned websites.  He mentioned OFAC's

14   program guidelines.  He didn't give you a cite, and, most

15   tellingly, your Honor, he didn't articulate what that standard

16   would be even if he didn't know the cite, and that's because

17   there is not one.  OFAC has broad discretion that when it comes

18   to restraining Americans' ability to use and enjoy their own

19   property, even when it's a minority interest in property, is

20   far too broad than the Constitution permits.

21          I want to just respond briefly to the point about Rule

22   41.  This is a novel request to address this issue in a context

23   of a motion brought under Rule 41.  The Second Circuit has

24   acknowledged and recognized that Rule 41 can be used in civil

25   proceedings where the owner of the property is not subject to a

K8DQusvO

criminal indictment and, therefore, can't contest seizure in a

pending criminal case.  I see no reason that the Court, and

I've heard none articulated by the government today, why the

same principles that animated the drafters of Rule 41 to

provide for an expedient remedy to return property and the

Second Circuit in determining that that remedy is available to

those who are not under criminal indictment should not be

available to Mr. Intrater here.

And it's not as if, as Mr. Jones said, Rule 41 is only

available to cure unreasonable searches and seizures and

extraordinary narrowly inappropriate government activity.  Rule

41 has often traditionally been used in a very mundane case

where the government has executed a perfectly legitimate search

warrant, taken someone to trial based on the evidence seized in

that warrant, convicted the person at trial, and just lost or

dithered and never bothered to get around to giving back to the

person from whom the property was seized in the search their

property back.

That sort of mundane issue is in many respects what

we're dealing with here.  OFAC needs to give us our property

back, and we should be provided a rapid remedy to get a court

to rule on that.  The government can't demonstrate, and still

hasn't demonstrated, why they won't let us run it and get it

back, why it still has to be treated as if Vekselberg owns the

entirety of the corpus of the investment funds.  And absent

1    that, we ought to get our property back, and we ought to be

2    able to manage it in the way we see fit so long as we do not in

3    any circumstances remit any share of the benefits back to an

4    SDN.  That is sufficient for OFAC's purposes here.

5           This is not a remedy, if granted here, that would open

6    the flood gates to -- and otherwise imperil or impair OFAC's

7    overall ability to exercise its programs and to restrain the

8    activities of foreigners, narco traffickers, and terrorists.

9    All we are asking for, your Honor, is that we not be held

10   unnecessarily hostage to that effort.  That's what OFAC's

11   50 Percent Rule, that's what the absence of a standard for

12   deciding license applications, that's what the absence of a

13   time limit for acting on it imposes on American citizens; we

14   become hostages to the government's programs against

15   foreigners.  And while it may be OK to hold us hostage for

16   awhile while they will get everything sorted out, two years and

17   three months to today is too long.  For that reason, your

18   Honor, I respectfully request the Court grant our motion for

19   the return of our property so that we can get on with our

20   business.

21           I also ask that the Court deny the government's motion

22   to dismiss.  And if the Court has serious concerns that we

23   have -- that our claim should be dismissed for having failed to

24   exhaust administrative remedies, I would request that your

25   Honor give us an opportunity to submit supplemental briefing

K8DQusvO

 1    about why we don't think that's required in order to preserve

 2    the constitutional claims that we've asserted in our lawsuit.

 3              Thank you, your Honor

 4              THE COURT:  Thank you, Mr. Owens.

 5              Gentlemen, thank you.  I will try to get back to you

 6    as quickly as possible.  This has been helpful.  I want to get

 7    a copy of the transcript, and I will go back through the

 8    documents.

 9              MR. OWENS:  Thank you, your Honor.

10              MR. JONES:  Thank you, your Honor.

11              (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25